**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095

**Counsel for Plaintiffs and the Proposed Class**
[Additional Counsel listed on Signature Page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARLERY FRANCO., <br> individually and on behalf of all others <br> similarly situated, <br><br>             Plaintiffs, <br><br>   -against- <br><br> CONNECTICUT GENERAL LIFE INSURANCE <br> CO., CIGNA CORPORATION, and CIGNA <br> HEALTH CORPORATION, <br><br>          Defendants. | **SECOND AMENDED** <br> **CLASS ACTION** <br> **COMPLAINT** <br><br> **JURY TRIAL FOR ALL** <br> **CLAIMS SO TRIABLE** |

Plaintiff, Darlery Franco ("Franco" or "Plaintiff") , for her Second Amended Class

Action Complaint ( "Amended Complaint") against Defendants, Connecticut General Life

Insurance Company, Cigna Corporation and Cigna Health Corporation (collectively, "CIGNA"

or "Defendants"), alleges upon personal knowledge as to herself and her own acts, and upon

information and belief as to all other matters, based upon, *inter alia*, the investigation made by

and through her attorneys, as follows:

## SUMMARY OF CLASS ACTION CLAIMS

1.     Plaintiff Franco brings this case as a class action, alleging violations of the Employee Retirement Insurance Security Act of 1974 ("ERISA) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of contract for non-ERISA plans and breach the New Jersey Regulation for small employer plans, as described herein.  As a member in a fully-insured group plan insured by CIGNA, she has been harmed by underpayments made by CIGNA for services provided by out-of-network providers.  Those underpayments are pervasive and result from systematic operating procedures employed by CIGNA affecting millions of members every year.

2.     CIGNA members and dependents (hereinafter "members") pay an increased premium for the right to choose to use out-of-network or non-participating ("ONET" or "Nonpar") providers for health care services.  CIGNA contractually promised that it will pay Nonpar providers at the lesser of the billed charge or the usual, customary and reasonable ("UCR" also known as "U&C" and "R&C") amount for the service rendered by Nonpar providers.  CIGNA contractually promises its members that the UCR for a service is the "prevailing charge" charged by most providers of comparable services in the locality where the member received the service, with consideration given to the nature and severity of the member's condition, as well as any complications or unusual circumstances  involved that would require additional time, skill, or experience on the part of the Nonpar provider.  To price Nonpar claims, during the Class Period CIGNA typically used the Ingenix database, which fails to comply with the definition of UCR contained in CIGNA's insurance contracts.

3.     When CIGNA used Ingenix data to price Nonpar claims, it failed to disclose critical facts about the Ingenix data and the Ingenix methodology that CIGNA used to make its ONET reimbursement decision.  CIGNA's non-disclosure of material facts prevented its

members from effectively challenging or appealing its UCR determinations. Although CIGNA is aware of serious, systemic flaws in the Ingenix database, CIGNA concealed those flaws in its written communications with its members. For example, the Ingenix database averages the charges of both physicians and other healthcare providers who are not medical doctors. It also fails to consider provider-specific, patient-specific and procedure-specific factors affecting charges. These and other flaws were not disclosed to members by CIGNA, in violation of its fiduciary obligations.

4.      During the class period, CIGNA used other methods for determining UCR when Ingenix "actual data" was unavailable. In the absence of Ingenix "actual data," CIGNA used what it calls a "behind-the-scenes program" to calculate UCR. CIGNA's "behind-the-scenes program" averaged charge data from all zip codes with a minimal amount of data for that CPT code, and then priced UCR with a secret, undisclosed formula which did not comply with the member's contract with CIGNA and was known only to CIGNA.

5.      During the Class Period, CIGNA used an older, outdated version of Ingenix to price UCR, in violation of the member's contract and without the required disclosure to its members.

6.      During the Class Period, CIGNA priced Nonpar provider claims using a percentage of the average wholesale price, or "AWP." CIGNA's use of AWP continued even after CIGNA lost two cases in federal district court in New York rejecting its use of AWP to price Nonpar provider claims.

7.      Whether it used Ingenix "actual data," its own "behind-the-scenes program," outdated Ingenix data, AWP, or some other methodology to price UCR for Nonpar providers,

CIGNA underpaid its members. Collectively, its UCR pricing methods are referred to herein as "CIGNA's Nonpar Pricing Methods."

8.    CIGNA's Nonpar Pricing Methods violated CIGNA's contractual obligations to its members, and violate federal and state law as herein described.

## SUMMARY OF RELIEF SOUGHT IN THIS CLASS ACTION

9.    As alleged in this Amended Complaint, CIGNA breached the terms of its health plans. In addition to making invalid UCR determinations, CIGNA further reduced or minimized Nonpar provider payments by using multiple surgical, assistant and co-surgeon reductions that were not adequately disclosed to its members. In this class action, Plaintiff and the members of the defined Classes seek reimbursement for their unpaid benefits, as well as other appropriate equitable and legal relief to remedy CIGNA's ongoing violations of federal and/or state law.

## JURISDICTION, VENUE AND PARTIES

10.    Subject matter jurisdiction exists under § 502 of ERISA, 29 U.S.C. § 1132; § 1964 of RICO, 18 U.S.C. § 1964, and the federal question statute, 28 U.S.C. § 1331. Plaintiff seeks to represent all similarly situated members as set forth in the Class definitions stated in Paragraph 74 of this Amended Complaint.

11.    Venue is appropriately established in this District under the applicable federal venue statute, 28 U.S.C. § 1391, and § 1965 of RICO, 18 U.S.C. § 1965, because CIGNA conducts a substantial amount of business in this District. Venue is also appropriate in this District because Plaintiff Franco is a New Jersey resident and a member of a health plan sponsored by a New Jersey employer.

12.    CIGNA is incorporated in Connecticut and its principal place of business is located in Connecticut. Many of the Explanation of Benefit ("EOB") records and other official communications regarding Plaintiff's health plan list Connecticut General Life Insurance

Company as the responsible entity; however, other EOB records and certain appeals notices list "CIGNA" or "CIGNA Health Care" as the responsible entity. Throughout this Amended Complaint, Defendants are collectively referred to as "CIGNA."

## PLAINTIFF'S EXPERIENCE WITH CIGNA

13.     During the Class Period, CIGNA failed to comply with the terms of Plaintiff's health plans by systematically making UCR determinations that reduced the allowable amount without valid or compliant data to support such determinations.

14.     Plaintiff Franco is a young woman who suffered complete facial paralysis on the left side of her face from nerve damage inflicted by the use of forceps during her birth in Colombia. She required facial reanimation surgery to restore proper functioning to her facial muscles and to repair nerve damage.

15.     While she was a college student and a dependent of her father's insurance plan with CIGNA, Plaintiff Franco applied to CIGNA for preauthorization for the surgery she needed. CIGNA declined to preauthorize the surgery, so Ms. Franco decided to wait until she was insured under her own insurance policy.

16.     After graduating from college, Ms. Franco became employed by the Hispanic Women's Center in Newark, New Jersey, which, until July 2003, insured its employees through CIGNA. Ms. Franco taught English to adults who are preparing for U.S. citizenship.

17.     Ms. Franco selected Dr. Elliott Rose (who in turn chose Dr. Fred Valauri to work with him) to perform her microsurgery because of his vast experience with facial surgery and his familiarity with the complex surgical procedures she required, including grafting nerves from other parts of her body into her face.

18.     CIGNA preauthorized the full amount of her surgeons' charges in advance of the surgery. On June 18, 2003, Dr. Rose and Dr. Valauri performed the all-day surgery on Plaintiff Franco.

19.     Despite its preauthorization of Dr. Rose and Dr. Valauri's charges in advance of the surgery, CIGNA's reimbursement to Plaintiff Franco was for *less **than one-half*** of the preauthorized amount; in fact, CIGNA paid only $25,000 out of the surgeons' total charges of $64,000. By failing to pay an appropriate amount, CIGNA's underpayment left Franco owing nearly $40,000 to her surgeons.

20.     Plaintiff Franco appealed CIGNA's denial of full reimbursement. In a final appeal decision dated December 29, 2003, CIGNA advised Franco that it was providing additional reimbursement of 25% for the services provided by Dr. Rose and, therefore, paid an additional $5,000, for a total of $30,000 in all. CIGNA's final determination still left Plaintiff Franco owing $34,000 to Dr. Rose and Dr. Valauri. Even after a final appeal, CIGNA paid less than one-half of their full billed charges, and Franco was financially responsible to them for all unpaid amounts.

21.     CIGNA sent Franco Explanation of Benefit ("EOB") records stating that the surgeons' charges purportedly exceeded the "prevailing charge" for the geographic area where the service was performed (which was Manhattan). The EOBs reflect CIGNA's use of UCR to reduce reimbursement amounts.

22.     CIGNA's EOBs sent to Plaintiff Franco were both uninformative, false and misleading.

23.     CIGNA's September 18, 2003 EOB sent to Franco stated that a "contract schedule applied." The UCR allowance is described in a column called "Contract amount." On

the reverse side of the EOB, "Contract amount" is defined as "[t]he negotiated charge agreed to by the provider." These references to a "contract" are false and misleading. Dr. Rose was a Nonpar provider and no "contract" or "contract schedule" exists between him and CIGNA. Contrary to the EOB, Dr. Rose had not "agreed to" *any* negotiated amount.

24.    CIGNA disallowed over $4,000, stating that a particular billed charge "is not typically performed on the same date of service as the other billed procedures." CIGNA did not say what the basis was for this conclusion, and did not specify which particular procedure it was referring to. CIGNA's EOB refers to "surgery inpatient" for all procedures, and does not list the particular CPT code, making it impossible for the member to understand what payment relates to a particular procedure.

25.    CIGNA disallowed amounts on the basis of UCR, stating: "Payment reflects prevailing charge for service in your area." CIGNA's EOB does not say how it calculated the "prevailing charge" and whether Ingenix data (or some other data or methodology) was used to compute it.

26.    Nonpar providers (such as Dr. Rose) are entitled to receive full payment of their billed charges and are not compelled to accept payments from CIGNA that are less than their actual charges for the services they provide. Only in-network providers are contractually obligated to accept CIGNA's discounted fees as payment in full.

27.    CIGNA's September 16, 2003 EOB sent to Franco for co-surgeon Dr. Valauri made the same erroneous statements as the EOB sent to Franco regarding Dr. Rose. CIGNA referred to "Contract amount" and a "Contract schedule" when Dr. Valauri, as a Nonpar provider, had no contract with CIGNA and had not agreed to any negotiated amount with

CIGNA. CIGNA paid less than one-half of Dr. Valauri's billed charges for the surgery on June 18, 2003.

28.    By letter dated October 20, 2003, Dr. Rose appealed the "unwarranted reduction of benefits" on behalf of Plaintiff Franco. The appeal letter noted that CIGNA's payment was less than 40% of the billed amount, "leaving the patient an out-of-pocket responsibility of $38,990."

29.    In an appeal determination dated December 29, 2003, CIGNA notified Franco that CIGNA would make "an additional payment of 25% for services provided by Dr. Elliott Rose on June 18, 2003." CIGNA did not tell Franco the basis for the additional payment, and did not tell Franco what pricing method CIGNA used either initially or during the appeal. Finally, CIGNA did not address why it was refusing to pay over $34,000 that was left unpaid.

30.    CIGNA's December 29, 2003 appeal decision letter was misleading and violated Franco's rights under federal law. It did not state the reasons for CIGNA's denial of benefits, or provide any of the information required by ERISA regulations. It prevented Franco from understanding why CIGNA was continuing to deny over $34,000 in benefits and deprived her of an effective challenge of that denial.

31.    As of June 30, 2003, Franco was no longer covered by the ACSA Trust plan insured by CIGNA.

32.    Franco became employed by the City of Newark and again became insured by CIGNA in 2005.

33.    On September 13, 2005, Franco had another stage of facial reanimation surgery with Dr. Rose.

34.     CIGNA issued an EOB dated October 7, 2005 in which it again listed "surgery services" without differentiation and without noting particular CPT codes. CIGNA covered less than 50% of the billed charges, leaving over $16,000 unpaid.

35.     CIGNA's EOB does not say why CIGNA is not paying for more than one-half of the charges. It does not refer to UCR or "prevailing charges" or any pricing method whatsoever.

36.     CIGNA issued a "Benefits Statement" to Franco on February 17, 2006. (CIGNA Healthcare of New Jersey, Inc. issued it as an agent of Connecticut General Life Insurance Company.) The February 17, 2006 Benefits Statement advised Franco that "patient responsibility" was $4,950 but it failed to provide critical information about the services it was discussing, how CIGNA determined the amount of her responsibility, what pricing method was used, or any other information.

37.     CIGNA's Benefit Statements fail to provide legally required information.

38.     CIGNA breached its contractual obligations to Plaintiff Franco by using Nonpar Pricing Methods to reduce payments for her facial surgery that were inconsistent with CIGNA's contractual obligations. CIGNA did not adequately disclose these reimbursement policies and protocols to Plaintiff, as required by applicable federal law. CIGNA also issued EOBs, Benefit Statements and appeal letters that did not comply with legal requirements.

## THE INGENIX DATABASE

39.     Upon information and belief, at all relevant times Defendant CIGNA relied upon and utilized the Ingenix databases (known as PHCS and MDR) to make UCR determinations. As set forth below, Ingenix data cannot accurately or properly determine UCR.

40.     In October 1998, Ingenix, Inc. ("Ingenix"), a wholly-owned subsidiary of United HealthCare Group, purchased a UCR database from the Health Insurance Association of America ("HIAA"), an insurance trade association.

41.    Since 1973, HIAA had produced and marketed its database primarily to insurers, such as CIGNA.  HIAA informed the data purchasers (including CIGNA) that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose.  In fact, HIAA released its data with a disclaimer that specifically stated, in relevant part, as follows:

> The data are provided to members [*i.e.*, insurance companies such as Defendants] for informational purposes only and the HIAA disclaims any endorsement, approval or recommendation of the data.  There is neither a stated nor implied "usual and customary" charge.

42.    Once Ingenix acquired the PHCS database from HIAA in 1998, it continued to use substantially the same disclaimer in its communications with insurers including CIGNA.

43.    Nevertheless, during the Class Period, CIGNA used (and continues to use) the Ingenix data as the primary source of data upon which it bases its UCR determinations, even though CIGNA knows that it cannot and should not be used for that purpose.

44.    CIGNA's Standard Operating Procedure (which is "confidential" and "unpublished" and whose distribution is "limited solely to authorized personnel" within CIGNA) acknowledges:  **"PHCS data is published by Ingenix.  Ingenix provides proprietary data to subscribers but does not determine R&C amounts."**

45.    Despite CIGNA's awareness that the Ingenix data "does not determine R&C amounts," CIGNA knowingly used Ingenix data to price UCR for its members.

46.    Despite CIGNA and Ingenix's mutual knowledge that the Ingenix data did not determine UCR, CIGNA and Ingenix both defended the Ingenix data when questioned about UCR determinations based on it. By agreement, CIGNA relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data.  Ingenix promised to supply witnesses in court in the event CIGNA's use of Ingenix data was challenged.  In the course of appeals and responding to other questions from CIGNA members, Ingenix provided graphs and other details,

vouching for the accuracy and legitimacy of its data. CIGNA then used the detail from Ingenix to vouch for the Ingenix data to the CIGNA member or provider who was questioning UCR.

47. There are a number of flaws in the Ingenix data which makes it an invalid and inappropriate basis for setting UCR rates because Ingenix:

(a) Does not determine the numbers or types of providers in any geographical area;

(b) Does not determine the actual types of procedures within a geographic area;

(c) Collects charge data which is not representative of the actual number of procedures performed within a geographic area;

(d) Does not collect sufficient provider-specific data to enable its users to determine whether the charges are from one provider, from several providers, or from only a minority of the providers in a geographic area;

(e) Does not collect sufficient data to enable its users to determine whether the data reflects the charges of providers with any particular degree of expertise or specialization;

(f) Fails to compare providers of the same or similar training and experience level and, instead, combines and averages all provider charges by procedure code without separating the charges of physicians and non-physicians;

(g) Does not collect patient specific information such as age or medical history or condition;

(h) Does not ascertain the most common charge for the same service or comparable service or supply;

(i) Does not determine the Place of Service (POS) or type of facility;

(j) Does not collect sufficient data to enable it or its users to determine an appropriate medical market for comparing like charges;

(k)    Combines zip codes inappropriately;

(l)    Uses zip codes instead of appropriate medical markets;

(m)    Fails to compare procedures that use the same or similar resources (and other costs) to the provider but, rather, indiscriminately combines all provider charges by procedure code without regard to such factors;

(n)    Fails to compare procedures of the same or similar complexity by, among other things, failing to record or account for CPT code modifiers;

(o)    Does not use an appropriate statistical methodology;

(p)    Does not properly consider charging protocols and billing practices generally accepted by the medical community or specialty groups;

(q)    Does not properly consider medical costs in setting geographic areas;

(r)    Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

(s)    Is subject to pre-editing by data contributors;

(t)    Reports charges that are systemically skewed downward;

(u)    Uses relative values and conversion factors to derive inappropriate UCR amounts;

(v)    Uses a methodology that does not comply with CIGNA's contractual definition of UCR; and

(w)    Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by members or their employers.

48.    These and other flaws render CIGNA's use of Ingenix data invalid and unlawful for determining UCR. All past UCR determinations based on Ingenix data should be overturned because they were based on a noncompliant and invalid database.

49.    By systematically and typically making UCR determinations without compliant and valid data to substantiate its determinations, during the Class Period CIGNA has breached its obligation to comply with its health plan contracts with Plaintiff and Class members.

50.    Since before 1998 and through the present date, CIGNA contributed claims data to Ingenix and received a discount on the purchase of the Ingenix database.

51.    Ingenix and CIGNA both know the database was noncompliant, flawed and biased, and not an appropriate basis for UCR determinations.

### CIGNA's Other Pricing Methods Used to Reduce Payment for Nonpar Providers Other Than Ingenix

52.    As a further means of reducing ONET reimbursement for services rendered by Nonpar providers, CIGNA uses pricing methods in addition to Ingenix.

53.    CIGNA knowingly used outdated Ingenix data, which it internally referred to as "old" data, to price claims for its members' Nonpar provider claims, including those in plans governed by the New Jersey Regulation, as described in ¶67. That Regulation required all updates to be loaded within 60 days - a requirement with which CIGNA almost never complied.

54.    CIGNA did not use Ingenix data if it did not report a certain number of charges for a given CPT code. Each CIGNA claims platform applied its own standard to determine the number of charges in the Ingenix data which would trigger the use of its default formula.

55.    Whenever the minimum number of charges were not present in Ingenix data, each of CIGNA's claim systems applied its own default formula to calculate UCR.

56.     CIGNA's default formula at times involved use of conversion factors and relative values. Other times, default formulas involved using outdated Ingenix data. As CIGNA itself noted, CIGNA system wide uses an "inconsistent number of occurrences (i.e., each system uses a different # of occurrences and default formulas)." In 2002, CIGNA personnel noted: "We are very inconsistent when there are less than 9 occurrences/charges on the Ingenix data. We already knew this because the systems each have their own 'default R&C' calculations."

57.     CIGNA did not tell its members that "default" formulas were used to price UCR. CIGNA members had no way of knowing that a "default" formula had been used to price UCR, nor the method inherent in such default formula.

58.     CIGNA described one of its default formulas as a "behind-the-scenes" program. In September 2001, CIGNA personnel described a "behind-the-scenes" program to calculate UCR as follows:

> Yes, you can say that if we receive less than 10 reportings [charges] on a SURGICAL procedure, a behind-the-scenes-programs [sic] calculates the U&C amount by averaging the reportings for all zips associated with that procedure that have more than 4 reportings. If there are less than 4 reportings for all zips associated with the procedure, then the procedure does not get updated at all.
>
> As for how it gets different amounts for the different zips, Step 5 is where that happens. Factors are calculated for the mean and each of the percentiles for each zip area. Then, Step 6 multiplies those factor amounts by the Relative Value for the procedure to get the amounts that are updated to the database for each zip.
>
> Please let me know if this helps. I know that it is 'clear as mud' and I will try to get you a more 'user friendly' explanation of this process as soon as I can get around to it.

59.     CIGNA does not advise its members when it has used a "default" formula or other "behind-the-scenes" program to price UCR for its members.

60.     Each of its "default" methods violates CIGNA's contractual obligations to members.

61.     In addition to using differing "default" formulas, CIGNA's claims platforms applied different rounding rules to price UCR. The use of different rounding rules means that a CIGNA member will receive a different UCR based solely on whether the CIGNA platform used the exact Ingenix dollar amount or applied rounding rules.

62.     CIGNA did not tell its members that it applied different rounding rules to price UCR. CIGNA members had no way of knowing whether, and how, rounding rules were used to price UCR for their particular benefits.

63.     The inconsistent pricing of UCR across CIGNA's numerous claims platforms means that CIGNA members received different UCR amounts for the same date, same procedure in the same geographic area simply due to the fortuity of which claims platform processed their claim.

64.     The inconsistent UCR determinations system wide also undermined the consistency and fairness of CIGNA's appeal process. As noted internally by CIGNA, there is an "inconsistent handling of R&C during the appeal process, including handling of large R&C cuts." Making a bad situation worse, customer service personnel at CIGNA quoted UCR to members based a particular claims platform, when the member's actual UCR might be processed differently on a different claims platform. CIGNA itself recognized that it was quoting wrong UCR amounts to members.

65.     Another pricing method used by CIGNA was to automatically reduce coverage for multiple procedures performed on the same day or during the same session, even if the additional procedures were unrelated to what CIGNA considers to be the initial procedure.

CIGNA also paid significantly reduced amounts to Nonpar assistant and co-surgeons who perform services for CIGNA members. By so doing, CIGNA made Nonpar pricing determinations that dramatically reduced amounts in violation of the terms of their health plan contracts. Plaintiff Franco and Class Members were harmed by CIGNA's use of these undisclosed multiple surgical and assistant and co-surgeon policies and protocols which reduced Nonpar reimbursement amounts.

66.    By using Ingenix data and other Nonpar Pricing methods to reduce reimbursements in ways that are not disclosed in CIGNA's health plans with Plaintiff and Class members, CIGNA violated, and continues to violate, its legal obligations to Plaintiff and Class members.

67.    CIGNA was obligated to comply with N.J.A.C. § 11:21-7.13(a) (the "New Jersey Regulation") governing such plans. The New Jersey Regulation provides that the "…carrier shall pay covered charges for medical services on a reasonable and customary basis, or actual charges, and for hospital services, based on actual charges." It requires insurers to use the 80th percentile of the Ingenix data updates within 60 days after each update is released by Ingenix. CIGNA's Nonpar pricing methods (including underpaying hospital charges not based on actual charges, and using outdated Ingenix data or other default formulas) did not comply with the New Jersey Regulation for CIGNA's small employer plan members.

68.    In addition, whenever CIGNA used default formulas or the "behind the scenes" program to price UCR for New Jersey small employer plan members, CIGNA violated the New Jersey Regulation.

69.    CIGNA failed to provide to its members with material information regarding their ONET determinations. CIGNA's lack of disclosure and misrepresentations violates ERISA,

RICO and federal common law. By failing to give members an explanation of the basis for their UCR or other Nonpar determinations, CIGNA failed to provide the "full and fair review" required by ERISA. CIGNA has entered into an illicit agreement with Ingenix that neither will disclose database information to conceal the defects from members.

70.    CIGNA violated various fiduciary and statutory and common law duties to Plaintiff and Class members by not providing them with a full and fair appeals process and the underlying data on which they purportedly relied on to deny their benefits, and by failing to make decisions untainted by their self-interest.

71.    ERISA fiduciaries must ensure that the documentation provided to their members is complete and accurate regarding what benefits will be paid. One of the required documents is a Summary Plan Description ("SPD"), which is supposed to alert members as to benefit payment for both in-network and out-of-network providers. Federal regulations define specific minimum requirements for SPDs.

72.    CIGNA violated the SPD regulations and failed to set forth required information about UCR and Nonpar Pricing Methods in its SPDs.

73.    Plaintiff seeks unpaid benefit amounts, and legal and equitable relief for the conduct described herein, on her own behalf and on behalf of Class members, as defined herein.

## CLASS ACTION ALLEGATIONS

74.    (a)    Plaintiff Franco brings this class action on behalf of an "ERISA Class," defined as:

> All persons in the United States who are, or were, from March 1, 1998 through the date set by the Court as the outside class date, ("class period") members in group health care plan insured or administered by CIGNA subject ERISA (other than New Jersey small employer plan members), who received medical services (including hospital, ambulance, physician, mental health, pharmaceutical, or any other type of medical services or supplies)

from a Nonpar provider for which CIGNA (or anyone acting on
behalf of CIGNA) allowed less than the provider's billed charge.

(b)    Plaintiff Franco brings the class action for a non-ERISA class defined as:

> All persons in the United States who are, or were,
> from March 1, 1998 through the date set by the Court as the
> outside class date, ("class period") members in non-ERISA group
> health care plan insured or administered by CIGNA (other than
> New Jersey small employer plan members), who received medical
> services (including hospital, ambulance, physician, mental health,
> pharmaceutical, or any other type of medical services or supplies)
> from a Nonpar provider for which CIGNA (or anyone acting on
> behalf of CIGNA) allowed less than the provider's billed charge.

(c)    Plaintiff Franco brings this action on behalf of a "New Jersey SEHP
Class," defined as:

> All persons in the United States who are, or were, from
> March 1, 1998 through the date set by the Court as the outside
> class date ("New Jersey SEHP Class Period") members in any
> New Jersey small group health care plan insured or administered
> by CIGNA, who received medical services (including hospital,
> ambulance, physician, mental health, pharmaceutical, or any other
> type of medical services or supplies) from a Nonpar provider for
> which CIGNA (or anyone acting on behalf of CIGNA) allowed
> less than the Regulation required.

(d)    Plaintiff Franco brings this action on behalf of a "RICO Class," defined

as:

> All persons in the United States who are, or were, from
> March 1, 1998 through the date set by the Court as the outside
> class date ("RICO Class Period"), members in any health plan
> insured or administered by CIGNA who received medical services
> (including hospital, ambulance, physician, mental health,
> pharmaceutical, or any other type of medical services or supplies)
> from a Nonpar provider for which CIGNA (or anyone acting on
> behalf of CIGNA) allowed  less than the provider's billed charge.

(e)    Plaintiff Franco brings  this action on behalf of a "RICO Section 664

Subclass," defined as:

All persons in the United States who are, or were, from March 1, 2001 through the present ("RICO Section 664 Subclass Period"), members in any health care ERISA plan insured or administered by CIGNA who received medical services (including hospital, ambulance, physician, mental health, pharmaceutical, or any type of medical services or supplies) from a Nonpar provider for which CIGNA (or anyone acting on behalf of CIGNA) allowed less than the provider's billed charge.

## COMMON CLASS CLAIMS, ISSUES AND DEFENSES

75.    The following common class claims, issues and defenses pertain to Plaintiff and the Class:

(1.)    Whether CIGNA's use of Ingenix data or its other Nonpar Pricing Methods (including default formulas) to calculate usual, customary, or reasonable ("UCR") charges in determining Nonpar reimbursement violated ERISA, RICO or other applicable law;

(2.)    Whether CIGNA's Nonpar benefit reductions violated ERISA, RICO, or other applicable law;

(3.)    Whether ERISA requires each Class member to prove exhaustion or futility;

(4.)    Whether CIGNA's alleged fiduciary violations, if proved, justify appointment of a monitor under ERISA § 502(a)(3) or other injunctive relief;

(5.)    Whether Class members (including those who assigned claims) may recover benefits under ERISA and the method of calculation of the reimbursement;

(6.)    Whether the claim for failure to provide accurate Summary Plan Descriptions ("SPDs") and other information upon request entitles Class members to any relief;

(7.)    Whether interest should be added to the payment of unpaid benefits under ERISA;

(8.)    Whether CIGNA's claims review procedures complied with ERISA;

(9.)    The standard of review applicable to review CIGNA's adverse benefit determinations;

(10.)    The identity and scope of the ERISA and other plans subject to the Complaint;

(11.)    Whether the contractual terms of the relevant plans authorize CIGNA's Nonpar Pricing Methods to pay Nonpar provider claims;

(12.)    Whether CIGNA violated its fiduciary duties owed to its Members when it made its reimbursement decisions based on its Nonpar Pricing Methods or otherwise engaged in the conduct alleged in the Complaint;

(13.)    Whether CIGNA's failure to properly disclose the specific reason for UCR and Nonpar Pricing Methods in its Explanation of Benefits (EOBs") as well as failure to disclose material information (including the offer to disclose the relevant evidence) violated ERISA;

(14.)    Whether the Court's interpretation of the ERISA plans must be guided by the state regulators' interpretation of such plans;

(15.)    What the applicable statute of limitations periods are for the claims of Class members;

(16.)    Whether CIGNA's failure to pay interest (a) when claims were not timely paid and (b) when the UCR was increased on appeal, violated ERISA;

(17.)    Whether CIGNA violated the New Jersey Regulation for all small employer plans in New Jersey; and

(18.)    Whether CIGNA violated RICO and, if so, the appropriate damages to be awarded.

### The Class Satisfies Legal Requirements

76.    The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, CIGNA insures millions of members nationwide. CIGNA also insures thousands of members who are members of New Jersey small employer plans.  The precise number of members in the Class are within CIGNA's custody and control. Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class.

77.     Plaintiff's claims are typical of the claims of Class members because, as a result of the conduct alleged herein, CIGNA has breached its statutory, plan and contractual obligations to Plaintiff and the members of the Class through and by a uniform pattern or practices as described herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action litigation and has no interests antagonistic to or in conflict with those of the Class.  For these reasons, Plaintiff is an adequate Class representative.

79.     The prosecution of separate actions by individual members of the Class  would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for CIGNA.

80.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits (under ERISA) or damages (under RICO) suffered by individual Class members may be relatively small (although significant to each of them), the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them.  Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

81.     CIGNA failed to comply with the terms of Plaintiff's and Class members' health plans by systematically and typically making UCR determinations that have underpaid benefits, in part by using noncompliant and invalid data to make its reimbursement determinations. CIGNA has also failed to comply with the terms of Plaintiff's and Class members' health plans by systematically and typically reducing reimbursement for multiple procedures and procedures

by assistant surgeons and co-surgeons, when such reductions are not authorized or adequately disclosed in the health plan contracts.

### COUNT I

**BREACH OF PLAN TERMS FOR BENEFITS AND
BREACH OF CONTRACT IN VIOLATION OF ERISA §
501(a)(1)(B) AND BREACH OF CONTRACT**

82.    The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

83.    Under the terms of the health plans of Plaintiff and Class members, CIGNA administers benefits and is a fiduciary as that term is defined by ERISA.  CIGNA makes the final decision on benefit appeals and otherwise functions in a way that makes it liable for underpaid benefits under ERISA to members in both fully insured and ASO Health Plans

84.    During the Class Period, CIGNA breached its plan provisions for benefits by underpaying UCR and other ONET reimbursement amounts.  CIGNA also breached its obligations to Plaintiff in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), by paying Nonpar provider claims less than CIGNA contractually agreed to pay.  CIGNA is liable to members whenever CIGNA breached its health plans including, but not limited to, instances where it used the Ingenix database or Nonpar Pricing Methods to calculate UCR and reimbursement for claims regarding Nonpar Providers.  In addition to liability for breach of contract under non-par ERISA claims, CIGNA is liable to Plaintiff and the Class for unpaid benefits and interest under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

85.    Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff and the members of the Class are entitled to obtain damages for breach of contract and for unpaid benefits plus interest, declaratory and injunctive relief related to enforcement of the terms of their plans, and to clarify future benefits.

## COUNT II

### FAILURE TO PROVIDE FULL & FAIR REVIEW IN
### VIOLATION OF ERISA § 502(a)(3)

86.     The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

87.     Under federal law, Plaintiff and Class members are entitled to receive a "full and fair review" of all claims denied by CIGNA.

88.     Any time CIGNA deprived members of "full and fair review", it violated § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

89.     Although CIGNA was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to § 503 of ERISA, 29 U.S.C. § 1133, and its implementing regulations, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to disclose data and/or the methodology used to determine UCR or Nonpar provider reimbursement, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

90.     Plaintiff and Class members have been harmed by CIGNA's failure to provide a "full and fair review" of appeals submitted by Plaintiffs and Class members under § 503 of ERISA, 29 U.S.C. § 1133, and by CIGNA's failure to disclose information relevant to appeals, in violation of ERISA and the federal common law.   Plaintiff and Class members  are entitled to injunctive and declaratory relief to remedy CIGNA's continuing violation of these provisions.

## COUNT III

### FAILURE TO COMPLY WITH FEDERAL CLAIMS
### REGULATIONS IN VIOLATION OF § 502(a)(3) OF ERISA

91.     The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

92.     During the Class Period and at present, CIGNA was subject to the ERISA claims procedure regulations. Plaintiff and Class members are entitled to assert a claim under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), for CIGNA's failure to comply with these requirements.

93.     Applicable federal claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to members and the like. By engaging in the conduct described herein including, but not limited to, making benefit determinations for Nonpar provider claims that are inconsistent with the terms of group health plans, by failing to give required notice to members, and failing to disclose data and/or methodology it used to determine UCR or other Nonpar reimbursements, CIGNA failed to comply with such regulations.

94.     The consequences of CIGNA's failure to comply with the regulations (as well as federal common law), are that CIGNA failed to provide reasonable claims procedures and failed to make required disclosures to Plaintiff and Class members.

95.     Members' administrative remedies are deemed exhausted *inter alia* by virtue of the invalid Ingenix database, other invalid Nonpar Pricing Methods, and CIGNA's failure to provide reasonable claims procedures. By virtue of the conduct alleged in this Amended Complaint, any appeal would have been futile.

96.     Plaintiff and Class members are entitled to injunctive and declaratory relief to remedy CIGNA's continuing violation of these provisions.

## COUNT IV

### FAILURE TO PROVIDE REQUIRED DISCLOSURES IN VIOLATION OF ERISA § 502(c)

97.     The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

98.     CIGNA's disclosure obligations under ERISA include furnishing accurate materials summarizing such group health plans, known as Summary Plan Description ("SPD") materials under § 102 of ERISA, 29 U.S.C. § 1022, and supplying information requested by members, such as Plaintiff and Class members under § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

99.     CIGNA's failure to supply accurate SPDs and accurate information is redressable under § 502(c) of ERISA, 29 U.S.C. § 1132(c).

100.    CIGNA's failure to disclose material information about its UCR and other Nonpar Pricing Methods (including default formulas and rounding rules) violates federal common law, which obligates fiduciaries such as CIGNA to provide material information to members.

101.    Plaintiff and Class members have been proximately harmed by CIGNA's failure to provide accurate information, in violation of federal common law, § 102 of ERISA, 29 U.S.C. § 1022, and § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), and are entitled to injunctive and declaratory relief to remedy CIGNA's continuing violation of these provisions.

## COUNT V

### VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE IN VIOLATION OF § 404 OF ERISA

102.    The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

103.    During the Class Period, CIGNA acted and continues to act as a fiduciary to Plaintiff and Class members in connection with their health plans, as the term fiduciary is interpreted under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).(Check Cite)  At such times, CIGNA also acted and acts as a fiduciary for self-insured plans, including by deciding those members' final appeals.

104.    As a functional fiduciary under ERISA and as a claims fiduciary making final appeal decisions for self-insured plan members, CIGNA owes members in such plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan, in accordance with § 404(a)(1)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(B) and (D). In failing to act prudently, and in failing to act in accordance with the documents governing the plan, CIGNA violated its fiduciary duty of care.

105.    As a fiduciary of health plans under ERISA, CIGNA owed members a duty of loyalty, defined as an obligation to make decisions in the interest of members, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with § 406 of ERISA, 29 U.S.C. § 1106.   Thus, CIGNA cannot make benefit determinations for the purpose of saving money at the expense of its members.

106.    During the Class Period, CIGNA violated (and continues to violate) its fiduciary duty of loyalty, *inter alia*, by using Ingenix and other Nonpar Pricing Methods (including default formulas and rounding rules) that benefited itself at the expense of members.  In addition, CIGNA violated (and continues to violate) its fiduciary duty of loyalty by failing to inform members of material information, including but not limited to flaws in the Ingenix database and its other Nonpar Pricing Methods (including default formulas and rounding rules) that preclude its appropriate use to determine UCR reimbursement.  In fact, during the Class Period, by using the U.S. mails and interstate wire facilities, CIGNA made representations *inter alia* about the Ingenix database that it knew were untrue.  As a data contributor to the Ingenix database, CIGNA knew many of the flaws that makes the Ingenix data an inappropriate basis for UCR.

107.    In relying on the Ingenix database or other Nonpar Pricing Methods (including default formulas and rounding rules), which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, *inter alia*, a reduction for multiple procedures that was not authorized and nowhere disclosed to members in their plan documents, CIGNA violated its fiduciary obligations to Plaintiff and Class members.

108.    Plaintiff and Class members are entitled to assert a claim for relief for CIGNA's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including restitution, injunctive and declaratory relief, and may seek removal of any fiduciary that breached its duties.

**COUNT VI**

**VIOLATION OF THE NEW JERSEY REGULATION**

109.    The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

110.    At all times relevant to this class action, CIGNA was legally obligated to comply with New Jersey law and regulations for members in New Jersey. For members in health plans with 50 or fewer members, CIGNA must comply with the law and regulations governing small plans including, but not limited to, N.J.A.C. § 11:21-7.13(a) (the "New Jersey Regulation").

111.    Under the New Jersey Regulation, CIGNA must pay Nonpar hospital services based on actual charges. CIGNA must also pay Nonpar medical services using the 80th percentile of the Ingenix database with each new updated version loaded within 60 days.

112.    Under the New Jersey Regulation, CIGNA cannot make reductions based on multiple surgery, assistant surgeons, or co-surgeons for New Jersey small plan members.

113.    During the Class Period, CIGNA's UCR and other Nonpar Pricing Methods (including default formulas and rounding rules, use of Outdated data, use of unauthorized data to

price reimbursement, reductions based on multiple surgical procedures or for assistant and co-surgeons, use of average wholesale price data) violated the New Jersey Regulation.  Class Members are entitled to recover unpaid benefits where CIGNA's payments were in derogation of the New Jersey Regulation.  They are also entitled to obtain injunctive, declaratory and equitable relief to ensure past and future compliance with the law.

**COUNT VII**

**VIOLATIONS OF RICO**

114.    The allegations in this Amended Complaint are realleged and incorporated by reference as if fully set forth herein.  This claim is asserted by Plaintiff on her own behalf and on behalf of RICO Class members.

115.    At all relevant times, CIGNA was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

116.    At all relevant times, and as described in this Amended Complaint, CIGNA carried out its underpayment scheme to defraud Plaintiff and Class members in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of CIGNA and Ingenix (the "CIGNA-Ingenix Enterprise" or the "Enterprise").

117.    At all relevant times, the CIGNA-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

118.    As described herein, the CIGNA-Ingenix Enterprise has and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which CIGNA has engaged.  In addition, the members of the CIGNA-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure. The members of the CIGNA-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this Amended Complaint, including the provision of

health insurance and plan and claims administration services by CIGNA, which was done for many claims lawfully and without resort to unlawful practices. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the CIGNA-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Amended Complaint including, but not limited to, intentional underpayment of benefits to Plaintiff and Class members resulting from CIGNA's use of flawed and invalid data for its UCR determinations.

119.    The purpose of the CIGNA-Ingenix Enterprise was to create a mechanism or vehicle by which CIGNA could reduce benefit payments to Plaintiff and Class members for services rendered by Nonpar providers through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively. In particular, as described herein, the CIGNA-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they are and were invalid. Through their roles in the CIGNA-Ingenix Enterprise, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix databases and indirectly through the monies saved by United Healthcare, its parent corporation, while CIGNA benefited by reducing the amount of benefits it paid to Plaintiff and Class members for services provided by Nonpar providers through the use of the Ingenix Databases to price UCR. (During the Class Period, Ingenix also used data submitted by data contributors, such as CIGNA, to create other products, the licensing and sale of which directly benefited Ingenix.)

120.    As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases (including CIGNA), CIGNA continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its data users (including CIGNA) were using the Ingenix databases improperly to make UCR determinations. At the same time it was issuing a disclaimer in a misguided effort to provide itself (and United Healthcare, its parent company) with legal protection, Ingenix was also promoting the Ingenix Databases as a cost-savings mechanism that could save substantial sums to those (such as CIGNA) who improperly used and relied upon them in making UCR determinations.

121.    Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users (including CIGNA). Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. Thus, CIGNA and Ingenix expressly observed the disclaimer in the breach, despite the fact that the disclaimer correctly stated that the Ingenix Databases could *not* be used as a basis for making UCR determinations. CIGNA provided data to Ingenix which it knew would be edited by Ingenix in a manner which precluded its use for UCR.

122.    Similarly, as alleged herein, Ingenix and CIGNA knew that UCR data is invalid if it fails to reflect necessary information. CIGNA knew that Ingenix actually used only four basic data points (billed charge, the first 3 digits of the provider zip code, date of service and five digit CPT code without modifier) to produce the final Ingenix database. Both CIGNA and Ingenix knew that the Ingenix data was invalid for use as UCR, but CIGNA consummated the fraud in which CIGNA continued to send the four data points to Ingenix and Ingenix continued to use the four data points to create the invalid UCR database which it sent to CIGNA to underprice UCR.

123.    Ingenix not only sought and accepted CIGNA's incomplete data, it continued to provide a significant discount to CIGNA and to provide "litigation support" for UCR pricing made by CIGNA using the Ingenix data. Ingenix also failed to conduct any audits or reviews of the data it received from data contributors, including CIGNA. These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the CIGNA-Ingenix Enterprise.

124.    CIGNA's submission of data to Ingenix benefited Ingenix, and users of the Ingenix databases, including United Healthcare (Ingenix's parent company), and CIGNA.

125.    Ingenix and CIGNA knew that the Ingenix databases were being used without Plaintiff and Class members ever being informed of the disclaimer or the inherent flaws in the Ingenix databases. For example, CIGNA falsely reported to Class members, via U.S. mail and interstate wire communications, that its reductions in amounts paid for ONET services were based on UCR when, in fact, the reductions were based on flawed and invalid numbers obtained from the Ingenix databases that substantially underreported UCR. During the Class Period, CIGNA referred overpayment recovery actions against its members to collection agencies based on the flawed Ingenix data. At the same time, CIGNA ensured that lawfully required information concerning ONET benefit reductions was not disseminated to Plaintiffs and Class members, in violation of CIGNA members' EOCs and federal law.

126.    During the Class Period, CIGNA participated in the conduct of the CIGNA-Ingenix Enterprise in order to shift the costs of medical treatment provided by ONET health care providers from CIGNA to its members, to reduce CIGNA's UCR payments and to create an appearance of legitimacy for its ONET benefit reductions. Using U.S. mail and interstate wire facilities, CIGNA provided false and misleading information to Plaintiff and Class members to

convert those withheld funds for the CIGNA-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its members from using ONET health care providers. Because CIGNA saves money when participating providers render services, the operations of the CIGNA-Ingenix Enterprise saved CIGNA money at the expense of Plaintiff and Class members. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by CIGNA and other users of the Ingenix databases, which would not have been obtained absent entry into the CIGNA-Ingenix Enterprise and was, in addition to the conduct of CIGNA alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

127.    CIGNA further used the Enterprise to facilitate its goal of reducing ONET benefits paid to Plaintiff and Class members by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix databases and which CIGNA relied upon to make UCR determinations.    As part of this fraudulent scheme, as alleged herein, CIGNA intentionally submitted, via U.S. mail and interstate wire facilities, data which it knew would be used to create false databases used to price UCR for its members and members of other health care plans.    Neither Ingenix nor its parent company, United Healthcare, took steps to stop or prevent or reject inadequate data that Ingenix received from CIGNA and other data contributors.    Ingenix was aware of the inadequacy of data contributed by data contributors such as CIGNA, but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR.

128.    If CIGNA had not participated in the conduct of the CIGNA-Ingenix Enterprise by submitting inadequate data to Ingenix, and using the Ingenix database, it would not have been able to obtain the benefits it did from the Enterprise.    Ingenix needed sufficient data to allow it to

represent to its customers that the Ingenix databases were the largest available and had sufficient numbers to remove any doubt as to their validity. CIGNA knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity. Ingenix needed the data to provide databases to its users to save them money on Nonpar provider claims. Without data from CIGNA and other large data contributors, the Ingenix Databases could not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, CIGNA could not have saved the millions of dollars it did if it had not used the Ingenix databases for making UCR determinations even though it knew that they were flawed and invalid. By using the Ingenix Databases for making its UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, CIGNA was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and United Healthcare.

129.    Despite their mutual knowledge that the Ingenix data did not determine UCR, CIGNA both defended the Ingenix data when questioned about UCR determinations based on it and by agreement relied on Ingenix to provide detailed "support" so it could defend its use of Ingenix data. Ingenix promised to supply witnesses in court in the event CIGNA's use of Ingenix data was challenged. In the course of appeals and other questions from CIGNA members, Ingenix provided graphs and other details, vouching for the accuracy and legitimacy of its data. CIGNA then used the detail from Ingenix to vouch for the Ingenix data to the CIGNA member or provider who was questioning UCR.

130.    Through its wrongful conduct as alleged herein, CIGNA, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

131.    CIGNA, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for ONET services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

(a)    mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters from physicians regarding preauthorization approval(s) and/or appeals (such as the March 13, 2003, October 20, 2003, and December 2, 2004 letters from Plaintiff Franco's physician, Dr. Elliott H. Rose to CIGNA); preauthorization approvals (such as the May 23, 2003 and September 8, 2005 letters from CIGNA to Plaintiff Franco); claim forms (such as the Health Insurance Claim Form submitted by Plaintiff Franco's physician to CIGNA dated June 25, 2003); materially false and invalid UCR determinations and EOBs (such as the September 16, 2003 EOB sent by CIGNA to Plaintiff Franco, and the October 7, 2005 EOB sent by CIGNA to Plaintiff Franco's physician); and materially false and misleading "Explanation[s] of Payment[s]" ("EOP") (such as the September 19, 2003 EOP sent by CIGNA to Plaintiff Franco's physician), for the purpose of saving CIGNA money at Plaintiff's and Class members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and

(b)    transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals (such as the June 2, 2003 facsimile sent by CIGNA to Plaintiff Franco); materially false UCR determinations and related explanation of such determinations, by means of telephone, facsimile and the

Internet, in interstate commerce, for the purpose of
effectuating the above-described false payment schemes,
and each such transmission constituting a separate and
distinct violation of 18 U.S.C. § 1343.

132.    CIGNA issued false and misleading letters to members and providers regarding

benefits, as well as false and misleading EOBs and EOPs. CIGNA instructed its claims personnel

to make ONET benefit reductions that were contrary to law and its members' EOCs and SPDs.

CIGNA knew that the data it contributed to Ingenix was inadequate and lacked required data

fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee

schedules, but CIGNA continued to use the Ingenix databases to make UCR determinations

anyway.

133.    In furtherance of its underpayment scheme for ONET services, CIGNA, in

violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S.

mail and interstate wire facilities to further all aspects of the intentional underpayment to

Plaintiff and Class members by delivering and/or receiving materials, including EOCs and SPDs,

EOBs, EOPs to Nonpar providers, Benefit Statements, appeal determinations and other materials

necessary to carry out the scheme to defraud Plaintiffs and Class members.

134.    The foregoing communications, sent via U.S. mail and interstate wire facilities,

contained false and fraudulent misrepresentations and/or omissions of material facts, had the

design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR

determinations, and/or otherwise were incident to an essential part of CIGNA's scheme to

defraud Plaintiff and Class members described in this Amended Complaint. Further, such

written communications were used by CIGNA to provide the underpayment scheme for ONET

services with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and

complaint of the underpayment scheme for ONET services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

135.    As named fiduciaries and claims administrators of various of the CIGNA plans, CIGNA occupied and occupies a position of trust and it had, and has, a special relationship with its members that requires it to accurately represent the terms and conditions of the CIGNA plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

136.    Each such use of the U.S. mail and interstate wire facilities alleged in this Amended Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

137.    The above-described acts of mail and wire fraud are related because they each involve common members (namely, Plaintiff and Class members), common ONET claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of CIGNA and the CIGNA-Ingenix Enterprise, such that they amount to and pose a threat of continued racketeering activity. CIGNA's scheme to defraud Plaintiff and Class members is open-ended and not inherently terminable.

138.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiff and Class members, whom CIGNA has underpaid ONET services.

139.    Plaintiff and Class members were injured by reason of CIGNA's RICO violations because they directly and immediately were underpaid benefits. CIGNA further deprived them of the knowledge necessary to challenge its underpayments. Their injuries were proximately caused by CIGNA's violations of 18 U.S.C. § 1962(c) because these injuries were the

foreseeable, direct, intended and natural consequence of CIGNA's RICO violations (and commission of underlying predicate acts) and, but for CIGNA's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

140.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and Class members are entitled to recover threefold their damages, costs and attorneys' fees from CIGNA and other appropriate relief.

## COUNT VIII

### VIOLATIONS OF RICO IN ERISA AND NON-ERISA PLANS (On Behalf Of the RICO Section 664 Subclass)

141.    The allegations in this Amended Complaint are realleged and incorporated as if fully set forth herein including, but not limited to, the allegations of Count VII describing the CIGNA-Ingenix Enterprise.   This claim is asserted by Plaintiff on behalf of herself and the members of the RICO Class who are also members of the ERISA Class.

142.    Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under    . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act.  18 U.S.C. § 1961(1)(B).  Section 664 of Title 18 provides:

> **Theft or embezzlement from employee benefit plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

143.    Each of the CIGNA healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Title I of ERISA is included in this Count, including Plaintiff Franco's plan(s).

144.    Each of the CIGNA healthcare plans that is subject to ERISA or is a non-ERISA plan funded by insurance coverage CIGNA provides or administers.    The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

145.    Plaintiff's governing plan documents warrant that all benefits due under the plans will be paid.  By improperly reducing payments on ONET claims, CIGNA intentionally caused Plaintiff and the members of the RICO Class who were *also* members of the ERISA Class (the "ERISA Section 664 Subclass") and the non-ERISA class to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

146.    For fully insured health care plans, in which CIGNA both administered the plans and paid the benefits from its own assets, CIGNA benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by CIGNA in its fiduciary capacity under ERISA and non-ERISA plans and paid to its Members, CIGNA improperly withheld such funds and maintained them as part of its own assets for CIGNA's own benefit. For self-funded health care plans, CIGNA made final appeal decisions and intentionally caused underpayment of benefits to the plan participants and members in order to justify its receipt of administrative fees.  Insurers such as CIGNA benefited in the same way, while Ingenix benefited indirectly through the savings generated by its parent, United Healthcare, and directly through the licensing fees it received from CIGNA and other insurers who used the flawed Ingenix Databases to commit RICO violations.

147.    CIGNA acted with specific intent to deprive Plaintiffs and RICO Section 664 Subclass members of guaranteed benefits, and was sufficiently aware of the facts to know that it

was acting unlawfully and contrary to the trust placed in them by Plaintiffs and RICO Section 664 Subclass members and the insurers whose plans it was administering.

148.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for CIGNA's direct or indirect benefit.

149.    As set forth above, CIGNA concocted multiple and multi-faceted schemes to make improperly reduced payments for ONET services.

150.    In furtherance of its false payment schemes, CIGNA, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. mail and interstate wire facilities to advance all aspects of the false payment schemes by delivering and/or receiving materials, including plan documents, insurance policies, summary plan descriptions, certificates of coverage, claim forms, reimbursement checks, EOBs and EOPs describing UCR determinations, appeal determinations, overpayment actions, preauthorization decisions, referrals to collection agencies, representations to regulators, and other materials necessary to effectuate the false payment schemes, as well as to contribute, edit and manipulate the source data for the Ingenix Databases.

151.    The foregoing mail communications and wire communications contained false and fraudulent misrepresentations and omissions of material facts, and otherwise were incident to an essential part of the false payment schemes and were used to provide the false payment schemes with an appearance of legitimacy and regularity, and postpone ultimate discovery and complaints of the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if no such mailings or wire transmissions had taken place, and had the

design and effect of preventing a meaningful evaluation and review of CIGNA's Nonpar Pricing Methods.

152.    As named fiduciaries and claims administrators of various of the CIGNA healthcare plans, CIGNA occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiff and RICO Section 664 Subclass members that requires it to accurately represent the terms and conditions of the CIGNA healthcare plans, and to disclose all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

153.    Each such use of the U.S. mail and interstate wire facilities constitutes a separate and distinct predicate act of "racketeering activity."

154.    The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the false payment schemes, and are continuous because they occurred over a significant period of years, and constitute the usual practice of CIGNA such that they amount to and pose a threat of continued racketeering activity.

155.    The purpose of CIGNA's false payment schemes was to underpay the guaranteed benefits to which Plaintiff and RICO Section 664 Subclass members are entitled to under health group plans, and convert those withheld funds for its own direct or indirect financial gain. It created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiff and RICO Section 664 Subclass members, in order to increase revenue through its plan and claims administration business.

156.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiff and RICO Section 664 Subclass members, who CIGNA deprived of the complete guaranteed benefits to which they are entitled for ONET services.

157.    CIGNA's RICO violations injured Plaintiff and RICO Section 664 Subclass members by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of CIGNA's RICO violations (and commission of underlying predicate acts), and but for CIGNA's RICO violations (and commission of underlying predicate acts), Plaintiff and RICO Section 664 Subclass members would not have suffered the injuries suffered by them.

158.    As a result of its misconduct, CIGNA is liable to Plaintiff and RICO Section 664 Subclass members in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and RICO Section 664 Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from CIGNA.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial for all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and Class Members demand judgment in their favor against CIGNA as follows:

A.    Declaring that CIGNA has breached the terms of Plaintiff's and Class members' health plans, and awarding damages for breach of contract of non-ERISA plans and unpaid benefits in ERISA plans to Plaintiff and Class members, as well as awarding injunctive

and declaratory relief to ensure enforcement of plan terms and to clarify future entitlement to benefits, including enjoining CIGNA from using the Ingenix database, or from making UCR determinations in the absence of proper or reliable data substantiating the lesser amounts;

      B.    Declaring that CIGNA is liable to Plaintiff and Class Members pursuant to RICO, 18 U.S.C. § 1964(c) for threefold their damages, costs and attorney fees;

      C.    Declaring that CIGNA has failed to provide a "full and fair review" to Plaintiff and Class members under § 503 of ERISA, 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Plaintiff and Class members to ensure compliance with ERISA's requirements;

      D.    Declaring that CIGNA has violated its disclosure obligations under ERISA and the federal common law, including under § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), and § 102 of ERISA, 29 U.S.C. § 1022, for which Plaintiff and Class members are entitled to injunctive, declaratory and other equitable relief;

      E.    Declaring that CIGNA has its fiduciary duties of loyalty and care to Plaintiff and Class members, and awarding appropriate relief, including restitution, declaratory and injunctive relief to Plaintiff and Class members, including removing any breaching fiduciary;

      F.    Declaring that CIGNA has violated federal claims procedures, and awarding Plaintiff and Class members declaratory and injunctive relief to remedy such violations;

      G.    Declaring that CIGNA violated ERISA's SPD requirements, and enjoining future use of noncompliant SPDs;

      H.    Awarding New Jersey small employer plan members unpaid benefits in all instances where CIGNA failed to comply with the New Jersey Regulation, and declaratory, injunctive and equitable relief to ensure past and future compliance with New Jersey law;

I.    Awarding Plaintiff and Class members the costs and disbursements of this

action, including reasonable counsel fees, costs and expenses in amounts to be determined by the

Court;

J.    Awarding prejudgment interest; and

K    Granting such other and further relief as is just and proper.

Dated:  October 17, 2008

Respectfully submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Barry M. Epstein
Barbara Quackenbos
Lynne M. Kizis
Kevin P. Roddy

By  _Barry M. Epstein /db_
      Barry M. Epstein, Esq.

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000

**POMERANTZ HAUDEK BLOCK**
  **GROSS MAN & GROSS LLP**
D. Brian Hufford, Esq.
Robert J. Axelrod
100 Park Avenue
New York, N 10017

**SEIGEL BRILL GREUPNER DUFFY & FOSTER**
Jordan M. Lewis, Esq.
Wood Foster, Jr., Esq.
1300 Washington Ave. S
Minneapolis, MN 55401

**THE ALPERT LAW FIRM**
401 E. Jackson Street, Suite 1825
Tampa, FL 33602

**Counsel For Plaintiffs**