# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARLERY FRANCO, *et al.*,<br><br>                                   Plaintiffs,<br><br>vs.<br><br>CONNECTICUT GENERAL LIFE INSURANCE CO., *et al.*,<br><br>                                   Defendants. | Civil Action No.  07-6039(SRC)(PS) |

## PLAINTIFFS CAMILO NELSON, SR.'S, SHAHIDAH NELSON'S, AND CAMELO NELSON, JR.'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068

Joseph P. Guglielmo
SCOTT+SCOTT LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
(212) 223-6444

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, 10th Floor
San Diego, California 92101
(619) 233-4565

Paul M. Weiss
Jeffrey A. Leon
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois  60602
(312) 220-0000

Richard J. Burke
FREED & WEISS LLC
1010 Market Street, Suite 650
St. Louis, Missouri 63101

David M. Sternfield
LAW OFFICES OF DAVID M. STERNFIELD
640 N. LaSalle Street, Suite 556
Chicago, Illinois 60610

*Attorneys for the Nelson Plaintiffs and the Proposed Class*

**TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF ALLEGATIONS SET FORTH IN THE COMPLAINT ........................1

II.   ARGUMENT ....................................................................................................................5

A.    Plaintiffs Have Standing to Pursue Their Claims ....................................................5

B.    Plaintiffs Have Alleged a Sherman Act Claim ........................................................6

C.    Plaintiffs Have Alleged a Plausible Agreement to Fix the UCR Amount
      Artificially Low, Thereby Stating a *Per Se* Claim....................................................8

D.    Plaintiffs Have Sufficiently Alleged an Unreasonable Restraint of Trade
      Under a  Rule of Reason Analysis ..........................................................................10

      1.    The Data Market and the Market for ONS are Inextricably Linked..........10

      2.    Defendants Engaged in Concerted Action to Artificially Depress
            UCR, Which is Inconsistent with Competition...........................................12

E.    Plaintiffs Have Sufficiently Alleged a Plausible Conspiracy ................................13

F.    Plaintiffs Have Sufficiently Pled a RICO Claim ...................................................14

      1.    Plaintiffs Have Sufficiently Alleged Predicate Acts of Mail and
            Wire Fraud ..................................................................................................14

      2.    Plaintiffs Have Sufficiently Alleged Out-of-Pocket Loss ........................15

      3.    Plaintiffs Have Properly Pled Two Separate and Distinct Claims
            Under RICO and ERISA..............................................................................17

      4.    CIGNA Fails to Address the Properly Pled Association-in-Fact
            Enterprise Comprised of CIGNA, UHG, and Ingenix ...............................19

      5.    Plaintiffs Have Sufficiently Pled the Three Elements of an
            Association-in-Fact Enterprise Required by *Boyle* ...................................19

            a.    Plaintiffs Have Properly Pled a Common Purpose .......................20

            b.    Plaintiffs Have Alleged Sufficient Longevity...............................21

            c.    Plaintiffs Have Pled a Sufficient Relationships Among
                  Enterprise Members .......................................................................21

6.      Plaintiffs Have Also Adequately Pled Each Defendant's
        Participation in the Operation/Management of the CIGNA-Ingenix
        Enterprise ..................................................................................................22

7.      Plaintiffs Have Sufficiently Pled the Existence of RICO
        Conspiracy ..................................................................................................23

G.      Plaintiffs Have Sufficiently Alleged State Law Claims ........................................24

1.      CIGNA's Assertion that Plaintiffs' State Law Claims Are
        Purportedly Preempted by ERISA Cannot be Resolved on Rule
        12(b)(6) Motion to Dismiss ........................................................................25

2.      Plaintiffs Have Properly Pled a Cartwright Act Claim ..............................26

3.      Plaintiffs Have Adequately Alleged a Civil Conspiracy Claim.................27

H.      Plaintiffs Have Sufficiently Pled Fraudulent Concealment Which Tolled
        the Limitation Period ...........................................................................................27

I.      Plaintiffs' Claims Are Not Partially Barred by the Statute of Limitations ...........28

III.    CONCLUSION..................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ................................................................14

*Am. Med. Ass'n v. United HealthCare Corp.*,
    2007 WL 1771498 (S.D.N.Y. June 18, 2007) ("*AMA I*")....................6, 17

*Am. Med. Ass'n v. United Healthcare Corp.*,
    588 F. Supp. 2d 432 (S.D.N.Y. 2008) ("*AMA II*") ...........................8, 17

*American Needle, Inc. v. NFL*,
    130 S. Ct. 2201 (2010)...........................................................................12

*Am. Pipe & Const. Co. v. Utah*,
    414 U.S. 538, 94 S.Ct. 756 (1974)...................................................28, 29

*Anderson v. Ayling*,
    396 F.3d 265 (3d Cir. 2005)...................................................................16

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ........................................................................7, 16

*AT&T Commc'ns, Inc. v. Superior Court*,
    21 Cal. App. 4th 1673 (Cal. Ct. App. 1994) ..........................................26

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
    2008 WL 2644207 (E.D. Pa. July 2, 2008) ............................................13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................7, 13

*Bennett v. Great-West Life & Annuity Ins. Co.*,
    2009 WL 2575891 (S.D. Cal. Aug. 18, 2009) ........................................26

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................5

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)...........................................................................11, 12

*Boyle v. U.S.*,
    129 S. Ct. 2237 (2009)................................................................19, 20, 21

*Brenner v. Local 514, United Broth. of Carpenters and Joiners of America*,
    927 F.2d 1283 (3d Cir. 1991)..................................................................29

iii

*Bridge v. Phoenix Bond & Indem. Co.*,
128 S. Ct. 2131 (2008) ............................................................................................15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ................................................................................................12

*Campmor, Inc. v. Brulant, LLC*,
2010 WL 1381000 (D.N.J. Apr. 1, 2010) ...............................................................27

*Capital Inv. Funding, LLC v. Lancaster Res., Inc.*,
2009 WL 1748984 (D.N.J. June 19, 2009) .............................................................27

*Carpet Group Int'l v. Oriental Rug Imp. Ass'n.*,
227 F.3d 62 (3d Cir. 2000) ......................................................................................11

*Cellular Plus, Inc. v. Superior Court*,
14 Cal.App.4th 1224 (Cal. Ct. App. 1993) .............................................................26

*Christidis v. First Penn. Mortg. Trust*,
717 F.2d 96 (3d Cir. 1983).......................................................................................27

*City of Moundridge v. Exxon Mobil Corp.*,
250 F.R.D. 1 (D.D.C. 2008)......................................................................................13

*Consol. Credit Agency v. Equifax, Inc.*,
2004 WL 5644363 (C.D. Cal. Aug. 5, 2004)...........................................................26

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
120 F. Supp.2d 556 (E.D. Va. 2000) .......................................................................10

*Cty. of El Paso, Tex. v. Jones*,
2009 WL 4730303 (W.D.Tex. Dec. 4, 2009) ..........................................................20

*Dearth v. Great Rep. Life Ins. Co.*,
9 Cal. App. 4th 1256 (Cal. Ct. App. 1992) .............................................................26

*Devlin v. Scardelletti*,
536 U.S. 1 (2002).......................................................................................................28

*First Nationwide Bk. v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)........................................................................................18

*Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge
Securities, Inc*,
93 F.3d 1171 (3d. Cir. 1996).....................................................................................25

*Heartland Payment Sys., Inc. v MICROS Sys., Inc.*,
2008 WL 4510260 (D.N.J. Sept. 29, 2008) ............................................................13

iv

*Hollingshead v. Matsen,*
  34 Cal. App. 4th 525 (Cal. Ct. App. 1995) ........................................................................26

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,*
  424 F.3d 363 (3d Cir. 2005) ..............................................................................................12

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,*
  253 F. Supp. 2d 262 (D. Conn. 2003) ................................................................................12

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ...........................................................................................................12

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997) ............................................................................................27

*In re Ins. Brokerage Antitrust Litig.,*
  2006 WL 2850607 (D.N.J. Oct. 3, 2006) ...........................................................................23

*In re Lord Abbett Mut. Funds Fee Litig.,*
  407 F. Supp. 2d 616 (D.N.J. 2005) ......................................................................................5

*Kansas v. UtiliCorp United, Inc.,*
  497 U.S. 199 (1990) ...........................................................................................................12

*Kehr Packages, Inc. v. Fidelcor, Inc.,*
  926 F.2d 1406 (3d Cir. 1991) ............................................................................................15

*Keystone Ins. Co. v. Houghton,*
  863 F.2d 1125 (3d Cir.1988) .............................................................................................29

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
  232 F.3d 979 (9th Cir. 2000) ............................................................................................27

*Kolar v. Preferred Real Estate Investments, Inc.,*
  361 Fed. Appx. 354 (3d Cir. 2010) ......................................................................................7

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973) ...........................................................................................................16

*Maio v. Aetna, Inc.,*
  221 F.3d 472 (3d Cir. 2000) .........................................................................................16, 18

*McCoy v. Health Net, Inc.,*
  569 F. Supp. 2d 448 (D.N.J. 2008) .................................................................................3, 10

*McGee v. State Farm Mut. Auto. Ins. Co.,*
  2009 WL 2132439 (E.D.N.Y. July 10, 2009) .....................................................................20

*McNulty v. Reddy Ice Holdings, Inc.*,
  2009 WL 2168231 (E.D. Mich. July 17, 2009) ..............................................20, 21

*Michael Davekos, P.C. v. Liberty Mut. Ins. Co.*,
  2008 WL 241613 (Mass. App. Div. Jan. 24, 2008) ..........................................4, 10

*Motorola Credit Corp. v. Uzan*,
  322 F.3d 130 (2d Cir. 2003)..............................................................................18

*Myrus Hack, LLC v. McDonald's Corp.*,
  2009 WL 872176 (D.N.J. Mar. 30, 2009).........................................................16

*Nat'l College Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984).............................................................................................10

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
  239 F.3d 333 (3d Cir. 2001)..............................................................................16

*N'Jai v. Floyd*,
  2010 WL 2690335 (3d Cir. July 8, 2010) ...........................................................7

*Pereira v. U.S.*,
  347 U.S. 1 (1954)...............................................................................................15

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)..............................................................................16

*Provience v. Valley Clerks Trust Fund*,
  509 F. Supp. 388 (D.C. Cal. 1981) ...................................................................26

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
  288 F.3d 548 (3d Cir. 2002) ...............................................................................5

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)...........................................................................................22

*Rolo v. City Inv. Co. Liquidating Trust*,
  155 F.2d 644 (3d Cir. 1998)..............................................................................27

*Salinas v. U.S.*,
  522 U.S. 52 (1997).............................................................................................23

*Sarkisyan v. CIGNA Healthcare of Cal., Inc.*,
  613 F. Supp. 2d 1199 (C.D. Cal. 2009) ............................................................26

*Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*,
  869 F.Supp. 278 (D.N.J. 1994) .........................................................................25

*Schirmer v. Principal Life Ins. Co.*,
    2008 WL 4787568 (E.D. Pa. 2008) ........................................................25

*Schmuck v. U.S.*,
    489 U.S. 705 (1989).................................................................................15

*Tingey v. Pixley-Richards West, Inc.*,
    953 F.2d 1124 (9th Cir. 1992) ................................................................16

*Twohey v. Lincoln Nat. Life Ins. Co.*,
    2000 WL 1006529 (N.D. Cal. July 11, 2000)..........................................26

*U.S. v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ...............................................................................10

*U.S. v. Tiller*,
    302 F.3d 98 (3d Cir. 2002) .....................................................................15

*U.S. v. Yusuf*,
    536 F.3d 178 (3d Cir. 2008).....................................................................15

*Washington v. Grace*,
    353 Fed. Appx. 678 (3d Cir. 2009) .........................................................16

*Yang v. Odom*,
    392 F.3d 97 (3d Cir. 2004).......................................................................28

**Rules and Statutes**

Fed.R.Civ.P. 8 ................................................................................................16

Fed.R.Civ.P. 8(a)2 ...........................................................................................7

Fed.R.Civ.P. 9(b) .................................................................................14, 16, 27

Fed.R.Civ.P. 12 ................................................................................................7

Fed.R.Civ.P. 12(b)(1)......................................................................................16

Fed.R.Civ.P. 12(b)(6).............................................................................15, 16, 25

18 U.S.C. §1962(c) .........................................................................................23

18 U.S.C. §1962(d) .........................................................................................23

Plaintiffs Camilo Nelson, Sr., Shahidiah Nelson ("Plaintiffs")[1] respectfully submit this memorandum of law in opposition to Defendants' Motions to Dismiss.  Defendants CIGNA, Ingenix and UnitedHealth Group (the "UHG Defendants") move to dismiss Plaintiffs' complaint ("Complaint"), ignoring and mischaracterizing Plaintiffs' allegations arguing that the Complaint is "utterly devoid of any specific allegations" showing a plausible conspiracy among them. UHG Mem. at 1.[2]  Defendants cannot sustain there unsupported and groundless attacks for the simple reason that the Complaint is replete with factual allegations that show not just a *plausible* conspiracy, but an indisputable one.  Indeed, as demonstrated below and as set forth in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Joint Consolidated Amended Complaint, filed on October 29, 2009 ("Franco Memo"),[3] Plaintiffs have pled specific, detailed facts stating a claim for relief.  Thus, Defendants' motions to dismiss should be denied in their entirety.

## I.     SUMMARY OF ALLEGATIONS SET FORTH IN THE COMPLAINT

CIGNA, UHG and their co-conspirators (collectively, "Insurer Conspirators") market health plans that afford coverage for medical treatment from (i) in-network providers, who agree to cover health care services at negotiated discounted rates, and (ii) out-of-network providers,

---

[1] Plaintiff, Camelo Nelson, Jr. is a minor and a covered beneficiary under Camilo Nelson, Sr.'s health plan, thus, Mr. Nelson, Sr. has standing to pursue the claims of Camelo Nelson, Jr. and counsel will be withdrawing Camelo Nelson, Jr. as a named plaintiff.

[2] Citations to "UHG Mem. at __" refer to the United Defendants' Motion to Dismiss [Doc No. 424-1].

[3] CIGNA relies on its Memorandum in Support of Defendants' Motion to Dismiss the Consolidated Complaint, filed on September 9, 2009 ("CIGNA Memo"), for virtually all its arguments in this motion.  Nelson CIGNA Mem. at 1.  For the sake of expediency, Plaintiffs fully incorporate all the arguments set forth in the Franco Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss.  [Doc. No. 262].  Likewise, to the extent that Ingenix and UHG also rely on the CIGNA Memo to support their arguments, Plaintiffs incorporate those arguments set forth in the Franco Plaintiffs' Memorandum.

who charge insureds their usual, non-discounted rates.  ¶¶9, 44.[4]  This action concerns an illegal agreement by Defendants, the Insurer Conspirators and defendant Ingenix to systematically under-reimburse Plaintiffs and the class they seek to represent – subscribing patients nationwide – for out-of-network services ("ONS").

In general, CIGNA's plans uniformly promise that they will reimburse insureds for ONS based on a percentage of the "usual, customary and reasonable" ("UCR") rate charged by doctors in the same or similar geographic area for substantially the same service.  ¶13.  Unknown to Plaintiffs and other subscriber patients, the Insurer Conspirators agreed to fix the UCR rates for ONS, thereby under-reimbursing patients.  ¶¶45-46, 104.

Central to this scheme is the Ingenix Database, the "black box" into which the Insurer Conspirators agreed to submit UCR healthcare provider charge data, and out of which the Insurer Conspirators contract to purchase UCR rate schedules compiled from their aggregated data. ¶120.  The Ingenix Database – which consists of the Prevailing Healthcare Charges System ("PHCS") and the MDR Database – was purchased by Defendant UHG through its wholly-owned subsidiary Ingenix in 1997.  PHCS, which provides the primary underlying data for the Database, was originally created and operated through the insurance industry's trade association, the Health Insurance Association of America, now known as America's Health Insurance Plans ("HIAA/AHIP").  ¶¶76-83.  Defendants are major developers and contributors of data to the Ingenix Database, and the Board of Directors of HIAA/AHIP includes executives of the Insurer Conspirators, including the Chairman and CEO of CIGNA and senior UHG executives.  ¶77.

From the inception of the Database in the 1970s through its sale to UHG, HIAA/AHIP developed and managed the PHCS Database through committees and at the direction of the

---

[4] Unless otherwise noted, all cites to numbered paragraphs refer to the Nelson Complaint.

2

Board of Directors, which was composed of health insurance industry representatives.  ¶¶78, 80. When UHG purchased PHCS, HIAA/AHIP, Ingenix and UHG agreed to a 10-year "Cooperation Agreement" to provide HIAA/AHIP (and its members) with continued input in the operation of PHCS, and formed a lasting "Liaison Committee" through which they collaborated and collectively controlled Ingenix.  ¶85.  Indeed, as part of the Ingenix acquisition, UHG agreed to become a member of HIAA/AHIP.  ¶86.

The operation of the Ingenix Database has been a product of agreements between the Insurer Conspirators.  For instance, Ingenix provides uniform UCR pricing schedules to health insurers based on provider charge data submitted to Ingenix by those same health insurers, including CIGNA and UHG.  ¶90.  The data used for the Ingenix Database is designed to significantly and deliberately under-report UCR rates ("False UCRs"), ¶¶91-108, and includes only four limited data points.  ¶¶79-80.  The Insurer Conspirators and Ingenix manipulate the data by "scrubbing," or eliminating certain high charges, providing in-network billed charge data and other mechanisms which are designed to depress UCR rates.  ¶¶95-97.

The data Ingenix uses to produce UCR rate schedules are incapable of forming the foundation of an accurate UCR.  *See* ¶¶90-108.  In *McCoy v. Health Net, Inc.*, this Court held a "tutorial" on the Ingenix Database prior to the preliminary fairness hearing and heard expert testimony regarding the methods used by Ingenix to create its commercial databases.  569 F. Supp. 2d 448, 463-64 (D.N.J. 2008).  The Court found the Ingenix Database suffers from serious flaws in "(a) data collection/sampling errors; (b) database creation/editing errors; (c) data analysis errors."  *Id.* at 464.

The Ingenix Database is faulty in design and in operation.  The New York State Attorney General ("NYAG") described reimbursement for ONS through the Ingenix Database as "***a***

*rigged system*" that is a "*fraudulent*," "*industry-wide problem*" built on "*garbage in and garbage out*."   ¶¶114-23.   Senator John D. Rockefeller IV, speaking for the Majority of the Senate Committee on Commerce, Science and Transportation, concluded the insurance industry's practices were "*deceptive*," and that "*we now know that the insurance companies were not delivering what they promised*."   ¶125 (emphasis added).   *See also Michael Davekos, P.C. v. Liberty Mut. Ins. Co.*, No. 10002, 2008 WL 241613, at *3 (Mass. App. Div. Jan. 24, 2008) (finding, after trial, that Ingenix Database was inadmissible as evidence of UCR for determining reimbursement levels, since it "lacks the requisite indicia of reliability to be admissible" due to its pervasive flaws and inadequacies).

The Insurer Conspirators know that their system produces False UCRs.   Members of HIAA/AHIP, including CIGNA and UHG, discussed and rejected expanding data inputs to produce more reliable UCRs in 2005 – yet did nothing to confirm or verify the UCRs that Ingenix provided, and that they utilized.   ¶¶93, 105-08.   CIGNA includes similar (if not identical) language in its marketing materials and health plans, to the effect that ONS reimbursement will be based on the lesser of the UCR or the actual charge imposed by the healthcare provider.   This representation is false because ONS reimbursement is based on False UCRs.   ¶74.   Neither Defendants nor the Insurer Conspirators disclose how UCRs are calculated or that Ingenix is the source of the UCRs.   ¶111.

As a result of Defendants' actions, patients were under-reimbursed and liable for the unpaid portion of providers' charges.   ¶¶104, 129-33.   Plaintiffs' 94-page Complaint details Defendants' scheme, the significant harm resulting from this scheme and the laws violated by the scheme.   Largely ignoring Plaintiffs' allegations, Defendants seek dismissal of Plaintiffs' ERISA, Sherman Act, RICO Act, and various state law claims.   As detailed herein, Defendants'

arguments fail.

**II.     ARGUMENT**

    **A.     Plaintiffs Have Standing to Pursue Their Claims**

Contrary to CIGNA's assertions that Plaintiffs do not allege "an injury in fact" or that they "suffered any harm" (CIGNA Nelson Memo at 2-3),[5] To establish standing under Article III, "a plaintiff must . . . demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *See, Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2002) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). *See also In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 624 (D.N.J. 2005).

Plaintiffs have properly alleged that Defendants' actions in submitting, manipulating and creating False UCRs has directly resulted in harm to Plaintiffs and damaged Plaintiffs as they paid more for the out-of-network care they received. Specifically, such facts are sufficient to establish Plaintiffs' standing to sue under Article III. Indeed, Plaintiffs have specifically pled in a number of instances that the improper conduct of Defendants has caused injury to Plaintiffs, thus establishing that they have standing to sue:

- "Defendants' actions have resulted in injury to Plaintiffs and Class Members." ¶32;

- "By scheming to fix UCRs at below-market levels as a means to artificially depress ONS rates, Defendants and the Conspirators shifted the actual costs of paying for healthcare services and health insurance to their subscribers, including Plaintiffs and the Class." ¶129;

---

[5] Citations to "CIGNA Nelson Memo at __" refer to the CIGNA Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Nelson's Complaint. [Doc. No. 423-1].

- "As a result of the Defendants' anticompetitive and deceptive conduct, Plaintiffs and the Class  pay increased out-of-pocket costs due to the artificially low reimbursement amounts, thus, paying more for ONS than they would have in a competitive market free from collusion and price fixing:  each dollar Defendants were able to lower ONS reimbursements is one additional dollar Plaintiffs and Class members were, and are, obligated to pay out of pocket."  ¶132;

- "Plaintiffs, like all members of the Class, have been damaged by Defendants' and the Conspirators' misconduct because, among other things, Plaintiffs were misled as to the reimbursement rates for out-of-network health insurance coverage provided by CIGNA and have been under-reimbursed or underpaid for out-of-network medical expenses."  ¶210;

- "Plaintiffs and the members of the Class residing in California have suffered injury in fact and lost money as a result of the unfair competition alleged." ¶312; and

- "Plaintiffs … have been forced to pay higher out-of-pocket costs for ONS as a result of CIGNA's conduct alleged herein, ONS that they would not even have purchased had they been adequately informed of its true cost, while providers received lower payments for their services as beneficiaries of their patients' assignments of benefits than they should or otherwise would have." ¶326.

Defendants' reliance on *Am. Med. Ass'n v. United HealthCare Corp.*, No. 00-2800, 2007 WL 1771498 (S.D.N.Y. June 18, 2007) ("*AMA I*"), (CIGNA Nelson Memo at 2), is unavailing. Unlike here, the *AMA* decision was in response to a summary judgment motion, and the decision was based on the parties' statements of facts, full merits discovery, and various affidavits submitted to the court.  *Id.* at *2-*3.   In fact, the *AMA* court had previously ***denied*** the defendants' motion to dismiss for want of standing, and allowed the case to move forward to summary judgment stage.  *Id.* at *2.  As set forth above, Plaintiffs alleged an injury-in-fact that is traceable to Defendants' action.  Thus, they have established Article III standing to sue.

**B.      Plaintiffs Have Alleged a Sherman Act Claim**

To survive a motion to dismiss, a complaint must contain: "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

6

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citations and quotation marks omitted).

The requirement that a complaint set forth plausible grounds for relief is not akin to a probability requirement at the pleading stage. *Id.* at 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff need not provide "detailed factual allegations," but must only set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007) (internal citations and quotation marks omitted). Fed. R. Civ. P. 8(a)(2), which governs applicable pleading standards for federal antitrust claims, requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."

Post-*Iqbal* and *Twombly*, the Third Circuit clarified that a Rule 12 motion must fail "[s]o long as the complaint sets forth a 'plausible' claim to relief." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 Fed. Appx. 354, 359 n. 5 (3d Cir. 2010) (citing cases). Further, the court must still "accept as true all of the allegations contained in the complaints and draw reasonable inferences in favor of the plaintiff." *N'Jai v. Floyd*, Slip Copy, 2010 WL 2690335, at *1 (3d Cir. July 8, 2010) (citing cases). Here, Plaintiffs' careful description of Defendants' agreements, through contractual arrangements and collective action, read as a whole and in the light most favorable to Plaintiffs, articulates a plausible violation of the Sherman Act. *See, e.g.,* ¶¶43-55, 76-87, 88-113. As alleged in the Complaint, the Ingenix Database is the product of collective action by CIGNA, UHG and the Insurer Conspirators. Contrary to Defendants' arguments that no agreement has been pled, Plaintiffs' Complaint specifically sets forth that Defendants conceived, constructed and managed the Database collectively by them on the basis of explicit agreements, including joint management and non-disclosure agreements, for their own profit-

7

making use.  *Compare* ¶¶88-89 (agreement by Defendants and Conspirators to use Ingenix Database); ¶¶90-104 (agreement by Defendants and Conspirators to provide and use false data); with CIGNA Nelson Memo at 3 (the Nelsons "do not plead any direct evidence of such an agreement…"); and with UHG Mem. at 3 ("Plaintiffs do not allege that CIGNA agreed with anyone to fix rates…").  The Complaint pleads many additional facts in support of an agreement. *See also,* ¶¶ 43, 46, 55-56, 58-60, 62, 66, 84-87, 223-28.  Thus, contrary to Defendants' arguments, Plaintiffs have alleged valid Sherman Act claims.

As the court in the *AMA* action concluded (finding that the plaintiffs had established Sherman Act claims in a case alleging antitrust violations arising out of similar conduct), "[p]laintiffs easily satisf[ied] the requisite pleading standard with respect to their allegation of conspiracy," the Court should find Plaintiffs' allegations sufficient here.  *See Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446 (S.D.N.Y. 2008).

> **C.     Plaintiffs Have Alleged a Plausible Agreement to Fix the UCR Amount Artificially Low, Thereby Stating a *Per Se* Claim**

Ignoring the well-pled allegations of the Complaint, the UHG Defendants grossly mischaracterize the alleged horizontal price-fixing agreement as a mere data-sharing agreement. UHG Mem. at 3-5.[6]  To the contrary, the Complaint sets forth the details of several "plausible" price-fixing agreements between CIGNA and UHG and UHG's subsidiary Ingenix to produce fake results that do not reflect accurate UCR rates and are a means of deflating and capping ONS reimbursements:

- CIGNA, through its membership and participation in HIAA/AHIP, agreed with UHG and the Insurer Conspirators on how the Ingenix Database would be constituted, what data would be included and how it would be used to create UCRs (¶¶84-86);

---

[6] CIGNA also argues that Plaintiffs have failed to allege a plausible agreement by incorporating the duplicate argument in their previously-filed CIGNA Memo.

- CIGNA, through its membership and participation in HIAA/AHIP, agreed with UHG and the Insurer Conspirators to have continuing input regarding the constitution and management of Ingenix (¶¶84-86);

- CIGNA, through its membership and participation in HIAA/AHIP, agreed with UHG and the Insurer Conspirators in 2005 not to make any changes to the data used to produce UCR schedules (¶93);

- CIGNA agreed with UHG/Ingenix to supply claims data to Ingenix for use in producing UCR schedules, as did the Insurer Conspirators (¶¶90-93);

- CIGNA agreed with UHG/Ingenix to purchase UCR schedules from Ingenix, as did the Insurer Conspirators (¶68); and

- CIGNA agreed with UHG not to supply any claims data to any competing data service, as did the Insurer Conspirators (¶68).

These are express agreements, proven through direct evidence. They exist in the context of an inexplicable lack of competition and support the lack of transparency amongst CIGNA and the Insurer Conspirators in the provision of insurance for ONS:

- CIGNA and its Insurer Conspirators do not compete for prospective insureds on the basis of ONS reimbursements, despite the fact that (i) they compete on a wide variety of plan provisions (including co-pay levels, deductibles, out-of-pocket maximums, numbers of covered visits, drug benefits, pre-existing condition coverage, etc.) and (ii) ONS reimbursements are important to customers who pay higher premiums for ONS coverage and providers who supply services without advance payment (¶¶74, 111);

- CIGNA and the Insurer Conspirators include similar (if not identical) language in their respective plans to the effect that ONS reimbursements will be based on the lesser of the UCR or the actual charge imposed by the healthcare provider, and conceal their ONS methods and methodologies (¶¶73, 112);

- CIGNA, Ingenix and the Insurer Conspirators never publicly disclose how Ingenix collects and manipulates the data on how Ingenix provides UCR payment caps (¶¶209-11); and

- Neither CIGNA nor the Insurer Conspirators have entered the data market that Ingenix dominates even though Ingenix generates a 20% profit margin, twice the profit margin as the rest of UHG, a direct competitor in the broader health insurance market (¶69).

As such, UHG's assertion that Plaintiffs do not allege any connection between the illegal "ceiling" created by the false UCR and the ultimate reimbursement amount ignores the Complaint entirely.  UHG Mem. at 4.  Indeed, such concerted, cooperative effort amongst competitors to establish a ceiling on reimbursements paid to consumers far exceeds mere "data sharing" – it is paradigmatic price-fixing.  *See U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structures is engaged in an unlawful activity.").[7]

Moreover, inquiry into the facts and circumstances of the alleged conspiracy is not a matter of first impression.  After a thorough investigation of the insurance industry's reliance on Ingenix, the NYAG found that the ownership and use of Ingenix among horizontal competitors creates a conflict of interest that is rife with collusion, and the U.S. Senate's Commerce Committee agreed.  ¶¶114-28.  Courts evaluating Ingenix have reached the same conclusion. *Davekos*, 2008 WL 241613, at *3 ("Ingenix remains 'at the mercy' of its participating insurer clients."); *McCoy*, 569 F. Supp. 2d at 465.

### D.  Plaintiffs Have Sufficiently Alleged An Unreasonable Restraint of Trade Under a Rule of Reason Analysis

#### 1.  The Data Market and the Market for ONS are Inextricably Linked

Ingenix and UHG challenge Plaintiffs' rule of reason Sherman Act claim, arguing that Plaintiffs lack standing because they do not participate in the relevant market.  UHG Mem. at 6.

---

[7] Additionally, a determination as to whether a challenged restraint is governed by the *per se* rule or the rule of reason is typically highly fact intensive and is therefore inappropriate for adjudication on a motion directed at the pleadings.  Courts have observed that "'there is often no bright line separating *per se* from Rule of Reason analysis' . . . In this regard, the analysis is inevitably fact-intensive."  *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp.2d 556, 563 (E.D. Va. 2000) (quoting *Nat'l College Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984)).  The facts as pled here more than satisfy a finding of *per se* illegality.

These arguments are conclusory and premised on legal theories that have been rejected by the Supreme Court.

Plaintiffs allege the relevant product market is the "market for data used to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services (the 'Data Market')" in the U.S., which is "directly and inextricably linked to the market for ONS (the "Linked ONS Market")."  ¶¶63-64.  The data produced in the Data Market provide the principal means for pricing in the market for ONS.  The link between the Data Market and the Linked ONS Market exists because Defendants control and depress amounts reimbursed in the ONS Market through its primary pricing input, namely the Data Market.  *Id.*  To wit, "for every dollar the Insurer Conspirators are able to decrease their reimbursement cost through their unlawful conspiracy [to manipulate the Data Market], there is a corresponding dollar of increase to the affected Subscribers' healthcare costs."   ¶65. Accordingly, "[b]y agreeing to joint control and administration of the Data Market, the Insurer Conspirators are able to assure that the reimbursements they pay in the Linked ONS Market will be artificially depressed," thus causing injury to Plaintiffs.  ¶67.

The Supreme Court has rejected Defendants' argument that the Data Market cannot be a relevant market because patients do not directly participate in that market.  In *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479-81 (1982), the Supreme Court held that the plaintiff's injury was redressable under the antitrust laws even though she was not an economic actor in the market that had been restrained.  *See also Carpet Group Int'l v. Oriental Rug Imp. Ass'n.*, 227 F.3d 62, 77 (3d Cir. 2000) (holding that the plaintiffs who were neither competitors nor consumers in the relevant market nonetheless ***had antitrust standing because their injuries were "inextricably intertwined" with alleged antitrust violations***) (citation omitted)(emphasis added).

In so holding, the Supreme Court distinguished *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), on the rationale that the "risk of duplicative recovery" in allowing indirect purchasers to pursue antitrust claims is not present in *McCready*.  *McCready*, 457 U.S. at 474-75.   On precisely the same rationale, the two cases cited by the UHG Defendants, both of which rely heavily on *Illinois Brick*, are factually inapposite.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369-70 (3d Cir. 2005)(relying on *Illinois Brick* to hold that the facts of the case implicated the same policy concerns); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) (holding that, based on *Illinois Brick*, only the direct purchaser has standing because it alone suffered antitrust injury).  Because Plaintiffs' factual allegations sufficiently establish that they are the direct, if not the only, victims of Ingenix and UHG's anticompetitive activity, the *Illinois Brick* rationale of "risk of duplicative recovery" is inapplicable here.  Plaintiffs have been injured as a result of the harm to competition in the Data Market inflicted by Defendants. Plaintiffs' injury "flows from that which makes [D]efendants' acts unlawful" – their agreement to manipulate the Ingenix Database.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).   Put another way, Plaintiffs received lower reimbursements because Defendants' UCR reimbursement rates were not "set by free market competition," but rather by Defendants' scheme to control and lower UCR rate data used to calculate reimbursements for ONS.  *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc*., 253 F. Supp. 2d 262, 272 (D. Conn. 2003).

2.      **Defendants Engaged in Concerted Action to Artificially Depress UCR, Which is Inconsistent with Competition**

CIGNA's, Ingenix's and UHG's actions here are not independent but, rather, are in the "common interests of the parties to the restraint, at the expense of those who are not parties." *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2213 (2010).  In a competitive and open market

the independent use of suppressed UCRs would inevitably lower an insurer's market share due to competitive pressure.  *See Heartland Payment Sys., Inc. v MICROS Sys., Inc.*, No. 07-5629, 2008 WL 4510260, at *16 (D.N.J. Sept. 29, 2008) (ability to preserve market share despite increases in prices suggests rational economic motivation for defendant to engage in alleged conspiracy). If all Insurer Conspirators had not agreed to submit manipulated UCR data, they would have been unable to implement their scheme, just as the cartel would end if the Insurer Conspirators competed for subscribers on the basis of ONS reimbursements.   Here, where the Insurer Conspirators (a) all use the same manipulated UCR rates fabricated by the same inscrutable data platform and (b) refrain from competing on ONS reimbursements, they prevent competition.

Contrary to Defendants' characterization, Plaintiffs do not allege mere unilateral parallel conduct, but instead detail the Insurer Conspirators' concerted actions to create, operate and secretly use the Ingenix Database to reap supra-competitive profits, including their joint design, cooperative management, and manipulation of the database's inputs to exert control over the outputs, which have a direct bearing on price.  *See supra*, at Section C.  Even if Plaintiffs' allegations are wrongly viewed as mere parallel conduct, the Complaint's allegations of actions against economic self-interest place CIGNA, Ingenix and UHG's conduct in a context that strongly suggests a preceding agreement, making dismissal inappropriate, even post-*Twombly*. *See*, *e.g.*, *Babyage.com, Inc. v. Toys "R" Us, Inc.*, Nos. 05-6792, 06-242, 2008 WL 2644207, at *3-*4 (E.D. Pa. July 2, 2008) (denying motion to dismiss where plaintiffs adequately pled parallel conduct and "plus factors"); *City of Moundridge v. Exxon Mobil Corp.,* 250 F.R.D. 1, 4 (D.D.C. 2008) (upholding complaint that "alleges facts providing circumstantial evidence of a price fixing agreement").

### E.      Plaintiffs Have Sufficiently Alleged a Plausible Conspiracy

13

Defendants strain credulity when they argue that Plaintiffs have failed to "even try to plead" facts demonstrating a plausible conspiracy, including how Defendants "coordinated" their conduct.  UHG Mem. at 7.  Apparently Ingenix and UHG have not conducted even a cursory review of the Complaint because if they had, they would have discovered an abundant amount of facts supporting the existence of a conspiracy.  *See e.g.*, ¶¶43-55, 72, 73-75, 76-82, 83. Additionally, contrary to UHG's fallacious reasoning, the mere fact that "all the leading players in the health insurance industry" are involved in the conspiracy (UHG Mem. at 7) does not render each one of those insurance companies a necessary participant in the alleged conspiracy. Indeed, even assuming that this is a sound reasoning, which it is not, Plaintiffs have amply demonstrated coordinated efforts among the Insurer Conspirators, including UHG and CIGNA. *See supra*, at Section C.

**F.      Plaintiffs Have Sufficiently Pled a RICO Claim**

**1.      Plaintiffs Have Sufficiently Alleged Predicate Acts of Mail and Wire Fraud**

In a single footnote, CIGNA refers to a Rule 9(b) pleading requirement and, without analysis, summarily argues that "the Nelsons have failed to plead the predicate acts of mail and wire fraud with particularity."  Nelson CIGNA Mem. at 4.  The lone case cited by CIGNA, *Am. Dental Ass'n v. Cigna Corp*., 605 F.3d 1283 (11th Cir. 2010), is factually inapposite because there, unlike here, the plaintiffs failed to adequately allege a scheme to defraud, *see* 605 F.3d at 1292, leaving the court to conclude that it could not "infer a scheme-driven deception from a complaint that provides no details of fraud or conspiracy," *id*. at 1293.  To the extent that CIGNA suggests that *American Dental Ass'n* requires that communications involve "specific misrepresentations" that Plaintiffs relied upon or were misled by, RICO has no reliance requirement, and the communications themselves need not be fraudulent where, as here, they are

alleged to be in furtherance of a larger scheme to defraud.  *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2138 (2008); *Schmuck v. U.S.*, 489 U.S. 705, 715 (1989); *U.S. v. Yusuf*, 536 F.3d 178, 187 (3d Cir. 2008).  As such, CIGNA's cursory and conclusory arguments based solely on an inapposite case law are insufficient to raise a pleading challenge under Rule 12(b)(6).  *See generally Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) ("[U]nder Rule 12(b)(6) the [movant] has the burden of showing no claim has been stated.").

Likewise, Ingenix's and UHG's contention that Plaintiffs have not adequately alleged predicate RICO acts against CIGNA, UHG Mem. at 8, is conclusory and, in any event, immaterial as to Plaintiffs' claims against Ingenix and UHG.  That argument also suggests a fundamental misunderstanding of RICO mail and wire fraud principles.  As the Third Circuit has reiterated, liability for a violation of the mail and wire fraud statutes does not require a showing that each Defendant itself mailed or wired anything.  *U.S. v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002) ("[T]he defendant [under mail fraud statute] need not personally send the mailing or even intend that it be sent.") (citing *Pereira v. U.S.*, 347 U.S. 1, 8-9 (1954)).  To the extent that Ingenix and UHG also argue that Plaintiffs "fail to allege that Ingenix or UHG had any involvement in CIGNA's communications with [Plaintiffs]," UHG Mem. at 8-9, those issues are also immaterial to Plaintiffs' RICO claims since the alleged predicate acts are not based on any communications between CIGNA and Plaintiffs.  In any case, the Complaint sufficiently sets forth allegations concerning the predicate acts committed by CIGNA, Ingenix, and UHG.  *See* ¶¶26-27, 43-55, 76-133, 149-77, 245-52.

### 2.     Plaintiffs Have Sufficiently Alleged Out-of-Pocket Loss

Ingenix and UHG also erroneously argue that Plaintiffs have failed to allege a RICO injury in the form of "concrete financial loss."  UHG Mem. at 9.   It is well established in this

Circuit that "RICO standing need not be pled under [Rule] 9(b)." *Myrus Hack, LLC v. McDonald's Corp.*, Slip Copy, 2009 WL 872176, at *9 (D.N.J. Mar. 30, 2009). Under the liberal notice pleading requirement of Rule 8, Plaintiffs need allege only "some factual allegations . . . in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008); *see also Washington v. Grace*, 353 Fed. Appx. 678, 681 (3d Cir. 2009) (finding that notice pleading requirement under Rule 8 is met, because "[w]hile the amended complaint may not be clear in all respects, it is not unintelligible."). The court sitting on a Rule 12(b)(6)[8] motion to dismiss a RICO claim for lack of standing must determine whether the factual allegations, accepted as true, allow a reasonable inference that Plaintiffs have suffered a concrete financial loss. *Ashcroft*, 129 S. Ct. at 1949. Far from "simply alleging an injury to business or property," the Complaint is replete with factual allegations from which Plaintiffs' out-of-pocket loss can be easily inferred. ¶¶129-33; *see also, e.g.*, ¶¶ 32, 34, 48, 53, 55, 65-67, 119, 125, 142, 145, 163, 178-79, 185, 204-05, 212, 221, 253, 263, 273, 278-79, 284, 289.[9]

---

[8] "Civil RICO 'standing' is usually viewed as a 12(b)(6) question of stating an actionable claim, rather than as a 12(b)(1) question of subject matter jurisdiction." *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005) (citing *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 n.7 (3d Cir. 2000)).

[9] CIGNA's argument that Plaintiffs lack Article III standing is also based on the purported failure to sufficiently allege out-of-pocket losses. For purposes of Article III standing, injury-in-fact includes both threatened and actual injury. *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973). The court ruling on a Rule 12(b)(1) motion to dismiss for want of Article III standing must treat "the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn [therefrom]." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001) (citation omitted). As discussed, Plaintiffs have sufficiently alleged out of pocket loss and additional facts from which favorable inference can be made that they have suffered out-of-pocket expenses. For instance, it is undisputed that Plaintiffs entered into a contract with CIGNA that entitles them to reimbursement for at least some types of ONS based on the UCR. CIGNA does not deny that Plaintiffs were injured due to CIGNA's reductions in ONS benefit payments. ¶ 32. Nor does CIGNA deny the admissions in the NY AOD detailed in the Complaint at ¶¶ 48, 51, 70, 114-23. Indeed, even if Plaintiffs have not yet obtained any ONS that was supposed to be reimbursed based on the UCR but that was instead based on the False

### 3.    Plaintiffs Have Properly Pled Two Separate and Distinct Claims under RICO and ERISA

In yet another attempt to conjure up a basis to attack Plaintiffs' RICO standing, Ingenix and UHG assert that Plaintiffs' RICO claims are "based on unexhausted requests for reimbursements" of ERISA benefits.  UHG Mem. at 11-12.  This is patently false.  Plaintiffs have never alleged that their RICO claims are based in any way on their ERISA claims against Defendants.  Ingenix and UHG heavily rely on *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008) ("*AMA II*"), which, contrary to their mischaracterization, does not stand for the proposition that "fail[ure] to demonstrate *in the[] complaint* how the[] ERISA remedies had been frustrated" warrants dismissal of RICO claim for lack of cognizable injury.  UHG Mem. at 12 (emphasis added).  Indeed, the *AMA* court had previously *denied* the defendants' 12(b)(6) motion to dismiss the ERISA claim based on the purported failure to exhaust administrative remedies.  *AMA I*, 2007 WL 1771498, at *2.  Only upon reviewing the *evidentiary record* submitted by the parties did the court find *at summary judgment* that it could dismiss the ERISA claim for lack of genuine issue of material fact.  *AMA I*, 2007 WL 1771498, at *7-*8.  Therefore, by the time the plaintiffs in *AMA* amended their complaint to add new RICO claims, the court had "already denied remedy under ERISA."  *AMA II*, 588 F. Supp. 2d at 440.  Here, Plaintiffs' ERISA claims remain fully intact, because the court has yet to determine the sufficiency of the allegations on the face of the Complaint, let alone engage in any sort of evidentiary analysis to determine whether Plaintiffs' ERISA claims should proceed to trial.

Additionally, Ingenix and UHG misstate the law when they rely on additional Second Circuit cases to assert that RICO standing categorically requires exhaustion of contractual

---

UCRs, Plaintiffs are entitled to pursue injunctive and declaratory relief to ensure that any future ONS obtained under the Agreement is reimbursed properly.

remedies.  *First Nationwide Bk. v. Gelt Funding Corp*., 27 F.3d 763 (2d Cir. 1994); *Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003).  There is no such law in the Third Circuit. Instead, the clear import of the lone Third Circuit case cited by Ingenix and UHG is simply that a RICO injury cannot be predicated on speculative harm or some contingent or future events. *Maio v. Aetna, Inc.*, 221 F.3d 472, 494 (3d Cir. 2000)(holding that, in a false representation case, there is no RICO injury when the only injury alleged is "a vague allegation that quality of care may suffer in the future").

Moreover, even if the Second Circuit law were fully binding in this Circuit, the holdings in both *First Nationwide Bank* and *Motorola* are limited to the specific facts of those cases.  *First Nationwide Bank* held that "***in the specific context of a fraudulently induced loan*** . . . the amount of loss cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole."  27 F.3d at 768 (emphasis added)(citations omitted). Indeed, the plaintiffs there did not even allege that the borrowers failed to fully repay them under the terms of the contract.  *Id*. at 767 (arguing that the plaintiffs have RICO standing "regardless of whether the borrowers presently were in default").  Similarly, *Motorola* is another loan repayment case, where the RICO claims were based on ***third-party***'s failure to pay on a debt.  On an appellate challenge to the district court's grant of preliminary injunction following a six-day evidentiary hearing, the Second Circuit ruled that the plaintiffs lacked RICO standing because "[i]t is undisputed that Plaintiffs have not foreclosed on the loans . . ., and that arbitrations are pending . . . that concern the same underlying transactions."  *Id.* at 136. Contrary to these cases, this is not a "fraudulently induced loan" case brought by a secured lender, where the lender alleges neither that they have not been repaid nor that the collateral is insufficient.  Aside from the fact that there is no collateral here, Plaintiffs have repeatedly alleged that, in breach of the

18

policy language, they have been systematically under-reimbursed for ONS as a result of Defendants' fraudulent scheme to artificially depress the UCR.

**4.    CIGNA Fails to Address the Properly Pled Association-in-Fact Enterprise Comprised of CIGNA, UHG, and Ingenix**

Taking their allegations as a whole and accepting them as true, Plaintiffs have plausibly alleged that the Defendants conducted the affairs of an association-in-fact enterprise comprised of CIGNA, UHG and Ingenix (the "CIGNA-Ingenix Enterprise" or the "Enterprise") through a pattern of racketeering activity.  ¶151.  CIGNA, however, decides to completely ignore this clear allegation of a CIGNA-Ingenix Enterprise, and instead fabricates a new, un-alleged multi-party RICO enterprise, to assert that Plaintiffs have failed to sufficiently state that fictitious enterprise. Nelson CIGNA Mem. at 4.  The mere fact that "other health insurers" *also* participated in the conspiracy to underpay the subscribers has nothing to do with, much less render them "essential" to, the operation of the specifically alleged CIGNA-Ingenix Enterprise.  *Id*.  As such, to the extent that CIGNA's contentions are not directed against the CIGNA-Ingenix Enterprise as pled, CIGNA's argument fails.

**5.    Plaintiffs Have Sufficiently Pled the Three Elements of an Association-in-Fact Enterprise Required by *Boyle***

Even if CIGNA has challenged the proper RICO enterprise as pled, which it does not, Plaintiffs have sufficiently pled that the CIGNA-Ingenix Enterprise comprises an association-in-fact enterprise.  The *Boyle* decision put an end to debate among lower courts as to the permitted breadth of association-in-fact enterprises.  *Boyle v. U.S.*, 129 S. Ct. 2237 (2009).  At least one court since *Boyle* has reconsidered its grant of a motion to dismiss an association-in-fact enterprise RICO claim based on *Boyle*, and has noted that:

> [w]hile *Boyle* does not represent a watershed change in controlling law, it does constitute a (sic) important clarification of the standards for establishing a RICO

19

> enterprise originally set forth in *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such a clarification was necessary because many of the circuits, including the Sixth Circuit, either wrongly applied or cited a more stringent standard than was required under *Turkette*.

*McNulty v. Reddy Ice Holdings, Inc.*, Slip Copy, 2009 WL 2168231, at *3 (E.D. Mich. July 17, 2009).  Other courts since *Boyle* have reached similar conclusions.  *Cty. of El Paso, Tex. v. Jones*, Slip Copy, 2009 WL 4730303, at *21 (W.D.Tex. Dec. 4, 2009) (noting that *Boyle* defined enterprise "broadly"); *McGee v. State Farm Mut. Auto. Ins. Co.*, Slip Copy, 2009 WL 2132439, at *4 n.7 (E.D.N.Y. July 10, 2009) ("*Boyle* establishes a low threshold for pleading. . . an [association-in-fact] enterprise[.]").

Specifically, *Boyle* lowered the threshold for an association-in-fact enterprise by clarifying that it "must have at least three structure features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."  Importantly, however:

> an association-in-fact enterprise . . . need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods – by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times.  The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.  While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Id.* at 2245.

### a.  Plaintiffs Have Properly Pled a Common Purpose

Plaintiffs have alleged that the purpose of the Enterprise was to create a mechanism by which CIGNA, UHG and Ingenix could work together to reduce benefit payments for ONS utilizing flawed and invalid data through a means that would appear to be a valid basis for UCR

and would therefore not be susceptible to challenge for the purpose of increasing profits.  ¶¶154, 157.  Ingenix also benefited directly by enhancing its ability to earn licensing fees through the sale of the ***Ingenix Database, including other databases which used CIGNA and UHG data***. ¶160.

### b.  Plaintiffs Have Alleged Sufficient Longevity

As set forth in the Complaint, the CIGNA-Ingenix Enterprise came into existence in 1998, when HIAA sold the PHCS database to Ingenix, which was more than sufficient time for Defendants to pursue the enterprise's purpose.  ¶153; *cf. Reddy Ice*, 2009 WL 2168231, at *4 (longevity requirement met by period of "roughly a year").

### c.  Plaintiffs Have Pled a Sufficient Relationship Among Enterprise Members

Plaintiffs have also pled the relationship among the members of the Enterprise, a relationship that exceeds the simple, ordinary business interaction that CIGNA implies.  As the Supreme Court indicated in *Boyle,* allegations that "several individuals, ***independently and without coordination***, engaged in a pattern of crimes listed as RICO predicates . . . would not be enough to show that the individuals were members of an enterprise.'"  129 S. Ct. at 2245 n.4 (emphasis added).  Here, however, the Complaint is replete with factual allegations showing that Defendants' fraudulent acts were consciously undertaken as part of an agreed scheme to depress payments for ONS.  *See* ¶¶154, 159; *see also* ¶¶26-27, 29, 46-50, 150-80.  Several post-*Boyle* courts have found far less rigid operations than what are alleged here to constitute RICO enterprises.  *E.g*., *Reddy Ice*, 2009 WL 2168231, at *4 ("periodic meetings and telephone calls in furtherance of the market allocation conspiracy and in furtherance of the scheme to tamper with and retaliate against Plaintiff" established enterprise, even though allegations "do not establish any more formal organizational structure such as hierarchical decision-making or fixed roles").

21

6.     **Plaintiffs Have Also Adequately Pled Each Defendant's Participation in the Operation/Management of the CIGNA-Ingenix Enterprise**

Although a RICO defendant must play "some part in directing the enterprise's affairs," "*significant control* over or within an enterprise" is not required.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 n.4 (1993)(italics in original).   Contrary to UHG's and Ingenix's gross mischaracterization of the affairs of the CIGNA-Ingenix Enterprise as "CIGNA's reimbursement determinations," UHG Mem. at 10, Plaintiffs have repeatedly alleged that the purpose of the CIGNA-Ingenix Enterprise was to create and maintain the Ingenix Database that facilitates the underpayment scheme for ONS.  As such, any argument based on Plaintiffs' purported failure to allege that Ingenix and UHG directed how CIGNA reimbursed its plan members is totally irrelevant.

Moreover, UHG and Ingenix suggest that Plaintiffs' allegations were limited to Ingenix's knowledge regarding CIGNA's utilization of the Ingenix Database (UHG Mem. at 10), which is squarely at odds with the actual allegations set forth in the Complaint:

- Defendants participated in and controlled the CIGNA-Ingenix Enterprise in a multitude of ways, including knowingly participating in the formation and maintenance of the Ingenix Database and in decision-making with respect to the inclusion of data within the Ingenix Database that would reduce ONS payments. ¶¶154, 159, 163-66.

- CIGNA and UHG also agreed to purchase and utilize the Ingenix Database for the express purpose of depressing its ONS payments, ¶¶154, 166-67, and intentionally submitted "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONS, knowing the data would be further edited by Ingenix.  ¶¶154, 161, 163-66.

- Inclusion of CIGNA's and UHG's data was critical to both the appearance of legitimacy of the Ingenix PHCS database and to the usefulness of that data for depressing the price paid for ONS.  It was therefore essential to the Enterprise's success.  ¶166.

- Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Database was the largest available and had sufficient numbers to remove any doubt as

22

to their validity.  ¶167.  Without data from CIGNA and UHG, the Ingenix Database could not have been successfully marketed as the "industry standard" for UCR pricing.  *Id.*

- In addition, Defendants undertook countless and nearly constant acts of mail and wire fraud in furtherance of the Enterprise's common purpose of reducing the price paid for ONS.  ¶158.

- Defendants agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONS payments achieved by use of the Ingenix Database for UCR determinations.  ¶154.

- Defendants also provided false and misleading information and deterred subscribers and Provider Class members from challenging or otherwise questioning how they set UCR.  ¶¶163, 167.

Clearly, therefore, UHG's and Ingenix's attempt to portray their relationship with CIGNA as nothing more than a simple business relationship cannot stand.  UHG Mem. at 10.  As set forth in the Complaint, the relationship between CIGNA, Ingenix and UHG was forged in furtherance of a common, fraudulent purpose.  This is simply not a case like *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607 (D.N.J. Oct. 3, 2006), where the plaintiff made "mere allegations that the Defendants did business with one another."  *Id.* at *16.  Plaintiffs here have properly pled not only the existence of the CIGNA-Ingenix Enterprise, but also each Defendant's direction of the conduct of the enterprise.

## 7.    Plaintiffs Have Sufficiently Pled the Existence of RICO Conspiracy

RICO provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."  18 U.S.C. §1962(d).  To maintain a RICO conspiracy claim, Plaintiffs must allege that the defendant "knew about and agreed to facilitate the scheme."  *Salinas v. U.S.*, 522 U.S. 52, 66 (1997).  Plaintiffs have sufficiently alleged a conspiracy to violate 15 U.S.C. 1962(c).

Ingenix and UHG erroneously contend that Plaintiffs "offer no factual allegations at all connecting either Ingenix or UHG to CIGNA's [fraudulent] representations to Plaintiffs, which are the core of their RICO claims." UHG Mem. at 13. To the contrary, the "core of the[] RICO claims" is the CIGNA-Ingenix Enterprise's underpayment scheme, *not* any fraudulent misrepresentations, which was repeatedly alleged with facts showing the intimate relationship among Ingenix, UHG, and CIGNA. For instance, Plaintiffs alleged that the Conspirators agreed to systematically under-reimburse for out-of-network services through use of the Ingenix Database. ¶¶30, 46-50, 58, 90, 150, 157. The members of HIAA, including UHG and CIGNA, agreed to sell the PHCS Database developed by HIAA to Ingenix, UHG's subsidiary, in 1998. ¶83. As part of the PHCS sale, HIAA and Ingenix agreed to have member companies, including UHG and CIGNA, participate in an ongoing Ingenix PHCS Advisory Committee. ¶84. As set forth in the Complaint, the Conspirators knowingly created and maintained a flawed system that uses limited amounts of manipulated data to artificially depress reimbursement rates for ONS. ¶¶46, 90, 154, 163, 166. The Conspirators supplied manipulated data to the Ingenix Database which was then further manipulated with the express purpose of creating artificially low pricing schedules. ¶¶26-27, 48-49, 90, 95-98, 154, 165-67. The Insurer Conspirators also agreed not to provide out-of-network charge data to any potential Ingenix competitor. ¶113. Each Insurer Conspirator further agreed to utilize (and in fact has utilized) the resulting false UCR schedules to determine reimbursement for ONS, thereby reducing its costs for such services. ¶¶26-27, 48-49, 58, 90, 102, 108, 154, 165, 167. To protect the conspiracy from detection, the Insurer Conspirators agreed to conceal the scheme, utilizing a series of material misrepresentations and omissions. ¶¶50-51, 109-13, 150, 163, 167, 170-74.

## G.     Plaintiffs Have Sufficiently Alleged State Law Claims

1.    **CIGNA's Assertion that Plaintiffs' State Law Claims Are Purportedly Preempted by ERISA Cannot be Resolved on Rule 12(b)(6) Motion to Dismiss**

CIGNA's assertion that, on the face of the Complaint, Plaintiffs' state law claims should be dismissed because they have been purportedly preempted by ERISA ignores the procedural posture and specific dispute in this case.  In *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc*, 93 F.3d 1171 (3d. Cir. 1996), the Third Circuit held that when the defendant's status as a proper ERISA defendant remains to be resolved, the district court should not rule on the issue of preemption.  *Id.* at 1185- 86 (agreeing with the plaintiffs' argument that "the district court's preemption finding is dependent upon an initial finding that [the defendant] was an ERISA fiduciary").   Here, like the defendants in *Glaziers*, CIGNA's position is that it is not a proper ERISA defendant because it is not the "plan administrator." CIGNA Memo at 17.  Moreover, in *Glaziers*, the question regarding the proper ERISA defendant has previously reached the district court on a ***summary judgment motion***, "[a]fter the pleadings were closed and discovery completed."  *Id*. at 1178.   Similarly, in *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F.Supp. 278 (D.N.J. 1994), this court has ruled that "the standard for granting summary judgment reveals that it is far too premature for the Court properly to resolve this core issue [of whether the defendants are proper ERISA defendants]," even when the defendants "conced[ed] for the purposes of the motion that they were fiduciaries to the Plan."  *Id*. at 286-87.  Therefore, the clear import of *Glaziers* and *Schiffli* is that a Rule 12(b)(6) motion to dismiss on the face of the pleadings is not an appropriate method to determine whether ERISA preempts state law claims when the dispute as to the defendant's status as a proper ERISA defendant is yet to be resolved.  *See also Schirmer v. Principal Life Ins. Co.*, No. 08-2406, 2008 WL 4787568, at *4 (E.D. Pa. 2008) ("Dismissing Plaintiffs' state law claims at

this early stage of the litigation [on motion to dismiss] would be premature.  Allowing the Plaintiffs to plead state claims in the alternative permits them to maintain a cause of action if the facts ultimately bear out that any of the plans . . . are not subject to ERISA.").[10]

### 2.        Plaintiffs Have Properly Pled a Cartwright Act Claim

CIGNA, Ingenix and UHG argue for dismissal of Plaintiffs' Cartwright Act claims by reference to their Sherman Act argumentation.  Nelson CIGNA Mem. at 8-9; UHG Mem. at 13-14.  As explained herein, Plaintiffs have adequately pled their Sherman Act claims, which is more than sufficient to plead a Cartwright Act claim, in part because standing is broader under the Cartwright Act than under federal antitrust statutes.  *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1234 (Cal. Ct. App. 1993) ("Although California law . . . requires an 'antitrust injury,' the scope of that term is broader" than under federal antitrust statutes); *accord Consol. Credit Agency v. Equifax, Inc.*, No. 03-1229, 2004 WL 5644363, at*9 (C.D. Cal. Aug. 5, 2004) ("[T]he more restrictive definition of 'antitrust injury' under federal law does not apply.) (quoting *Cellular Plus*).  "Thus, federal antitrust precedents are properly included in a Cartwright

---

[10] As such, the cases cited by CIGNA are factually inapposite.  In *Twohey v. Lincoln Nat. Life Ins. Co.*, No. 00-196, 2000 WL 1006529 (N.D. Cal. July 11, 2000), the court actually engaged in the analysis of plaintiffs' state law claims themselves to rule that those claims were not adequately pled.  *Id.* at *2-*3.  The remaining four federal cases cited by CIGNA did not involve the dispute regarding whether the defendants were proper ERISA defendants.  *Sarkisyan v. CIGNA Healthcare of Cal., Inc.*, 613 F. Supp. 2d 1199, 1203 (C.D. Cal. 2009) (ruling that "ERISA's applicability to the present lawsuit cannot reasonably be questioned."); *Bennett v. Great-West Life & Annuity Ins. Co.*, Slip Copy, 2009 WL 2575891 (S.D. Cal. Aug. 18, 2009) (removing an action originally filed on purely state law grounds by claiming ERISA's applicability to the suit, defendants do not dispute that they are proper ERISA defendants ); *Provience v. Valley Clerks Trust Fund*, 509 F. Supp. 388 (D.C. Cal. 1981) (same); *Tingey v. Pixley-Richards West, Inc.*, 953 F.2d 1124 (9th Cir. 1992) (same).  The California state courts in all the state cases cited by CIGNA ruled on a summary judgment standard, which, unlike motion to dismiss standard, is based on the evidentiary record beyond the face of the complaint. *Hollingshead v. Matsen*, 34 Cal. App. 4th 525 (Cal. Ct. App. 1995); *AT&T Commc'ns, Inc. v. Superior Court*, 21 Cal. App. 4th 1673 (Cal. Ct. App. 1994); *Dearth v. Great Rep. Life Ins. Co.*, 9 Cal. App. 4th 1256 (Cal. Ct. App. 1992).

Act analysis, but their role is limited: they are 'often helpful' but not necessarily decisive." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 2000).

### 3.    Plaintiffs Have Adequately Alleged a Civil Conspiracy Claim

Plaintiffs have already shown that the Complaint is replete with factual allegations of concerted actions among CIGNA, Ingenix, and UHG to artificially depress ONS reimbursements to the sole detriment of Plaintiffs and other members of the class.  CIGNA's, Ingenix's and UHG's argument against Plaintiffs' civil conspiracy claim dovetails their arguments against Plaintiffs' antitrust and RICO conspiracy claims.  Nelson CIGNA Mem. at 9; UHG Mem. at 14. As such, their argument against civil conspiracy also fails for the same reasons delineated above.

### H.    Plaintiffs Have Sufficiently Pled Fraudulent Concealment Which Tolled the Limitation Period

CIGNA invokes Rule 9(b)'s particularity requirement to erroneously assert that Plaintiffs failed to sufficiently allege fraudulent concealment to toll the limitation period.  Nelson CIGNA Mem. at 9-10.  The Third Circuit has explained that the purpose of Rule 9(b)'s requirement is to "provide notice of the 'precise misconduct' with which the defendants are charged" in order to give [the defendants] an opportunity to respond meaningfully to a complaint." *Campmor, Inc. v. Brulant, LLC*, No. 09-5465, 2010 WL 1381000, at *7 (D.N.J. Apr. 1, 2010) (quoting *Rolo v. City Inv. Co. Liquidating Trust*, 155 F.2d 644, 658 (3d Cir. 1998)).  Additionally, the heightened pleading requirement under Rule 9(b) should be relaxed in this case since, because "the factual information is peculiarly within [Defendants'] knowledge or control," and strict application of Rule 9(b) will "permit [Defendants] to successfully conceal the details of their fraud." *Capital Inv. Funding, LLC v. Lancaster Res., Inc.*, Slip Copy, 2009 WL 1748984, at *4 (D.N.J. June 19, 2009) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) and *Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983)).

Here, despite CIGNA's untenable contention that "[Plaintiffs] do not 'supply any details' about CIGNA's alleged conduct," Plaintiffs have alleged more than sufficient facts to give adequate notice of the specific activity that constitutes fraud. *E.g.*, ¶¶7-8, 43, 46, 51, 109-13, 130, 150, 161, 174, 209-14, 283, 298. Indeed, CIGNA has been aware of the unlawful nature of its underlying acts that formed the basis of Plaintiffs' fraudulent concealment claim at least as far back as 2004 when this lawsuit was instituted. Additionally, the New York Attorney General's investigation led to a finding that the systemic reduction of ONS reimbursement rates by using the Ingenix Database is entirely hidden from the consumers. ¶¶114-23.

## I.      Plaintiffs' Claims Are Not Partially Barred by the Statute of Limitations

Contrary to the CIGNA Defendants' arguments, Plaintiffs' claims are not partially barred by the statute of limitations. CIGNA Memo at 10-11. Plaintiffs' have validly pled that Defendants have fraudulently concealed the nature and basis which Defendants have conspired to reduce Plaintiffs' out-of-network reimbursements. ¶¶43, 51, 74, 109-13, 154, 174, 215-18, 219-20, 240, 320, 335.

Additionally, Plaintiffs' claims are likewise not partially barred based on the fact that such claims have been tolled since the filing of the *Franco* action in 2004. Given that the *Nelson* Plaintiffs' claims have now been consolidated into the *Franco* action, Plaintiffs claims have been tolled at least since 2004 under the Supreme Court's holding in *American Pipe*. See *Am. Pipe & Const. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756 (1974). It is well settled that "the filing of an action on behalf of the class tolls a statute of limitations against them." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)). *See also, Yang v. Odom,* 392 F.3d 97, 103 (3d Cir. 2004)(noting *American Pipe* tolling applies to all members of the Class). Thus, given that the Nelsons are members of the underlying *Franco*

28

class, their claims have been tolled at least since the filing of the *Franco* suit in 2004.  Thus,

under *American Pipe*, Plaintiffs' ERISA claims can relate back to 1999 and their Antitrust and

RICO claims would relate back to 2000.  Plaintiffs' RICO and Antitrust claims can relate back to

1999 based on the application of continuing violation doctrine.[11]  Thus, Defendants' Motion to

Dismiss based on statute of limitation defenses should be denied.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny CIGNA's

and the UHG Defendants' Motions to Dismiss.

Dated:  August 6, 2010

                                        CARELLA, BYRNE, CECCHI,
                                        OLSTEIN, BRODY & AGNELLO
                                        Attorneys for Plaintiffs


                                        By:___/s/ James E. Cecchi_____
                                             JAMES E. CECCHI

Of Counsel:

Joseph P. Guglielmo
SCOTT+SCOTT LLP
500 Fifth Avenue
40th Floor
New York, NY 10110
(212) 223-6444

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, 10th Floor
San Diego, CA 92101
(619) 233-4565

---

[11] The Third Circuit has long held that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  *Brenner v. Local 514, United Broth. of Carpenters and Joiners of America*, 927 F.2d 1283, 1295 (3d Cir. 1991) (citing *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1129 (3d Cir.1988)).

Paul M. Weiss
Jeffrey A. Leon
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois  60602
(312) 220-0000

Richard J. Burke
FREED & WEISS LLC
1010 Market Street, Suite 650
St. Louis, Missouri 63101

David M. Sternfield
LAW OFFICES OF DAVID M. STERNFIELD
640 N LaSalle Street, Suite 556
Chicago, Illinois 60610

*Attorneys for the Nelson Plaintiffs and the Proposed Class*