**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DARLERY FRANCO, individually and on behalf of all others similarly situated, | : : : |
| Plaintiffs, | : : |
| v. | : : |
| CONNECTICUT GENERAL LIFE INSURANCE CO., et al., | : : : |
| Defendants. | : : : |

**Case No. 07-cv-6039 (SRC) (PS)**

**OPINION**

**CHESLER**, District Judge

This matter comes before the Court on four separately filed motions to dismiss: (1)

Defendant CIGNA's motion to dismiss the Consolidated Amended Class Action Complaint

("CAC") [docket entry 250]; (2) CIGNA's supplemental motion to dismiss the Amended

Complaint filed by North Peninsula Surgical Center, L.P. (hereinafter, the "North Peninsula

Complaint") [docket entry 384]; (3) CIGNA's supplemental motion to dismiss the Complaint

filed by Camilo Nelson, Sr., Shahidah Nelson and Camilo Nelson, Jr. (hereinafter, the "Nelson

Complaint") [docket entry 423]; and (4) the motion filed by Defendants UnitedHealth Group,

Inc. ("UnitedHealth") and Ingenix, Inc. ("Ingenix") to dismiss the Nelson Complaint [docket

entry 424]. All of the motions have been opposed. The Court has considered the papers filed by

the parties and has opted to rule on the papers and without oral argument, pursuant to Federal

Rule of Civil Procedure 78. For the reasons expressed below, CIGNA's motion to dismiss the

1

CAC will be granted in part and denied in part; CIGNA's supplemental motion to dismiss the North Peninsula Complaint will be granted in its entirety; CIGNA's supplemental motion to dismiss the Nelson Complaint will be granted in part and denied in part; and UnitedHealth's and Ingenix's motion to dismiss the Nelson Complaint will be granted in part and denied in part.

## BACKGROUND

This consolidated action revolves around the manner in which Defendant CIGNA determined the benefit amount it owed to members of its employer-sponsored health benefit plans when those members sought treatment from providers who were out-of-network ("ONET"), that is, who did not participate in CIGNA's preferred provider network. The crux of the various claims is that CIGNA violated its contractual obligation to pay for the ONET services at the "usual, customary and reasonable" ("UCR") amount by obtaining UCR information from a flawed database maintained by a company known as Ingenix. The Ingenix data allegedly generated artificially low UCRs. Thus, the basic theory of this litigation is that CIGNA's use of Ingenix data resulted in the underpayment of ONET benefits to which CIGNA plan members were entitled. Apart from the straightforward charges of failure to fulfill plan obligations, the complaints allege that CIGNA knowingly participated in the depression and manipulation of UCR data and thus engaged in a fraudulent scheme to underpay for ONET services and in an anticompetitive conspiracy to fix prices for ONET service reimbursements. The scheme and conspiracy allegedly involved various other insurers as well as Defendants UnitedHealth and Ingenix.

As identified above, three separate but similar complaints are at issue in the instant motions to dismiss.[1]  Each has been pled as a putative class action.  Each seeks relief pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), the Racketeer and Corrupt Organizations Act ("RICO") and the Sherman Antitrust Act ("Sherman Act").  The Nelson Complaint and the North Peninsula Complaint also assert various state law causes of action, and these will be reviewed in the discussion below after the Court addresses the sufficiency of the federal claims.  All three complaints are predicated on similar if not identical allegations of wrongdoing.  Following its brief identification of the various plaintiffs involved in this litigation, the Court will provide an overview of the factual background of the case.

## I.   THE PARTIES

The CAC asserts claims brought by two CIGNA plan subscribers, Darlery Franco and David Chazen (the "Subscriber Plaintiffs"); by several ONET providers (collectively, the "Provider Plaintiffs"); and by several associations whose members consist of physicians and non-physicians who provided ONET services to patients insured by CIGNA (collectively, the "Association Plaintiffs").

Subscriber Plaintiff Darlery Franco ("Franco"), a resident of New Jersey, was at all relevant times a member of a health plan fully-insured by CIGNA and sponsored by a New Jersey employer.  On June 18, 2003, Franco underwent facial reanimation surgery to restore

---

[1] In many regards, the three complaints at issue, i.e., the CAC, the North Peninsula Complaint and the Nelson Complaint, contain overlapping and substantially similar if not identical allegations.  In the interest of simplicity, where the Court's discussion involves all three complaints, the Court will refer to them generically as the "complaints."

proper functioning to her facial muscles and to repair nerve damage she sustained at birth.  The

surgery was performed by Drs. Elliott Rose and Fred Valauri, both non-participating providers

("Nonpars") in CIGNA's physician network.  CIGNA paid $35,000 of the surgeons' total charges

of $64,000.  Franco remained financially responsible to the providers for the $34,000 difference.

On September 13, 2005, Franco underwent another stage of facial reanimation surgery with Dr.

Rose.  CIGNA covered less than 50% of the billed charges, leaving Franco responsible for the

unpaid amount.

Subscriber Plaintiff David Chazen ("Chazen"), a resident of New Jersey, was at all

relevant times a member of a health plan fully-insured by CIGNA and sponsored by a New

Jersey small employer.[2]  On August 2, 2006, he suffered a shoulder injury which required

surgery.  Dr. Roger G. Pollack, a Nonpar orthopedist, performed the surgery on August 14, 2006.

Dr. Pollack billed $6,500 for the surgery.  CIGNA paid only $2,061.50 of this amount, leaving

Chazen liable for the remainder.  As of the filing of the CAC, Chazen had paid his provider

approximately $3,730.

The Provider Plaintiffs consist of both physician and non-physician health professionals.[3]

They do not participate in CIGNA's provider networks and are thus all referred to in this Opinion

as ONET providers or Nonpars.  The Provider Plaintiffs named in the CAC are James M.

---

[2] New Jersey's Small Employer Health Benefits Act defines a "small employer" in
connection with a group health plan as one "actively engaged in business that employed an
average of at least two but not more than 50 eligible employees on business days during the
preceding calendar year . . . and the majority of employees are employed in New Jersey."
N.J.S.A. 17B:27A-17.

[3] Of those named in the CAC, three are plastic surgeons, one is a licensed physical
therapist and one is a provider of durable medical equipment services.

Gardner, M.D.; Darrick E. Antell, M.D.; Brian Mullins, M.S., P.T.; Carmen Kavali, M.D. and

Maldonado Medical, LLC.  Provider Plaintiff North Peninsula is a non-physician provider of

outpatient surgery services in California.[4]

The Association Plaintiffs, who assert claims in the CAC, are organizations whose

members consist of physicians, podiatrists or psychologists who actively practice or once

practiced in the United States and/or a particular state or locality.  The Association Plaintiffs

include the American Medical Association ("AMA"), Medical Society of New Jersey and 12

other organizations.

The Nelson Plaintiffs[5] are residents of California who were insured by an employer-

sponsored CIGNA health plan.  Camilo Nelson, Sr. was the plan subscriber and the other two

named plaintiffs were insured family members. (Unless otherwise noted, the Court will include

the Nelson Plaintiffs in its collective reference to the "Subscriber Plaintiffs" throughout this

Opinion.)  All three sought and obtained treatment from Stephanie Higashi, a chiropractor, doing

business as Mar Vista Institute of Health.  Higashi was a Nonpar with CIGNA.

Defendant CIGNA[6] provides healthcare and related benefits in the United States and

---

[4] North Peninsula's claims are not incorporated into the CAC because it initiated its case in the District of New Jersey after the Court had, on June 17, 2009, ordered the parties to the then-existing UCR-related complaints against CIGNA to file a consolidated complaint. Thus, North Peninsula's Complaint remains separate from the CAC.

[5] Like Provider Plaintiff North Peninsula, the CIGNA-insured Nelson Plaintiffs filed their complaint after the CAC was filed and thus proceed with a separate but similar complaint.

[6] The Court notes that there are actually three "CIGNA" entities named as Defendants in the CAC: Connecticut General Life Insurance Co., CIGNA Corporation and CIGNA Health Corporation.  Throughout the pleadings and the briefing, the parties consistently refer to all of them collectively as "CIGNA."  The Court likewise does the same.

internationally.  It offers a variety of products and services, such as consumer-directed

healthplans, health maintenance organizations, and preferred provider plans, among others.  It is

one of the largest health insurers in the United States.

Defendant UnitedHealth also offers health insurance products and services.

Defendant Ingenix is a wholly-owned subsidiary of UnitedHealth.  Ingenix offers, among

other things, software and data services to health care payors.  It owns and maintains a database

of provider charges (the "Ingenix Database") which it licenses to insurers.  Insurers use the

Ingenix Database to make reimbursement determinations for ONET services.


II.     THE FACTS

A summary of the dispute requires an overview of the relationship between the healthcare

industry and the health insurance industry as it concerns the payment of services rendered to

insured patients.  The following information is derived from the various complaints:

CIGNA enters into contracts with employers to enable them to provide health plans to

employees, their spouses and dependents.  CIGNA offers health insurance plans that differentiate

between coverage for medical treatment provided by in-network providers and ONET providers.

In-network providers, also referred to a "participating providers" or "Pars", have negotiated

discounted rates with CIGNA. As part of their agreement with the health insurance plan, the in-

network providers are precluded from billing the insured patient for any amount above the

negotiated rate for covered services.  ONET Providers, in contrast, charge insureds their usual,

non-discounted rates.  They are neither required to accept reduced rates nor precluded from

balance billing[7] insured patients for any amount not covered by the health plan.  In fact, "Nonpars may collect their full charges directly from patients at the time of service."  (CAC, ¶ 5.) Alternatively, the Nonpar may collect only the patient's co-payment or co-insurance obligation at the time of service and submit a claim to the insurance company to receive the covered amount for the service.  In the latter scenario, the provider typically obtains an assignment from the patient in lieu of collecting the entire charge when service is rendered.  This means that the patient "authorizes his or her health benefits plan to remit payment directly to the provider for covered services."  (*Id.*)  "Whether or nor the health plan honors the assignment and pays the amount owed for ONET services directly to the Nonpar, the Nonpar is entitled to bill the Member for the amount of the charge that exceeds the amount that the Member's health plan covers."  (*Id.*)  In other words, the provider may balance bill the patient for any amount disallowed by the insurance company.

The CIGNA plans at issue provided coverage for ONET services in return for an increased premium, that is, for a greater premium than would apply to a plan providing in-network coverage only.  The plans state that, for an ONET service, CIGNA will cover a percentage of the provider's billed charge or of the "usual, customary and reasonable" rate for the service, whichever is lower.  (The amount of coverage is the "allowed amount.")  The UCR is generally defined as the "prevailing fee" charged by providers for comparable services in the

---

[7] In the context of the healthcare industry, balance billing is the practice by a medical provider of billing a patient for the difference between the provider's actual charge and the amount reimbursed under the patient's health insurance benefits plan.  Under balance billing, the patient is responsible financially to the provider for his or her co-payment obligation under the plan, plus any amount of the actual charge that exceeds the covered amount under the plan.

7

geographic area in which the plan member received the service.  The plans also state that the member is financially responsible for the difference between the allowed amount and the Nonpar's billed charge.

CIGNA generally determined UCR by reference to the prevailing fee information supplied by the Ingenix Database.[8]   CIGNA contracted with Ingenix to use its database of fees charged by providers for various services in a locality.  According to the complaints, Ingenix accumulates data from various health insurers about out-of-network claims they receive and the amount providers bill for various services.  By using the "CPT" billing codes corresponding to healthcare services and procedures and grouping the data according to geographic areas, Ingenix generates uniform pricing schedules which give a range of prices showing the charges at various percentage intervals.  The Complaints, however, allege that the schedules are inaccurately and deliberately low and in fact generate "False UCRs."[9]   This occurs, Plaintiffs aver, both as a result of the supplying insurers' manipulation of information so that ONET charges are deflated and of the further manipulation of that information by Ingenix to additionally depress the charges.  In particular, plaintiffs aver that Ingenix collects limited information from insurers, covering only four data points, which skews the UCR schedules below what an accurate and comprehensive analysis would generate. Then, according to Plaintiffs, Ingenix "scrubs" the collected data by

_____

[8] Apart from the use of artificially low UCRs, the CAC complains of other ONET reimbursement methods allegedly utilized by CIGNA, including using an outdated version of the Ingenix Database to determine UCR, calculating UCRs by using its own data on average charges (the "behind-the-scenes programs") and using a percentage of the average wholesale price.

[9] The Court will use the same terminology for purposes of simplicity in reviewing these motions to dismiss, but notes that it makes no determination as to the accuracy of that characterization.

removing high-end values (but no low-end figures) so as to lower the average price of a service and therefore drive down "prevailing fees."

According to the complaints, what became known as the Ingenix Database as it existed at all times relevant to this lawsuit originated in 1973.  In that year, the Health Insurance Association of America ("HIAA"), a trade group for the health insurance industry, created a database known as the Prevailing Health Charges System ("PHCS").  In October 1998, PHCS was sold to Ingenix.  Membership in the HIAA has included all major health insurers in the United States, including CIGNA and UnitedHealth, spanning the time from creation of  PHCS to the present.  The complaints aver that the member insurers participated in the creation, design and maintenance of PHCS and then, after its sale to Ingenix, continued to be involved with the database through a cooperation agreement between HIAA and Ingenix.  Under this agreement, HIAA members would, among other things, supply provider charge data and receive a discounted rate for using the Ingenix Database.

Plaintiffs allege that by using False UCRs to determine what it would pay for Nonpars' services, CIGNA systematically underpaid ONET claims and thus shifted the cost of healthcare to subscribers, who were not only responsible for the increased difference between a provider's billed amount and CIGNA's allowed amount but also had paid more in premiums for the option of seeking treatment from a Nonpar.  Plaintiffs in this consolidated action contend that their rights under ERISA, RICO and federal antitrust laws, among others, have been violated as a result of CIGNA's payment of claims based on False UCRs and as a result of CIGNA's scheming with Ingenix and with other insurers to depress UCR values.   The motions before the

9

Court attack the viability of many legal theories for failure to state a claim based on the facts alleged but also, significantly, challenge the legal right of various plaintiffs to seek relief under these theories at all.  In the discussion that follows, the Court will address and resolve the standing challenges raised by Defendants before proceeding to review the sufficiency of the causes of action pled.

## ANALYSIS

### I.   STANDARD OF REVIEW APPLICABLE TO MOTIONS BROUGHT UNDER RULE 12(B)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims have facial plausibility.  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).  This means that the complaint must contain sufficient factual allegations to raise a right to relief above the speculative level, assuming the factual allegations are true.  *Id.* at 1965; *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).  The Supreme Court has made clear that "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 127 S.Ct. at 1964-65; *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the claims are based upon those documents.  *See Pension*

*Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The issue

before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence in support of the claims."  *In re Burlington Coat Factory Sec. Litig.*,

114 F.3d 1410,1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

As the Court will discuss below, a significant portion of the instant motions to dismiss

relies on the grounds that certain plaintiffs lack standing to assert some or all of the claims pled.

Because these challenges concern plaintiffs' statutory standing to bring this suit, the Court also

reviews those aspects of the motions to dismiss according to the standards applicable to Federal

Rule of Civil Procedure 12(b)(6).  *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 n. 7 (3d Cir. 2000)

(distinguishing challenge to a plaintiff's standing for lack of injury in fact, which implicates

subject matter jurisdiction under Article III of the Constitution and thus falls under Rule 12(b)(1),

from a challenge concerning whether a plaintiff meets statutory prerequisites to bring suit).

## II.   STANDING ISSUES

### A.   Standing of the Provider Plaintiffs

CIGNA challenges the statutory standing of Provider Plaintiffs to assert any of the federal

claims they have pled in this action.  The Court will examine the parties' arguments first on

ERISA and then on the RICO and Sherman Act claims.

#### 1.   ERISA Claims

It is well-established that standing to sue under ERISA § 502(a), the statute's civil

enforcement mechanism, is limited to participants or beneficiaries of ERISA plans.  29 U.S.C. §

1132(a); *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388

F.3d 393, 399-400 (3d Cir. 2004).  Those terms, generally, refer to individuals entitled to receive benefits under an employee benefit plan.[10]  Provider Plaintiffs are, of course, neither participants nor beneficiaries in employer-sponsored CIGNA health plans.  They nevertheless assert that they have standing based on an assignment of rights by the CIGNA-insured patients they treated.

Provider Plaintiffs rely on various District of New Jersey cases in which the theory of standing by assignment has been applied to an ERISA claim.  *See N. Jersey Ctr. for Surgery, P.A., v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, No. 07-4812 (HAA), 2008 WL 4371754, at * 3 (D.N.J. Sept. 18, 2008); *Wayne Surgical Ctr. v. Concentra Preferred Sys., Inc.*, No. 06-928 (HAA), 2007 WL 2416428, at *3-4 (D.N.J. Aug. 20, 2007).  In one of those district court cases, *Wayne Surgical*, the court gave the issue careful consideration.  It held that a provider of ambulatory surgical services had standing to bring an ERISA § 502 claim for benefits against a patient's health insurance carrier based on an assignment of benefits, "through which the patient assigns to [the provider] (among other rights) the patient's right to receive payment directly from the patient's insurer for the services that the patient receives at [the provider]." *Wayne Surgical*, 2007 WL 2416428, at *3.  The court relied on the Fifth Circuit's decision in *Tango Transport v. Healthcare Financial Services*, which reasoned that by remaining silent on the assignability of a § 502 claim for benefits, the statute implied that assignment was not

_____

[10] ERISA defines "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit."  29 U.S.C. § 1002(7).  It defines "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  29 U.S.C. § 1002(8).

prohibited.  *Id.* at *4 (citing *Tango Transport v. Healthcare Fin. Svcs.*, 322 F.3d 888 (5th Cir. 2003)).  The *Wayne Surgical* court found *Tango Transport*'s statutory interpretation persuasive, summarizing it as follows: "although Congress included an anti-assignment provision pertaining to pension plans under ERISA, Congress has not included an anti-assignment for health care benefits."  *Id.* (citing *Tango Transport*, 322 F.2d at 891).

Provider Plaintiffs do no cite any binding authority for the proposition that one other than a participant or beneficiary in an ERISA plan may sue under a theory of assignment.  The Court's own investigation confirms that the Third Circuit has not settled the question of standing to sue under ERISA § 502 by assignment. *Pascack Valley Hosp.*, 388 F.3d at 401 n.7 (declining to express opinion on derivative standing to sue under ERISA § 502(a)); *Cmty. Med. Ctr. v. Local 464A UFCW Welfare Reimbursement Plan*, 143 F.App'x 433, 435 (3d Cir. 2005) (noting that it would not resolve parties' dispute over whether Third Circuit law would permit a party to obtain standing to sue under ERISA § 502(a) by assignment).  Nevertheless, the Third Circuit has noted that many other circuit courts that have considered the issue have held that providers may assert such a claim "where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan." *Pascack Valley Hosp.*, 388 F.3d at 401 n.7.

Assuming for the purposes of this motion that the Third Circuit would adopt a standing-by-assignment theory with respect to ERISA § 502 claims, the Court nevertheless concludes that Provider Plaintiffs have failed to establish that they may stand in the shoes of CIGNA plan participants or beneficiaries as assignees of their patients' rights.  To determine whether the Provider Plaintiffs may stand in the place of their patients, the Court must be satisfied that the

13

alleged assignments encompass the patients' rights to receive the benefits of their health plan's ONET coverage. *Cmty. Med. Ctr.*, 134 F.App'x at 435 (observing in dicta that a court could not be satisfied that a provider has standing to pursue a claim under ERISA § 502(a) as an assignee without knowing the term or parameters of the purported assignments). In other words, as the Court will discuss in further detail below, the assignment must encompass the patient's legal claim to benefits under the plan.

This concern was echoed in the decision issued by the district court for the District of New Jersey in *North Jersey Center for Surgery v. Horizon BCBS of New Jersey*, in which it granted a plaintiff's motion to remand. *N. Jersey Ctr. for Surgery*, 2008 WL 4371754, at *4-5. Though the issue of ERISA standing by assignment arose in a different procedural context in that case, the facts underlying the litigation in *North Jersey Center for Surgery* are quite similar to the case at bar. There, a Nonpar with the Horizon BCBS provider network filed suit in state court against Horizon seeking to recover, under various state law theories of relief, for Horizon's alleged failure to fully reimburse the provider for the ONET services provided to Horizon subscribers. *Id.* at *5. As is the case here, the Horizon insureds had executed an assignment of rights, pursuant to which the provider would be entitled to receive reimbursement directly from Horizon for the amount covered by the health plan's ONET benefit. *Id.* Horizon removed the action to federal court, arguing that the provider plaintiff's claims could have been brought under ERISA § 502 and thus were completely preempted by ERISA. *Id.* at *7. Adopting the magistrate judge's report and recommendation, the district court held that the defendant had failed to meet its burden of showing that the provider's claims against Horizon could have been

14

brought under ERISA, pursuant to the assignment, and thus failed to establish the existence of

federal subject matter jurisdiction based on ERISA preemption of the state law claims.  *Id.* at *4-

5.  The court noted that the scope of the assignment, as described in the complaint, was too vague

for the court to conclude that the provider had obtained a complete assignment of its patients'

health insurance benefits.  *Id.* at *4.  Significantly, the court drew a distinction between such a

complete assignment of benefits and the more limited assignment of a right to receive

reimbursement from an insurer, reasoning that the contours of the purported assignments

mattered because the former kind of assignment would bring the action within ERISA while the

latter would not.  *Id.*  The court provided the following explanation of why Horizon failed to

establish that the assignment encompassed a claim for benefits under ERISA § 502:

> All the Court has is Plaintiff's generalized assertion that it is an "assignee
> and/or third-party beneficiary of the contracts of health insurance between
> [its] patients who are Horizon subscribers and Horizon." . . .  The Court
> thus has no way to determine whether the purported assignment conferred
> only rights to reimbursement of medical services (beyond the scope of
> ERISA) or the full benefits of the insurance plan (within the scope of
> ERISA) . . .  Horizon's reliance on the language in the Complaint is to no
> avail. Vague references to a common practice of non-network providers  . .
> .  and a purported assignment of benefits to NJCS  . . .  fail to conclusively
> establish that NJCS has a complete assignment of its patients' health
> insurance benefits. Consequently, the absence of evidence leaves this
> Court with grave doubt that Plaintiff would have standing to sue under
> ERISA. Such doubt augers in favor of remand.

*Id.* (internal citations omitted).  Another district court opinion reached a similar conclusion,

based on the applicable assignment document's language, which allowed the provider hospital to

receive payments directly from the patient's health benefits insurer but did not support an

"unequivocal assignment of all of [the patient's] rights under Seafarer's [ERISA] plan.  *Cooper*

*Hosp. Univ. Med. Ctr. v. Seafarers Health and Benefits Plan*, No. 05-5941, 2007 WL 2793372, at *3 (D.N.J. Sept. 25, 2007) (finding removing defendant had failed to demonstrate ERISA preemption and therefore failed to support existence of federal jurisdiction).

Provider Plaintiffs attempt to cast as inapposite the decisions in *North Jersey Medical Center* and *Cooper* simply because, there, concern regarding the scope of the assignment by an ERISA plan beneficiary to his or her provider arose in the context of a motion to remand. The procedural distinction of those cases from this one may go to the issue of which party bears the burden of demonstrating that the a claim may be brought pursuant to ERISA. It does not, however, dilute the sound reasoning of those decisions that the scope of the "assignment of benefits" is critical to determining whether a provider has standing to sue under ERISA.

Here, the burden falls on the Provider Plaintiffs to establish that they have standing to sue under ERISA § 502(a). When standing is challenged on a motion to dismiss, as CIGNA has done here, the burden falls on the proponent of the claim to establish it has standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Standing may be demonstrated at the pleading stage based upon the complaint's factual allegations, according to the burden a complaint must meet to pass muster under Rule 8(a). *Lujan*, 504 U.S. at 561. As discussed in Section I of this Opinion, Rule 8(a) demands that a complaint contain sufficient factual allegations to render a claim plausible. *Iqbal*, 129 S.Ct. at 1950.

The allegations of the CAC and North Peninsula Complaint, however, provide only the most conclusory assertions that the various Provider Plaintiffs obtained an assignment of

"benefits" from their patients.  Moreover, as the Court will explain below, the Provider

Plaintiffs' assignment theory of ERISA standing is belied by the fact that, according to Plaintiffs'

own allegations, ONET providers reserve the right to collect their entire actual charges from

patients, regardless of the insurer's claim determination.

   As pled in the complaints, the assignment allegations amount to no more than recitations

of the legal standard.  *Iqbal* and *Twombly* make clear, however, that though a court must take all

of the factual allegations in the complaint as true on a motion to dismiss, it is "not bound to

accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 129 S.Ct. at 1950

(quoting *Twombly*, 550 U.S. at 555).  The Court believes it is fair to assume that the Provider

Plaintiffs know what their own assignment forms provide, yet the complaints nowhere recite the

language of the relevant assignment provisions.  Though the assignment-related allegations vary

somewhat from provider to provider, the following examples illustrate the extent of information

pled regarding the contents of the assignments:

> The high cost of medical care makes it difficult for many patients to pay
> out of pocket for treatment at the time of service.  Instead, patients rely on
> their health plans to reimburse physicians for their services, leaving the
> Provider Plaintiffs and the other Provider Class members to advance the
> cost of their procedures.  As collateral for payment, patients sign a form
> assigning their health benefits to Dr. Gardner in advance of treatment.
> This form includes an express authorization by the patient for CIGNA to
> remit payment directly to Dr. Gardner for covered services.

* * *

> Dr. Antell receives assignments from some CIGNA beneficiaries.  These
> assignments indicate that CIGNA should pay Dr. Antell directly.  These
> assignments also enable Dr. Antell to stand in the shoes of the CIGNA
> beneficiaries, including to demand reimbursement in compliance with the
> UCR definition in their health plans.

* * *

> After June 19, 2005, Dr. Kavali has treated patients with coverage under plans covered or administered by CIGNA on an out of network basis.  In each case, Dr. Kavali has obtained from the patient an assignment of benefits.

* * *

> As collateral for payment, patients sign a form fully assigning their health benefits within the meaning of ERISA to NPSC [North Peninsula Surgical Center] in advance of treatment.  This form includes an express authorization by the patient for Defendant [CIGNA] to remit payment directly to NPSC for covered services.

(CAC, ¶¶ 119, 137, 163; North Peninsula Compl., ¶ 40.)

Simply asserting that CIGNA subscribers have assigned their CIGNA plan benefits fails to plausibly establish that each Provider Plaintiff has obtained at least one actual assignment of a patient's right to assert a claim for benefits and pursue litigation under ERISA.  Provider Plaintiffs allege that they may "stand in the shoes" of their patients to assert the patients' rights under the applicable ERISA health plans, but fail to plead facts (for example, actual assignment language) to support their legal conclusion that a valid assignment of the proper breadth was given by patients.  This deficiency is particularly glaring in light of the fact that in this action, and in the same consolidated class action pleading containing Provider Plaintiffs' allegations, plan *subscribers* also assert ERISA § 502 claims themselves seeking to recover for the very same type of injuries –  underpayment of ONET benefits and other ERISA violations.  The inherent tension in the pursuit of ERISA claims by both plan subscribers and providers who claim standing as

18

assignees of the subscribers renders the need for the exact language of the applicable assignment provisions that much more crucial to sorting out the standing issue.

Indeed, to the detriment of Provider Plaintiffs' position that they have standing by assignment to sue under ERISA, a common-sense reading of the CAC and the North Peninsula Complaint indicates that the assignments consisted of nothing more than the patient-insured's transfer of his or her right to reimbursement by the insurer for an ONET service, such that the provider would submit a claim for reimbursement and the insurer would be authorized to send this payment directly to the provider.  In this scenario, the subscriber or plan beneficiary patient would not pay for the service in full, but rather be balance-billed by the provider for any amount of the service charge not covered by the health benefits plan.  According to the Plaintiffs' own allegations, however, regardless of how the payment transaction is structured – whether the provider bills on the front end the full amount to the patient, who then obtains ONET reimbursement from his carrier, or the patient initially makes only a co-payment and agrees that the provider may stand in his shoes with regard to collection of the ONET coverage money from the insurer – the patient is always ultimately responsible for the entire charge.  If the assignment given by the patient is limited to direct receipt of the ONET reimbursement and/or is qualified by the provider's reservation of his or her right to collect the entire charge for the service from the patient, the claim for ONET benefits under the patient's CIGNA plan continues to run to the patient-insured.  Plaintiffs have attempted to conflate a Nonpar's method of billing and collecting payment with the Nonpar's assumption of the patient's rights to benefits under the health plan. The allegations in the Complaints do not support the latter.

19

At best, the allegations provide only the most ambiguous and conclusory information about what the purported assignments entail.  At worst for Provider Plaintiffs, they indicate that the assignments were limited to a patient's assigning his or her right to receive reimbursement from CIGNA for the covered portion of the service bill, which in no way can be construed as tantamount to assigning the right enforce his or her rights under the plan.  The Court cannot conclude, based on the information supplied in the Complaints, that the assignments encompass a CIGNA-insured's claim to benefits, such that any of the Provider Plaintiffs can legally be deemed a "participant or beneficiary" of his or her patient's ERISA health plan.  Simply put, Provider Plaintiffs have not met their burden of demonstrating that they have derivative standing to sue under ERISA.

All ERISA claims asserted by Provider Plaintiffs in the CAC and North Peninsula Complaint will accordingly be dismissed.

### 2.     RICO and Sherman Act Claims

CIGNA challenges Provider Plaintiffs' standing to pursue both RICO claims and Sherman Act antitrust claims on grounds that the complaints do not allege that Provider Plaintiffs obtained an express assignment from CIGNA insureds.  Third Circuit law directs that assignment of RICO claims, as well as assignment of antitrust claims, must be express.  *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (citing *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438-40 (3d Cir. 1993)).  To the extent Provider Plaintiffs attempt to rely on the same general and conclusory allegations that they have been assigned their patients' benefits, the allegations fall far short of the standard articulated in *Lerman*.  While the

20

*Lerman* court held that a valid assignment does not require that terms of art be employed, *id.*, the facts on which it concluded that certain assignment language was broad enough to effect a transfer of the RICO cause of action are quite distinct from those presented here.  In *Lerman*, the assignee had made a direct purchase of the entire assignor corporation that allegedly sustained the RICO violations, including all its assets and liabilities and "specifically all its causes of action."  *Id.* at 111.  In this case, no alleged fact regarding assignment even comes close to supporting a reasonable inference that any RICO or antitrust claims belonging to the CIGNA-insureds had been expressly assigned to the Provider Plaintiffs.

In addition to the assignment theory, the Complaints also assert that the Provider Plaintiffs have standing to litigate RICO and antitrust claims "as third-party beneficiaries of their patients's out-of-network benefits."  (CAC, ¶¶ 479, 532, 550, 560.)  CIGNA's motion to dismiss challenges the viability of the third-party beneficiary theory, based on both the non-applicability of a contract theory to non-contract claims as well as on the lack of allegations supporting the proposition that CIGNA intended its plans to benefit providers.  Provider Plaintiffs, in opposition, cite no authority to the Court that supports pursuit of RICO or antitrust claims based on a party's status as a third-party beneficiary.  Instead, they argue in a conclusory manner, that they have standing because the alleged artificial depression of UCRs by CIGNA, Ingenix and others targeted providers as well as subscribers.   Provider Plaintiffs make an attempt to salvage their RICO and antitrust claims by maintaining that they have personally and directly sustained

antitrust and racketeering injuries.  This attempt is, frankly, superficial and underdeveloped.  The argument, unsupported by any reference to factual allegations made in the Complaints, requires no further discussion

Accordingly, all RICO and antitrust claims asserted by Provider Plaintiffs in the CAC and North Peninsula Complaint must be dismissed for lack of standing.

### B.    Standing of Association Plaintiffs

Association Plaintiffs also seek to pursue ERISA, RICO and Sherman Act claims.   They assert that they have standing on two grounds: in a representative capacity, bringing claims on behalf of their healthcare provider members, and in a direct capacity, seeking remedy for injuries they claim to have sustained personally as a result of CIGNA's alleged violation of these statutes. The Court finds neither of these grounds satisfied and accordingly dismisses all claims pled by the Association Plaintiffs against CIGNA in the CAC.

The Association Plaintiffs cannot establish, based on the facts alleged, that "their members would otherwise have standing to sue in their own right."   *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).   This is an essential prong of representative standing, and the CAC's failure to allege facts that could plausibly support the standing of providers to sue under ERISA, RICO or the Sherman Act is fatal to the Association Plaintiffs' claim that representative standing exists.  It is well-settled that while an "association may have standing solely as the representative of its members" –  that is, without having sustained any unique injury to itself –  the association "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make

22

out a justiciable case had the members themselves brought suit." *Id.* at 343 (quoting *Warth v. Seldin*, 422 U.S. at 511). Moreover, associational standing cannot be recognized where either the claim asserted or the relief requested requires the participation of individual members of the association in the lawsuit. *Id.* As discussed above, resolving the claims at issue requires careful examination, on a provider-by-provider basis, of the assignments signed by patients and whether they contain the language required for a valid assignment of ERISA, RICO or antitrust claims to exist. The allegations of the CAC fail to establish that any provider member of the Association Plaintiffs would have standing in the provider's own right to assert these claims. Thus, insofar as the Association Plaintiffs seek to pursue any claims in this action against CIGNA on grounds that they have associational standing to sue, their claims must be dismissed.

Insofar as the Association Plaintiffs assert that they may pursue RICO and antitrust claims for relief on their own behalf, CIGNA's motion to dismiss is premised on the argument that the Association Plaintiffs have not sustained their own financial injury apart from harm allegedly sustained by provider members. Although CIGNA collapses these arguments related to standing, it actually raises two distinct types of challenges: one as to the Association Plaintiffs' constitutional standing under Article III and one as to their statutory standing to sue under RICO and/or the Sherman Act. The challenge to Article III standing questions whether the Association Plaintiffs seek redress for their *own* injury thus they present a justiciable case or controversy, whereas the arguments that the Association Plaintiffs have not asserted "an injury to business or property" questions whether they have pled a cognizable loss according to the statutes under which they seek relief. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 (1998)

(distinguishing between Article III standing and statutory standing); *Bennet v. Spear*, 520 U.S. 154, 162 (1997) (same).

The Supreme Court has held that an association can have independent standing to sue if it can establish the minimal requirements to satisfy Article III.   *Warth*, 422 U.S. at 511.  Article III's "irreducible constitutional minimum" of standing requires, among other things, that a plaintiff establish it has sustained "injury in fact."   *Bennet*, 520 U.S. at 162; *Lujan*, 504 U.S. at 560-61.  Such injury cannot consist solely of a "setback to the organization's abstract social interests" but rather must amount to "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources."   *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 (1982).  The Association Plaintiffs claim in the CAC that they have been forced to spend time and resources counseling provider members on how to deal with CIGNA's allegedly improper payment practices and UCR reimbursements.  The Court can accept, for purposes of this motion, that this impact suffices to state that the Associational Plaintiffs' resources have been depleted allegedly as a result of CIGNA's conduct and that they therefore have a personal stake in the outcome of the litigation.  *See id.* (finding that organization had standing to sue in its own right where it alleged that discriminatory racial steering practices had caused it to devote resources to counteracting those practices).

Establishing Article III standing does not, by itself, entitle the Association Plaintiffs to proceed with their claims, for both RICO and Sherman Act claims impose a statutory standing requirement.  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional

standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action"); *Maio*, 221 F.3d at 482 ("Apart from the Article III constitutional and prudential standing requirements . . . plaintiffs seeking recovery under RICO must satisfy additional standing criterion set forth in section 1964(c) of the statute.") (citations omitted). To sue under RICO, a litigant must allege that it has experienced a loss to "business or property" as a result of racketeering activity, as defined by the statute in section 1962. 18 U.S.C. § 1964(c); *Maio*, 221 F.3d at 482-83. This limitation "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Id.* at 483 (quoting *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir.1994)). Pleading a loss within the meaning of RICO requires that a plaintiff allege a concrete financial loss, not merely a loss of an intangible, albeit valuable, interest. *Id.* Moreover, RICO standing also requires more than a factual link between the injury to business or property and the alleged RICO violation; standing cannot be established without demonstrating proximate cause. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266-69 (1992). Similarly, to establish antitrust standing, a plaintiff must demonstrate both the type of harm targeted by antitrust laws, for example decreased competition, and injury resulting from that harm, such as when the plaintiff is a consumer in the relevant market. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993). "Antitrust injury must be caused by the antitrust violation – not a mere causal link, but a direct effect." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998). The Association Plaintiffs' conclusory allegations that they have been forced to devote resources to counseling members regarding issues related to

25

the allegedly improper UCR determinations made by CIGNA hardly alleges concrete financial

loss to business or property.  Nor do they establish, assuming the facts in the CAC to be true, that

there is any injury to them directly linked to the alleged violation of section 1 of the Sherman Act

which prohibits contracts, combinations or conspiracies "in restraint of trade."  15 U.S.C. § 1.

Accordingly, all claims brought by the Association Plaintiffs against CIGNA in the CAC

will be dismissed for lack of standing.

### C.      Subscriber Plaintiffs' Standing

#### 1.      Challenge to Nelson Plaintiffs' Article III Standing

In its motion to dismiss the Nelson Complaint, CIGNA maintains that the Nelsons, who

were at all relevant times beneficiaries of a CIGNA health plan, lack constitutional standing to

pursue this lawsuit because they have not alleged injury in fact.  CIGNA argues that although the

Nelsons take issue with the manner in which CIGNA paid ONET claims, they do not allege that

they were ever balance billed by a provider or actually paid more than they should have for an

ONET service as a result of CIGNA's underpayment of a claim.

The Court finds that CIGNA's argument takes much too narrow a view of the "injury in

fact" requirement.  In *Lujan*, a seminal case on Article III standing, the Supreme Court defined

injury in fact as "an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at

560.  The Court added that by "particularized," it meant that the harm claimed must personally

affect the plaintiff, as opposed to some third party.  *Id.* at 561 n.1.

26

The Nelson Complaint alleges that the Nelsons have received what they contend are artificially depressed reimbursements from CIGNA for ONET services and are responsible for any portion of the provider's billed charges not covered by CIGNA.  Whether the Nelson Plaintiffs have actually paid any portion of the Nonpar's billed charges or not may go to the question of what remedy, if any, they may obtain.  It does not, however, have any bearing on the question of whether their own legal interests have allegedly been violated by CIGNA's conduct. Whatever their actual out-of-pocket expenses have been, the clear inference to be drawn from the factual allegations, read as a whole, is that the Nelson Plaintiffs remain indebted to the Nonpar for the service.  There is no indication in the Nelson Complaint that any Nonpar who provided services to the Nelsons forgave any unpaid charges or has otherwise waived the Nonpar's right to collect.  The factual allegations plausibly state that the Nelson Plaintiffs owe ONET provider Higashi more than they would have had CIGNA properly determined and paid the ONET benefit to which they were entitled under their health plan.  This financial obligation is sufficient to establish injury-in-fact.  "'The gist of the question of standing' is whether petitioners have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Mass. v. E.P.A.*, 549 U.S. 497, 516 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The Court finds that the allegations of the Nelson Complaint demonstrate the existence of Article III standing.

2.     Franco's Standing To Assert RICO Claims

CIGNA argues that the RICO claim of lead Subscriber Plaintiff Franco must be dismissed because it was moot at the time it was filed.  On leave of court, Franco amended her complaint and added a RICO claim to the action in December 2008.  Yet, CIGNA maintains, she had no injury in fact on which to base the RICO claim because in February 2008 CIGNA paid the balance of Franco's medical bills and had fully reimbursed her for her out-of-pocket expenses in connection with the transactions which would have given rise to her claims.

The February 2008 payment does not defeat Franco's standing.  As Judge Shwartz correctly observed in expressly granting leave to Franco to add newly discovered claims, including the RICO claims, the governing jurisprudence on standing in class action litigation instructs that "making the named plaintiff whole does not render moot her ability to proceed for the class."  (11/26/08 Tr. at 19:4-10, Lefkowitz Cert. Ex. E.)  Indeed, the Third Circuit's holding in *Weiss v. Regal Collections* repudiates precisely the maneuver that CIGNA now urges this court to sanction by dismissing Franco's RICO claim for lack of injury in fact.  In *Weiss*, the Court held that a defendant could not moot a claim by settling with a class representative, even if the settlement occurred prior to class certification.  *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004).  The *Weiss* court relied on the relation-back doctrine, concluding that the filing of the class certification motion should relate back to the filing of the class complaint, thus thwarting any mootness effect that a settlement with the class representative in the intervening period could have.  *Id.*  The Court further noted policy reasons for following such a rule.  It reasoned that allowing named plaintiffs to be "picked off" at an early stage in a putative class

28

action would undercut the viability of the class action procedure, waste judicial resources, deprive the plaintiff an opportunity to bring a class certification motion and possibly encourage the filing of additional suits by other individuals claiming to be aggrieved by similar conduct of the defendant.  *Id.* at 345-46.

CIGNA attempts to distinguish *Weiss* by arguing that, unlike that case, the RICO claim here had not yet been filed at the time the settlement occurred.  Thus, it maintains this is not a situation in which CIGNA can be said to have employed the tactic of eliminating a claim by settling after the claim was *filed* but before it could be certified for class action treatment.  Rather, in their view, Franco did not have standing to assert the RICO claim to begin with, for she was made whole prior to the addition of the RICO claim to this litigation.

The Court is not persuaded by the argument.  Not only does it fail to rely on any binding authority, but it also presumes that the newly added claims would not relate back to the filing of this lawsuit, pursuant to Federal Rule of Civil Procedure 15.  While the Court makes no findings as to the date of accrual of any claims, as that issue has not been formally presented to this Court in the instant motion,[11] it observes that the Third Circuit disapproved in *Weiss* of settlement tactics that would stifle pursuit of relief through the class action mechanism.  The same concerns expressed by the *Weiss* court apply here.  Dismissing the RICO claims based on CIGNA's pay-off of a putative class representative would frustrate the policy and spirit inherent in the *Weiss* holding.

---

[11] CIGNA makes reference to statute of limitations issues in footnote 8 of its opening brief.  Such passing and informal treatment of a significant matter hardly raises it as an issue that must be analyzed by this Court as grounds for dismissal of the Subscriber Plaintiffs' RICO claims, in whole or in part.

In short, CIGNA's argument that Franco's RICO claims must be dismissed for lack of standing contravenes the law of this circuit and must be rejected.

### D.    Standing To Pursue Declaratory and Injunctive Relief - All Plaintiffs

CIGNA additionally seeks to dismiss all claims for declaratory and injunctive relief on grounds that the named Subscriber Plaintiffs are no longer CIGNA plan members and thus may not obtain the prospective relief they seek.[12]  In response, Subscriber Plaintiffs counter that they do not, in fact, seek injunctive relief.  They seek only a declaration that CIGNA violated a number of rights to which Subscriber Plaintiffs were entitled under ERISA, including payment of the ONET benefits owed under their health plans.

The Court will not dismiss Subscriber Plaintiffs' claim for declaratory relief simply because they are no longer participants in a CIGNA health plan.  The statute which provides the Court authority to issue declaratory judgments provides, in relevant part, that

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added).  Subscriber Plaintiffs have clearly presented a case or controversy regarding CIGNA's alleged violation of their rights under ERISA, notwithstanding the undisputed fact that they are not currently covered under a CIGNA health plan.  ERISA

---

[12] CIGNA's motion, as briefed, also seeks dismissal of Provider Plaintiffs' and Association Plaintiffs' claims for injunctive and declaratory relief.  This portion of the motion is, of course, moot in light of the Court's holdings that neither Provider Plaintiffs nor Association Plaintiffs have standing to sue under ERISA.

expressly contemplates that claims may be brought by current and former employees who are or may become eligible to receive a benefit from an employee benefit plan.  29 U.S.C. §§ 1102(7) & (8), 1132(a).  In essence, CIGNA is arguing that claims for relief brought by any health plan participant or beneficiary concerning unpaid benefits or other alleged ERISA violations become moot when that individual ceases to be covered under the plan.  CIGNA's argument runs counter to ERISA and the Declaratory Judgment Act.  Subscriber Plaintiffs have not lost standing to seek a declaration regarding CIGNA's legal obligations to them simply because they may not seek prospective enforcement of any rights under formerly effective ERISA plans.

To the extent the Defendants seek dismissal of Subscriber Plaintiffs' claims for injunctive relief, that portion of the motion is moot, as Subscriber Plaintiffs have conceded that they do not demand such relief.  To the extent they seek dismissal of Subscriber Plaintiffs' claims for declaratory judgment on grounds that they lack standing to assert such claims, the motion will be denied.

## III.   ERISA Claims

The Court now turns to the substance of the ERISA claims asserted by the Subscriber Plaintiffs.  The CAC and the Nelson Complaint plead for relief under ERISA for the following alleged misconduct: (1) unpaid benefits (owed pursuant to CIGNA plan documents); (2) failure to disclose use of Ingenix and/or methodology for determining UCR (in violation of 29 U.S.C. § 1022) (3) breach of the fiduciary duty of loyalty and due care (in violation of 29 U.S.C. § 1104); and (4) failure to provide a full and fair review of denied claims (in violation of 29 U.S.C. §

1133).  CIGNA attacks the viability of the ERISA claims on various grounds, including the

overall challenge that none of the ERISA claims may be sustained because CIGNA is not a

proper defendant to those claims.  The Court will address that argument first, and then proceed to

discuss whether any of the misconduct alleged plausibly supports a cognizable claim for relief

under the statute.

### A.    CIGNA as Defendant

ERISA § 502, under which Subscriber Plaintiffs seek to recover unpaid benefits as well

as relief for the other alleged statutory violations, authorizes suit against the plan and its

administrators in their official capacities.  *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d

Cir. 2007).  Likewise, Subscriber Plaintiffs' ERISA claim for declaratory relief under § 502(c)

can be brought only against plan administrators.  *Groves v. Modified Ret. Plan for Hourly Paid*

*Employees of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109, 112-13 (3d Cir. 1986).

CIGNA contends that Subscriber Plaintiffs have named the wrong party to their ERISA claims

because the allegations do not support their characterization of CIGNA as "plan administrator"

for any of the health plans at issue.

The term "plan administrator" is a term of art under ERISA.  *Id.* at 116.  The statute

defines it as "the person specifically so designated by the terms of the instrument under which the

plan is operated."  29 U.S.C. § 1002(16)(A)(i).  It further provides, however, that if no person is

so designated, then the "administrator" may be the plan sponsor of, if a plan sponsor cannot be

identified, the "administrator" may be designated by the Secretary of Labor.  29 U.S.C. § 1002

(16)(A)(ii) and (iii).  CIGNA argues that, according to the allegations of the CAC and the

Nelson Complaint, it meets none of those definitions and cannot therefore be liable for the ERISA § 502 claims asserted in the pleadings.

CIGNA's argument relies on too narrow a view of who or what may qualify as an administrator within the meaning of ERISA.  This Court must be guided by the Third Circuit's interpretation of the statutory definition of "administrator," particularly as it regards the naming of a proper defendant to an ERISA suit.  The appeals court held in *Evans v. Employee Benefit Plan, Camp Dresser & McKee, Inc.*, that the defining feature of a proper defendant under ERISA § 502(a)(1)(B) is whether that person or entity "exercis[es] control over the administration of benefits." *Evans v. Employee Benefit Plan, Camp Dresser & McKee, Inc.*, 311 F.App'x 556, 558 (3d Cir. 2009).  It thus rejected the plaintiff's ERISA claims against the employer, even though the employer name and address were declared in the plan section labeled "Employer and Plan Administrator", reasoning that despite this express statement in the plan, the plaintiff had not shown that the employer had responsibility for administering benefits.  *Id.* at 55-59.  In fact, the court observed, the plan language made it clear that the insurance carrier, MetLife, had discretion to interpret the plan's terms.  *Id.* at 559.

Though *Evans* is not precedential, the Court is persuaded by its consideration of the proper target of an ERISA claim.  Rather than looking solely to the plan's identification of "plan administrator," the court's analysis placed its focus on whether the identified entity had discretion to interpret the plan and make benefits determinations.  The Third Circuit's holding in *Evans* is, moreover, consistent with an earlier, and binding opinion of that court indicating that it is the plan administrator's exercise of discretionary authority in making claims decisions which

33

makes it a fiduciary of the plan and thus the entity which may be the subject of an ERISA claim.

Observing that ERISA § 502(a)(1)(B) and (d) permit private rights of action by a beneficiary

against the plan administrator as a fiduciary, the appeals court quoted the Supreme Court as

follows:

> a fiduciary has obligations other than, and in addition to, managing plan
> assets. . . . For example . . . a plan administrator engages in a fiduciary act
> when making a discretionary determination about whether a claimant is
> entitled to benefits under the terms of plan documents. . . . ERISA
> specifically provides a remedy for breaches of fiduciary duty with respect
> to the interpretation of plan documents *and the payment of claims*, one that
> is outside the framework of the second subsection . . . and one that runs
> directly to the injured beneficiary. § 502(a)(1)(B).

*Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008) (quoting *Varity

Corp. v. Howe*, 516 U.S. 489, 511-12 (1996) (alterations in original). The *Hahnemann* court went

on to note that a breach of such fiduciary obligations would provide an individual basis to seek

redress from the administrator as fiduciary. *Id.*

In the instant action, the applicable plans grant CIGNA the authority to determine

whether a person is entitled to benefits and to compute "any and all benefit payments." (*See*

Franco SPD at 70, Wohlforth Cert. Ex. 6; Chazen Plan at 56, Lefkowitz Cert. Ex. C.)  The CAC

alleges that "under the terms of the health plans of the Subscriber Plaintiffs and members of the

ERISA Class, CIGNA administers benefits and is a fiduciary."  (CAC, ¶ 378.)  Indeed the plan

language expressly provides that the nominal "Plan Administrator" delegates to CIGNA "the

discretionary authority to interpret and apply plan terms," which authority includes determining

eligibility for coverage, entitlement to benefits and calculation of benefit payments.  (*See, e.g.*,

Chazen Plan at 56.)  There are numerous allegations throughout the CAC and the Nelson

Complaint which assert that CIGNA made decisions regarding the payment of Nonpar claims, including selecting the UCR percentile at which ONET claims would be paid and deciding what amount of a Nonpar's billed charge would be covered or "allowed."  The CAC and the Nelson Complaint also indicate that CIGNA functioned as the payor of claims, whether it funded the plans or not.  Even if CIGNA was not nominally the "Plan Administrator" as identified in the plans, its role in fact with regard to the plans supports Subscriber Plaintiffs' allegations that CIGNA exercised control over benefits determinations in connection with their health plans. Thus, the Court finds that, in light of the Third Circuit's discussions in *Evans* and *Hahnemann*, the pleadings sufficiently establish at this stage of litigation that CIGNA is the proper defendant for Plaintiffs' ERISA claims.

### B.    ERISA Claim for Unpaid Benefits

CIGNA contends that Subscriber Plaintiffs' claim to recover alleged unpaid ONET benefits must be dismissed because it fails to rise to the pleading standard articulated in *Iqbal*. As summarized above, *Iqbal* holds that, to survive a motion to dismiss, a claim must be based on "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949-50.  The unpaid benefits claim revolves around the theory that CIGNA "breached its plan provisions for benefits by underpaying UCR and other ONET reimbursement amounts in ERISA health care plans." (CAC, ¶ 376.)  Yet, CIGNA argues, nowhere in the CAC or the Nelson Complaint do Plaintiffs identify what plan provisions were allegedly violated by the manner in which CIGNA calculated UCR and paid

Nonpar claims. Without such factual content, according to CIGNA, Subscriber Plaintiffs fail to allege that they may plausibly obtain relief under ERISA § 502(a)(1)(B).

The Court disagrees.  The Complaints at issue contain much more than mere conclusory assertions that CIGNA underpaid ONET claims in breach of plan provisions.  The factual allegations underpinning the alleged breach are plentiful.  Plaintiffs allege that under the plans, CIGNA was obligated to pay ONET claims at the UCR rate.  The CAC states: "CIGNA contractually promises that it will pay Nonpars at the lesser of their billed charge or the usual, customary and reasonable amount ("UCR," also known as "U&C" and "R&C" for the services rendered by Nonpars."  (CAC ¶ 6.)  CIGNA allegedly breached its contractual obligation with regard to the payment of ONET claims by using information it knew or should have known to furnish inaccurate UCRs. The Complaints further aver that, according to the plans, UCR is "the 'prevailing charge' charged by most providers of comparable services in the locality where the Member received the service, with consideration given to the nature and severity of the Member's condition, as well as any complications or unusual circumstances that would require additional time, skill, or experience on the part of the Nonpar."  (*Id.*)  Plaintiffs specify that by using the flawed Ingenix database for UCR information, CIGNA based ONET claims determinations on information that did not accurately represent the usual rate charged by practitioners in a particular geographic area for a service, that is, that did not comply with the plan definition of UCR.   Both the CAC and the Nelson Complaint go into great detail about the reasons they allege the Ingenix database deliberately yielded too-low and "False UCRs."

36

This analysis also applies to Chazen's ERISA § 502(a)(1) claim, even though CIGNA has argued that he has failed to plead a plan violation because the plan applicable to Chazen's claim for unpaid benefits permits the use of Ingenix to determine the ONET benefit.  Chazen's claim arises out of reconstructive surgery he underwent on August 14, 2006.  According to the CAC, "CIGNA used the Ingenix Database to determine the UCR used to pay Plaintiff's Chazen's claim" for that surgery.  (CAC, ¶ 109.)  As a result, Chazen avers, his financial liability for the surgery was higher than it would have been had CIGNA used an accurate database, rather than Ingenix to determine UCR.

The policy in effect when Chazen obtained the ONET service on which his claims are based provides that CIGNA will pay ONET benefits based on a "Maximum Reimbursable Charge."  (Lefkowitz Cert. Ex. C at 12.) That term is defined as

> the lesser of
>
> 1.     the provider's normal charge for a similar service or supply; or
>
> 2.     the policy-holder selected percentile of all charges made by providers of such service or supply in the geographic area where it is received.

(*Id.* at 64.) CIGNA correctly points out that the plan then expressly states that CIGNA "uses the Ingenix Prevailing Health Care System database to determine the charges made by providers in an area . . ." (*Id.*)  However, CIGNA's argument that Chazen has failed to plead a plausible breach of the plan misses the mark.  While the plan permitted the use of Ingenix to determine prevailing fees, the crux of this action is that the Ingenix database could not, and did not, generate accurate prevailing fee information.  The CAC alleges, indeed, that CIGNA participated in creating the

flaws in the database.  Chazen's theory of breach, in other words, is that CIGNA did not fulfill its

obligation to pay his ONET claim based on the "Maximum Reimbursable Charge," as defined by

the plan, because it knowingly used a flawed database.

Assuming the factual allegations of the Complaints to be true, as the Court must on a

motion to dismiss, the Court finds that the Subscriber Plaintiffs have adequately pled a plausible

claim to recover the unpaid ONET benefits they were allegedly owed by CIGNA under their

applicable plans.

### C.      ERISA Claims Based on Non-Disclosure of UCR Data

Subscriber Plaintiffs allege that CIGNA failed to provide them with material information

consisting of the "data and/or methodology it used to determine UCR or other Nonpar

reimbursements."  (CAC, ¶ 395.)  Based, in part, on such alleged withholding of information,

Plaintiffs assert various claims under ERISA § 502(a)(3), which authorizes plan participants,

beneficiaries and fiduciaries to seek injunctive and/or equitable relief to remedy statutory

violations.  The CAC summarizes the non-disclosure based wrongdoing as follows:

> When CIGNA used Ingenix data to price Nonpar claims, it failed to
> disclose critical facts about the Ingenix Database and the methodology that
> CIGNA used to make its ONET services reimbursement decision.  Using
> the False UCRs, CIGNA was able to under-reimburse the Subscriber
> Plaintiffs and the Provider Plaintiffs for ONET services.  CIGNA's non-
> disclosure of material facts prevented its Members and the Nonpar
> providers who treated them from effectively challenging or appealing its
> UCR determinations.  Although CIGNA is aware of serious, systemic
> flaws in the Ingenix Database, CIGNA concealed those flaws in its written
> communications with the Subscriber and Provider Plaintiffs.  For example,
> the Ingenix Database inappropriately averages the charges of all providers

> regardless of provider type or specialty.  It also fails to consider provider-specific, patient-specific and procedure-specific factors that affect charges. These and other flaws were not disclosed to Members by CIGNA in violation of its fiduciary obligations.

(CAC, ¶ 8.)

This portion of CIGNA's motion to dismiss turns on whether the alleged non-disclosure about Ingenix and/or ONET claims processing methodology may constitute a violation of a recognized and enforceable obligation under ERISA.  In their pleadings, Plaintiffs identify three statutory provisions which they allege to have been violated: sections 102, 404 and 503.  The Court will review each provision in turn to determine whether the misconduct alleged falls within the parameters of ERISA's directives.

ERISA § 102 deals with Summary Plan Descriptions ("SPDs").  It requires administrators to provide plan participants and beneficiaries with SPDs that include certain information listed in subsection (b) of the provision.  29 U.S.C. § 1022(a).  The list does not include information concerning the methodology for determining UCR in particular or, more generally, for calculating the amount owed to the participant or beneficiary on an ONET claim.  29 U.S.C. § 1022(b). Subscriber Plaintiffs argue that section 102 requires the SPD to be "accurate."  By reference to ERISA regulations, Plaintiffs maintain that the CIGNA SPDs could not be accurate for failure to inform insureds that its UCR methodologies would be used to reduce ONET benefits.  They refer in particular to 29 C.F.R. § 2520.102-3(j)(3),[13] which falls under the regulatory subpart governing

_____

[13] The brief actually cites to "29 C.F.R. § 2520.102-30(3)." (Pl. Op. Br. at 27 & 28.) The Court suspected that such a citation must have contained a typographical error, as no such provision exists in the Code of Federal Regulations.  In any event, the brief helpfully quoted language from the provision on which Plaintiffs relied, and the Court was able to locate the correct citation.

the contents of an SPD.  That provision requires the SPD to describe, among other things,

"whether, and under what circumstances, coverage is provided for out-of-network services."  29

C.F.R. § 2520.102-3(j)(3). The SPDs applicable to Subscriber Plaintiffs clearly set forth that

ONET services will be covered at the lesser of the provider's actual charge or a percentile of the

prevailing fee.  Plaintiffs, however, take the position that this disclosure falls short of the

regulation, which in their view, would encompass disclosure of the data used to determine

prevailing fees.  Their position lacks legal support.  They point to no language in either ERISA §

102 nor the implementing regulation cited above, or to any other authority, that endorses their

expansive interpretation.

Subscriber Plaintiffs' reliance on ERISA § 404 is similarly unavailing.  Section 404

imposes obligations on plan fiduciaries, including the requirement that the fiduciary discharge its

duties according to the "prudent man" standard.  29 U.S.C. § 1104(a)(1)(B).  The Third Circuit

has held that this standard encompasses a duty to provide certain information but that such duty is

limited to disclosure of "those material facts, known to the fiduciary but unknown to the

beneficiary, which the beneficiary must know for its own protection."  *Glaziers and Glassworkers*

*Union Local No. 252 Annuity Fund v. Newbridge Secs.*, 93 F.3d 1171, 1182 (3d Cir. 1996).  The

test of materiality inquires whether there is a substantial likelihood that the omission of the

information "would mislead a reasonable employee in making an adequately informed decision."

*Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1015 (3d Cir. 1997).  Plaintiffs have not cited, nor

has the Court's independent research uncovered, any binding authority holding that the fiduciary

duty of disclosure under ERISA requires that a plan fiduciary disclose the data the plan uses to

40

determine what constitutes the UCR or prevailing fee for a service. Indeed, the Third Circuit has expressed reluctance at giving section 404 such broad interpretation that the provision, which does not by its express terms set forth any disclosures that must be made, somehow can be turned into an unlimited disclosure obligation. *See Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 462 n.9 (3d Cir. 2003) (citing *Weiss v. CIGNA Healthcare, Inc.*, 972 F.Supp. 748, 754 (S.D.N.Y.1997)). No facts alleged in the CAC or the Nelson Complaint, moreover, state or even permit the inference that if the Subscriber Plaintiffs had known that CIGNA obtains UCR data from Ingenix, their ability to make an informed decision about whether to seek treatment from an in-network provider or Nonpar would have been impacted. Nor do the Complaints suggest that knowing such information would have affected their decision as to which ERISA health plan to select, assuming their employers made choices available. (In fact, Chazen was presumably already in possession of the allegedly lacking information, as his SPD expressly discloses the use of Ingenix.) Nor do the pleadings allege that CIGNA was on notice that the Subscriber Plaintiffs needed UCR methodology information to prevent them from making a harmful decision regarding coverage. *Id.* at 463. The fact is that the difference in coverage between in-network and ONET services was disclosed in the SPDs, and Subscriber Plaintiffs have failed to state how CIGNA's failure to provide even more information gives rise to an actionable violation of ERISA § 404.

Finally, section 503 sets forth two requirements: (1) the plan must set forth its "specific reasons" for a denial of benefits and (2) it must afford participants the opportunity for a full and fair review of a claim denial decision. 29 U.S.C. § 1133. Subscriber Plaintiffs maintain that by failing to explain what data was used by the plan to calculate the ONET benefit amount as to their

41

claims, CIGNA's disallowance of certain billed charges fell short of section 503's mandate to provide a "specific reason" and in so doing deprived Subscriber Plaintiffs of an opportunity to challenge the claim decision.  Neither the factual allegations of the CAC or the Nelson Complaint nor the legal authority they invoke bear out this theory of liability.  For each of the Subscriber Plaintiffs, the applicable complaints allege that when CIGNA disallowed certain amounts of an ONET claim, it informed each of the named Subscriber Plaintiffs that the allowed amount represented the reasonable and customary rate for the service, or alternatively, that a provider's bill exceeded the "Maximum Reimbursable Charge," a term expressly defined in the CIGNA plans as discussed above.  The Nelson Complaint alleges, for example, that in each instance in which the Nelson Plaintiffs were treated by Nonpar Stephanie Higashi, CIGNA paid only a portion of the amount billed by the provider, "falsely claiming that the bill had [been] reduced because a charge for a particular service had exceeded the Maximum Reimbursable Charge." (Nelson Compl., ¶ 187.) Similarly, the CAC alleges that as to amounts billed in connection with Subscriber Plaintiff Franco's June 18, 2003 surgery, "CIGNA disallowed amounts on the basis of UCR, stating 'Payment reflects prevailing charge for service in your area.'" (CAC, ¶ 89.)  Again, Subscriber Plaintiffs' theory is that such explanations were insufficient for failure to disclose usage of the Ingenix database to arrive at the "prevailing charge."  As to Franco, for example, the CAC complains that "CIGNA'S EOB record does not say *how* it calculated the 'prevailing charge' and whether Ingenix data (or some other data or methodology) was used to compute it." (*Id.*)   As with the other ERISA claims based on non-disclosure, Subscriber Plaintiffs fail to point to any authority that requires the level of detail they complain was not provided.  Section 503

requires that a "specific reason" be given for a claim denial; it does not require, as Subscriber

Plaintiffs' theory of liability would suggest, that the plan also explain what information the plan

considered in arriving at its decision, in this case, the ONET claims processing methodology.   No

ERISA provision or implementing regulation requires an insurer to provide every bit of data

underlying a claim decision and details about the way in which that data was used.   Yet, Plaintiffs'

assertion of a § 503 violation would appear to assume that the functional equivalent of a data

report on the calculation of UCRs is a necessary component of ERISA's disclosure requirements.

Such disclosure of detailed statistical compilations and data was certainly not the intent of the

drafters of ERISA or related regulations.   Subscriber Plaintiffs' factual allegations belie their

assertion that CIGNA failed to meet its statutory obligation under ERISA § 503.

In sum, to the extent that any claims for relief under ERISA § 502(a)(3) are based on the

failure to disclose the use of Ingenix and/or CIGNA's ONET claims processing methodology,

they must be dismissed.   For the reasons discussed above, Subscriber Plaintiffs have failed to

plead that CIGNA violated a recognized and enforceable obligation under the statute.


## IV.     RICO CLAIMS

The pleadings allege that by keeping UCR determinations artificially low and underpaying

ONET claims, CIGNA and Ingenix engaged in a scheme to defraud Subscriber Plaintiffs.   This

fraudulent scheme, they claim, violates RICO, 18 U.S.C. § 1962(c).   A civil RICO claim,

authorized under 18 U.S.C. § 1964(c), is asserted against CIGNA in the CAC and against CIGNA,

UnitedHealth and Ingenix in the Nelson Complaint based on the racketeering acts of mail fraud

and wire fraud, allegedly committed in furtherance of the underpayment scheme.  The CAC also

pleads the additional predicate racketeering act of embezzlement from an employee benefit plan.

Both subscriber complaints before the Court in this consolidated action also assert a civil RICO

claim based on Defendants' alleged conspiracy to commit a violation of 18 U.S.C. § 1962(c),

which conspiracy itself is a separate violation of the statute under 18 U.S.C. § 1962(d).

Before turning to the sufficiency of the complaints as to their assertions of § 1962(c) and

(d) violations, the Court must address Defendants' argument that the Nelson Plaintiffs lack

standing to pursue a RICO claim.

### A.    RICO Standing

As discussed earlier in this Opinion, the Court finds that the Nelson Plaintiffs have

satisfied Article III's standing requirements by alleging that they bear the obligation to pay any

difference between ONET provider Higashi's billed charge and CIGNA's ONET benefit payment.

Meeting the minimal standards of Article III, however, does not necessarily entitle the Nelson

Plaintiffs to sue under RICO, which imposes its own, additional standing requirements.  *Maio*,

221 F.3d at 482-83.  To establish the right to sue under RICO, a plaintiff must allege that he or

she has sustained an "injury to business or property."  18 U.S.C. § 1964(c).  The Third Circuit has

held that "a showing of [RICO] injury requires proof of a concrete financial loss and not mere

injury to a valuable intangible property interest." *Maio*, 221 F.3d at 483 (quoting *Steele v.*

*Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir.1994) (internal quotation marks omitted).  Yet, as

Defendants correctly argue, the Nelson Complaint is devoid of any allegation that the Nelson Plaintiffs actually overpaid for the treatment obtained from Higashi by reason of the Defendants' alleged scheme to underpay ONET benefits.

When pressed by movants to identify which factual averment states that the Nelsons paid their provider's bills, or were even balance-billed by the Nonpar for an allegedly excessive amount, the Nelson Plaintiffs point to only the most general and conclusory allegations that *CIGNA* paid a portion of Higashi's bills based on false UCRs and that, per the applicable plans, plan members remain financially responsible for the balance of the provider's billed charge. While the legal obligation to pay will suffice for purposes of Article III injury-in-fact, it does not amount to a tangible loss of property redressable under RICO.  To put it charitably, the Nelson Plaintiffs' opposition papers dance around a straightforward issue – did these plaintiffs incur any out-of-pocket expense?  The Court will not infer that any payment was actually made, as Plaintiffs could have easily pled such a fact, had it occurred.  In the absence of such an allegation, the Court cannot conclude that the Nelson Plaintiffs have established that they have sustained a concrete injury within the meaning of RICO.  *Maio*, 221 F.3d at 483.

Having failed to established that they have statutory standing under 18 U.S.C. § 1964(c), the Nelson Plaintiffs may not pursue any of their RICO claims.  As those claims will be dismissed, the Court will turn to the remaining arguments for dismissal of the RICO claims as they apply to Subscriber Plaintiffs Franco and Chazen.

**B.      Claim For Violation of 18 U.S.C. § 1962(c)**

The Court begins by quoting the governing statutory language of 18 U.S.C. § 1962(c).  It

provides:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct
> of such enterprise's affairs through a pattern of racketeering activity or
> collection of unlawful debt.

18 U.S.C. § 1962(c).  A properly pled violation of 18 U.S.C. § 1962(c) requires a plaintiff to

allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re*

*Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting *Lum v. Bank of Am.*,

361 F.3d 217, 223 (3d Cir. 2004)).  Defendants challenge the sufficiency of the RICO claims on a

number of grounds, namely failure to define a RICO enterprise, pleading facts inconsistent with

their participation in the scheme as required by the statute, and inadequate pleading of predicate

acts.  The Court will address Defendants' challenges in turn.

1.      Enterprise

Defendants primarily argue that Subscriber Plaintiffs fail to plead the existence of an

"association-in-fact" enterprise, both because they offer contradictory allegations as to whether

the enterprise consisted of multiple parties or involved only CIGNA and Ingenix and because no

facts demonstrate what the structure of the alleged enterprise is.

The statutory definition of enterprise includes "any union or group of individuals

associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The Supreme Court's

opinion in *United States v. Boyle* governs the contours of what constitutes an "association-in-fact

enterprise" within the meaning of RICO.  *United States v. Boyle*, 129 S.Ct. 2237 (2009).  In *Boyle*, the Court reinforced its previous statutory interpretation that "an association in fact enterprise is simply a continuing unit that functions with a common purpose."  *Id.* at 2245. Noting that the enterprise must, in fact, have a structure, the Court espoused the dictionary meaning of structure as "the way in which parts are arranged or put together to form a whole." *Id.* at 2244.  While structural features such as purpose, relationships among those associated and longevity sufficient to allow associates to pursue the group's purpose are required, formal structure is not. *Id.* at 2244-45.  The Court stressed that "such a group need not have a hierarchical structure or a 'chain of command' . . .  Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.*  Of particular significance to the instant motions,  *Boyle* held that while the existence of an enterprise is a distinct element from the pattern of racketeering activity, the RICO enterprise can be proven without going "beyond [the structure] inherent in the pattern of racketeering activity in which it engages." *Id.* at 2245.  Referring to the quoted phrase, the Court concluded:

> [I]f the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce."

*Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981).  In other words, the fact of being a group with a common purpose, i.e. an enterprise, may be established by the interrelation of parts inherent in the pattern of racketeering activity.  The Third Circuit summarized the impact of *Boyle* in clarifying what RICO's enterprise element does and does not require:

47

In short, *Boyle* holds that the RICO statute defines an "enterprise" broadly, such that the "enterprise" element of a § 1962(c) claim can be satisfied by showing a "structure," that is, a common "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 2244; *see id.* at 2245 ("[A]n association-in-fact enterprise is simply a continuing unity that functions with a common purpose."). "[A]fter *Boyle*, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." *United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir.), cert. denied, --- U.S. ----, 130 S.Ct. 656, 175 L.Ed.2d 500 (2009). To the extent our cases have interpolated additional requirements into the statute, they are abrogated by *Boyle*.

*Ins. Brokerage Antitrust Litig.*, 618 F.3d at 368.

The CAC meets *Boyle*'s low threshold for pleading the existence of an association-in-fact enterprise.  The CAC alleges that CIGNA and Ingenix were associated in a fraudulent scheme to underpay ONET benefits to CIGNA providers, an association described as the "CIGNA-Ingenix Enterprise" (hereinafter, the "Enterprise").  (CAC, ¶ 454, 457.)  The allegations are more than adequate to satisfy the three structural features of an association-in-fact enterprise, as set forth by *Boyle*. The CAC states the following: The Enterprise existed for two purposes: (1) reducing benefit payments by determining ONET claims based on artificially low prevailing fee data which could not be challenged effectively and (2) increasing the profits of CIGNA and Ingenix, among others that also used the data.  The Enterprise as identified came into existence in 1998 and thus has longevity sufficient to permit CIGNA and Ingenix to accomplish those purposes.  The relationship between CIGNA and Ingenix in this scheme consisted of CIGNA's supplying Ingenix with allegedly flawed data and in return purchasing and using Ingenix's database services to make its UCR determinations and thus depress ONET payments.  Assuming the facts to be true, the unit

formed by CIGNA and Ingenix in their pursuit of a scheme to defraud CIGNA subscribers

through the underpayment of ONET claims constitutes the RICO Enterprise.

Defendants' argument that the Complaints fail to define the Enterprise's membership, in

that Subscriber Plaintiffs vacillate between alleging that the group consisted of only Ingenix and

CIGNA and alleging that it consisted of Ingenix, CIGNA and host of other insurers, has no

bearing on the establishment of the existence the Enterprise.  Such precision and formality is not

required by RICO.  *Boyle*, 129 S.Ct. at 2245-46.  The fact that other parties may have also played

a role in the group, either consistently or only occasionally in spurts, does not negate the

association in fact of CIGNA and Ingenix for the common purpose of carrying out a scheme to

fraudulently underpay the ONET benefits of insureds such as Subscriber Plaintiffs.

2.    Participation in the Conduct of the Enterprise

The Supreme Court has held that to be subject to liability under 18 U.S.C. § 1962(c), a

person or entity "must have some part in directing [an enterprise's] affairs."  *Reves v. Ernst &*

*Young*, 507 U.S. 170, 179 (1993).  In so holding, however, the Court stressed that "RICO liability

is not limited to those with primary responsibility for the enterprise's affairs."  *Id.*  Indeed, merely

playing *some* part in the direction of affairs suffices.  *Id.*  In *Reves*, the Court adopted an

"operation or management" test for making this determination.  *Id.*  Applied to a civil RICO

claim, this test instructs that "'to conduct or participate directly or indirectly in the conduct of

such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the

enterprise itself."  *Id.* at 185.  Consistent with its interpretation of the broad scope of RICO, the

Court underscored that lower-rung participants in an enterprise could also operate or manage its

49

affairs. *Id.* at 184.  As the Third Circuit explained, *Reves* "made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control." *United States v. Parise*, 159 F.3d. 790, 796 (3d Cir. 1998).

Applying *Reves* and its "operation or management" test, the Court finds that the CAC adequately pleads that CIGNA participated in the conduct of the affairs of the CIGNA-Ingenix Enterprise.[14]  To reiterate, Plaintiffs aver that the affairs of the Enterprise involved underpayment of ONET claims by using a database of pricing information that was rigged to produce depressed prevailing fee figures.  The CAC is replete with allegations concerning CIGNA's decision-making role with regard to the use of Ingenix to determine ONET claims, the submission of allegedly insufficient and flawed data to the database, and the very defrauding of its subscribers by paying claims based on an amount it knew to be less than the prevailing fee.

Assuming these alleged facts to be true, the Court concludes that the CAC plausibly establishes that CIGNA played some part in the direction of the alleged Enterprise's affairs. CIGNA argues that it was not in a directing role in the alleged underpayment scheme because it did not exercise control over Ingenix. This argument misses the point of *Reves*, which did not limit RICO liability to performers who pulled all of the strings.  Nor does *Reves* require that the exclusive function of a participant's activity be to serve the scheme.  There is no doubt, and Plaintiffs indeed allege, that CIGNA was also involved in legitimate business operations.

---

[14] The Court does not comment on the role of Ingenix and UnitedHealth because they are not named as Defendants in the CAC.  Though Ingenix and UnitedHealth were targets of the Nelson Complaint's RICO claim, that claim is not viable for lack of standing.

Nevertheless, the CAC's allegations plausibly demonstrate that CIGNA operated a component of the Enterprise's underpayment scheme, and this suffices to subject CIGNA to a claim under § 1962(c).

### 3.    Predicate Acts

Participation in the operation or management of an enterprise is not enough, however.  A RICO defendant must have done so "through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The Third Circuit has held that this means that "'there must not only be a nexus between the [defendant] and the conduct [of] the affairs of an enterprise' but also a nexus between the conduct of those affairs and the pattern of racketeering activity."  *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 371 (quoting *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (alterations in original).  Further, to satisfy the related elements of a "pattern" of "racketeering activity," a plaintiff must allege that a defendant committed at least two acts of racketeering within a ten-year period.  18 U.S.C. § 1961(5).  In this case, those acts of racketeering are alleged to be mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, and embezzlement, in violation of 18 U.S.C. § 664.[15]  *See, generally*, 18 U.S.C. § 1961(1) (defining "racketeering activity").

Mail and wire fraud must be pled with particularity, in compliance with Federal Rule of Civil Procedure 9(b).  *Lum*, 361 F.3d 217, 223-24 (3d Cir. 2004).  Rule 9(b) requires that a plaintiff plead "the date, place or time of the fraud or otherwise inject precision or some measure

---

[15] The predicate act of embezzlement is raised only in a separate RICO count brought on behalf of a subclass. (CAC Count IX(A).)  The principal RICO claim, brought on behalf of the entire putative class of CIGNA subscribers, is based on mail fraud and wire fraud. (CAC Count VIII(A)).

of substantiation into a fraud allegation." *Federico v. Home Depot*, 507 F.3d 188, 200 (3d Cir.

2007).  CIGNA argues that Subscriber Plaintiffs' allegations fall far short of this standard.  The

Court disagrees.  The complaints detail an underpayment scheme that was committed, in part,

through the use of the U.S. mail and interstate wire facilities.  The CAC particularly charges the

date and contents of several mailings made from CIGNA to Franco and Chazen communicating

allegedly fraudulent information concerning reimbursement, the prevailing charge for the service

and the reasons why certain billed amounts were not covered.

On the other hand, to the extent that the CAC bases a civil RICO claim on the predicate

act of embezzlement from pension and welfare funds, 18 U.S.C. § 664, the claim must fail.  The

criminal act is defined as follows:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or
> converts to his own use or to the use of another, any of the moneys, funds,
> securities, premiums, credits, property, or other assets of any employee
> welfare benefit plan or employee pension benefit plan, or of any fund
> connected therewith, shall be fined under this title, or imprisoned not more
> than five years, or both.

18 U.S.C. § 664.   The crime of embezzlement entails the conversion or misappropriation of funds

belonging to another.  *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F.Supp. 2d 432, 444

(S.D.N.Y. 2008); *Mehling v. N.Y. Life Ins. Co.*, 163 F.Supp.2d 502, 508 (E.D.Pa. 2001).  "The

elements of an embezzlement include (1) the unauthorized (2) taking or appropriation (3) of

benefit plan funds (4) with specific criminal intent.  *Mehling*, 163 F.Supp.2d at 508.  The CAC

avers that CIGNA's improper reduction of payments on ONET claims wrongfully converted

assets from the CIGNA ERISA plans.  Yet, the factual allegations of the CAC fail to support, and

in some instances completely contradict the assertion that CIGNA has engaged in the conversion

52

of another's assets.  Subscriber Plaintiffs allege that as to fully-funded plans, CIGNA paid claims from its *own* assets and, in underpaying, withheld its *own* funds.  As to self-funded plans, no conversion at all is alleged; there, Subscriber Plaintiffs merely aver that CIGNA underpaid benefits to justify its receipt of administrative fees from the plan.

Subscriber Plaintiffs' attempt to demonstrate the viability of their embezzlement-based RICO claim consists solely of arguing that pleading section 664 predicate acts need only satisfy Federal Rule of Civil Procedure 8(a), as opposed to the more stringent "pleading with specificity" standard of Rule 9(b).  Even under the less demanding standard, the RICO claim based on the predicate act of embezzling from a welfare plan fails to state a claim upon which relief could be granted. Here, the CAC contains no facts which render it plausible that by paying less than it should have on ONET claims, CIGNA misappropriated plan funds with specific criminal intent. The RICO § 664 claims will therefore be dismissed.

**C.    Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**

Section 1962(d) outlaws any conspiracy to violate the other subsections of § 1962, including, as is relevant to this case, § 1962(c).  The only argument raised by CIGNA to dismiss this claim is its futility in light of Plaintiffs' failure to state an actionable RICO violation under 1962(c).  This point is undermined, however, by the Court's conclusion that Plaintiffs do plead a viable § 1962(c) claim.  Having failed to raise any other challenge to the claim for conspiracy to violation RICO, CIGNA has not demonstrated that the claim should be dismissed under Rule 12(b)(6).

## V.     ANTITRUST CLAIMS

Subscriber Plaintiffs assert claims under section 1 of the Sherman Act, 15 U.S.C. § 1,

which prohibits unreasonable restraint of trade "effected by a contract, combination or

conspiracy." *Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984); *see also*

*Am. Needle, Inc. v. Nat'l Football League*, 130 S.Ct. 2201, 2208-09 (2010) (stressing that the

distinguishing feature of Sherman Act section 1 liability is concerted action as opposed to

unilateral or independent action).  Their antitrust claim stems from the contention that CIGNA

agreed with its direct competitors to create, maintain and use a flawed database, to the exclusion

of other data providers, for the purpose of decreasing and indeed capping payments on ONET

claims.  The Complaints allege that Defendants restrained trade in two ways: by rigging the UCR

schedules and thus "price fixing" as to the ONET benefit and by manipulating the data market to

set below-market UCR schedules (ostensibly supplied by Ingenix).  After setting forth the basic

requirements for pleading a cognizable section 1 violation, the Court will examine the sufficiency

of Plaintiffs' antitrust claims.

### A.     Standard for Pleading Sherman Act Section 1 Claim

Pleading a colorable Sherman Act section 1 claim requires a plaintiff to allege (1) an

agreement (2) imposing an unreasonable restraint of trade within a relevant product market and

(3) resulting in antitrust injury, that is "injury of the type the antitrust laws were intended to

prevent and . . . that flows from that which make defendants' acts unlawful." *Ins. Brokerage*

*Antitrust Litig.*, 618 F.3d at 315-16.  CIGNA and Ingenix argue that the CAC and the Nelson

Complaint fail to plead factual allegations that plausibly support the existence of either a price-

fixing agreement or any other conspiracy to restrain trade.  Defendants also argue that Plaintiffs

lack standing for failure to plead an injury of the type that the antitrust laws are intended to

remedy.  Because the instant motions challenge the sufficiency of the antitrust claims with regard

to all of the elements, the Court will provide an overview of each one.

"The existence of an agreement is the hallmark of a Section 1 claim.  Liability is

necessarily based on some form of concerted action."  *In re Baby Food Antitrust Litig.*, 166 F.3d

112, 117 (3d Cir. 1999) (citation omitted).   A plaintiff may demonstrate that an agreement was

formed by either direct or circumstantial evidence.  *Cosmetic Gallery, Inc. v. Schoeneman Corp.*,

495 F.3d 46, 52-54 (3d Cir. 2007).  "Direct evidence in a Section 1 conspiracy must be evidence

that is explicit and requires no inferences to establish the proposition or conclusion being

asserted."  *Baby Food Antitrust Litig.*, 166 F.3d at 118.  In the absence of an actual agreement or

conspiracy to restrain trade, concerted action[16] may be established by demonstrating that

competitors engaged in "conscious parallelism," defined as uniform conduct from which the

existence of a conspiracy may be inferred.  *Id.* at 121-22.

The agreement, of course, must pertain to some unlawful conduct within the meaning of

the antitrust laws.  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004).  To

establish liability under section 1, a plaintiff must demonstrate that the challenged practice

imposed an unreasonable restraint on trade.  *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315.  The

illegality of the restraint may be demonstrated in one of two ways: under the *per se* standard or

---

[16] The Third Circuit has noted that the term "concerted action" is generally used as shorthand to refer to any activity meeting the "contract, combination or conspiracy" element of Section 1 liability.  *Baby Food Antitrust Litig.*, 166 F.3d at 117 n.3.

under a rule of reason analysis.  *Id.* at 315-16.  The *per se* standard applies to some practices

whose anticompetitive effect is presumed based on judicial experience.  *Id.* at 316; *see also*

*United States v. Brown Univ.*, 5 F.3d 658, 670 (3d Cir. 1993) ("*Per se* rules of illegality are

judicial constructs and are based in large part on economic predictions that certain types of

activity will more often than not unreasonably restrain competition.").  The Supreme Court has

explained that

> a *per se* rule is applied when "the practice facially appears to be one that
> would always or almost always tend to restrict competition and decrease
> output." In such circumstances a restraint is presumed unreasonable
> without inquiry into the particular market context in which it is found.

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. at 100 (quoting

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)).  Price fixing

agreements among competitors fall into the class of *per se* unreasonable restraints.  *Ins. Brokerage*

*Antitrust Litig.*, 618 F.3d at 316.  The rule of reason analysis, in contrast, is "a case-by-case

method that involves consideration of all of the circumstances of a case to decide whether certain

concerted action should be prohibited because it amounts to an anti-competitive practice."  *Baby*

*Food Antitrust Litig.*, 166 F.3d at 118.  Proving a section 1 claim by this approach requires the

plaintiff to show that the defendant's conduct had an "adverse, anticompetitive effect within the

relevant product market."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005).  This

alone, however, will not establish section 1 liability under a rule of reason analysis.  The Court

must then determine whether the anticompetitive effects are outweighed by any countervailing

pro-competitive benefits.  *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 316.  The Court has

provided an overview of the two approaches to pleading an unreasonable restraint on competition

under section 1 because Plaintiffs have in this case have attempted to plead both a *per se* antitrust violation (horizontal agreement among competing insurers to fix the reimbursement of ONET claims) and a restraint of trade under the rule of reason (manipulation of data market to affect UCR).

Finally, injury within the meaning of an antitrust claim represents more than an element of the merits of a claim; it is a condition of standing to pursue the claim. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993) (citing *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545 (1983)); *see also Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir.1997) (holding same) . The Supreme Court has defined "antitrust injury" as "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).   It has also held that the antitrust laws were enacted "to assure customers . . . the benefits of price competition." *Assoc. Gen. Contractors of California, Inc.*, 459 U.S. at 908; *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (holding that legislative history indicates goal of laws is "the protection of competition not competitors."). Thus, to demonstrate entitlement to proceed with an antitrust claim, it is insufficient that the plaintiff's injury was somehow causally linked to a defendant's allegedly unlawful behavior; the plaintiff must allege facts that establish he has sustained the type of loss that would flow from a restraint on competition. *Brunswick Corp.*, 429 U.S. at 489.

The governing authority on what constitutes an adequately pled antitrust conspiracy in violation of section 1 of the Sherman Act is *Bell Atlantic Corp. v. Twombly*.  Before discussing

the now well-known plausibility standard of pleading under Rule 8, the *Twombly* court reviewed

the crux of liability under Section 1 of the Sherman Act.  It noted that "the crucial question is

whether the challenged anticompetitive conduct stems from independent business decision or

from an agreement, tacit or express." *Twombly*, 127 S.Ct. at 553.  It further noted that allegations

that competitors engaged in parallel business behavior, without more, fall short of establishing the

requisite concerted action for a section 1 offense.  *Id.*  The *Twombly* court reached a clear holding

regarding what is required to state a section 1 antitrust claim: the complaint must contain "enough

factual matter (taken as true) to suggest that an [illegal] agreement was made." *Id.* at 556.  The

Court was careful to specify that "an allegation of parallel conduct and a bare assertion of

conspiracy will not suffice" to establish the existence of an agreement to restrain trade, even when

it is alleged that the parallel conduct was consciously undertaken by competitors in a particular

market. *Id.* at 556-57.   Summarizing the *Twombly* pleading standard, the Third Circuit has held

that " 'stating ... a claim requires a complaint with enough factual matter (taken as true) to

suggest' the required element." *Phillips v. Country of Allegheny*, 515 F.3d 224, 234 (3d Cir.

2008).

   **B.     Price-Fixing Claim**

   Plaintiffs' price-fixing theory is patently inapplicable to the Complaints' factual

allegations of misconduct.  The challenged conduct consists of an alleged horizontal conspiracy

among CIGNA, UnitedHealth together with its "alter ego" Ingenix and other insurers to depress

UCRs and thus cap reimbursement rates for ONET claims.  According to Plaintiffs, this scheme

was accomplished by the insurers' similar conduct of providing fee data solely to Ingenix and

58

exclusive use of the Ingenix database, making Ingenix UCR schedules the industry standard. The

CAC and Nelson Complaint allege almost identically that as follows:

> Defendants engaged in price fixing when they agreed with their
> Conspirators to utilize precisely the same flawed database to determine the
> UCR amounts for out-of-network medical services, which lead [sic] to
> them paying substantially the same reduced amounts for services rendered
> to their subscribers.
>
> Defendants' agreement also gives them, collectively with their
> competitors, tremendous power to set UCRs well below those which
> would exist in a competitive marketplace. In fact, no competitive pressure
> to raise UCRs exists while all the Conspirators act collectively to reduce
> prices. Without agreement and collective action between them, including
> the exchange and compilation of relevant pricing data, CIGNA,
> UnitedHealth and the Conspirators would be unable to systematically and
> across the board reduce their UCRs paid. This agreement to fix prices is
> an unreasonable restraint on trade and a *per se* violation of § 1 of the
> Sherman Act.

 (Nelson Compl., ¶¶ 59-60; *see also* CAC, ¶¶ 314-15.)

The core of the price-fixing claim is, in sum, that Defendants tacitly agreed to "create,

maintain and utilize a flawed centralized database to decrease reimbursements for ONET

services." (Pl. Op. Br. at 44.) Plaintiffs' Sherman Act claim is premised upon an agreement

among CIGNA, UnitedHealth and the other insurer conspirators, entered into by virtue of

membership and participation in HIAA, regarding how the Ingenix database would be constituted,

what data would be included and how it would be used to create UCRs. The Complaints aver that

CIGNA and other HIAA members entered into separate contracts with UnitedHealth and Ingenix

agreeing to supply data to Ingenix exclusively for the production of UCR schedules and to

purchase these schedules from Ingenix.

Fatal to the price-fixing claim is that, even reading the Complaints in the light most favorable to Plaintiffs, the purported agreement among CIGNA, UnitedHealth and the other "conspirators" to cap ONET reimbursements does not pertain to the pricing of anything. Plaintiffs have tried to distort conduct which allegedly resulted in the determination of artificially low ONET benefit payments into a "price fixing agreement" but have failed to articulate what product's or service's price has been manipulated. The *per se* antitrust violation of agreeing to fix prices refers to concerted action for the purpose of "raising, depressing, fixing, pegging, or stabilizing the price of a *commodity* in interstate or foreign commerce." *Socony-Vacuum Oil Co. v. United States*, 310 U.S. 150, 223 (1940) (emphasis added). In other words, it must involve competing products or services. *Broad. Music*, 441 U.S. at 8; *August News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001). Regardless of how frequently Plaintiffs refer to the ONET benefit amount as the ONET "price," there is no indication in the complaints that coverage ONET services - that is, services by providers who are out of CIGNA's preferred provider network - is a discrete product available for purchase and sale apart from the rest of a subscriber's insurance policy, at its own price. Moreover, the ONET price-fixing necessarily presupposes that ONET coverage offered by insurance company A (CIGNA, for example) could be interchangeable for with ONET coverage offered by insurance company B. The implied premise of the claim is simply implausible, as preferred provider networks are not uniform across competing carriers, and thus a provider who is ONET for one carrier may not be for another.

Assuming that Defendants and the co-conspirator insurance companies engaged in concerted action to cap ONET reimbursements, their agreement would pertain to one component

of the product sold, not to the price at which the policy is made available for purchase by the

Subscriber Plaintiffs.[17]  As the Eleventh Circuit Court of Appeals recently observed, the up-front

fee health insurers charge in exchange for assuming the subscriber's risk of future health costs –

known as a "premium" –  is based on complicated calculation involving many variables.

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1364-65 (11th Cir.

2011).  The price, or premium, is based on an actuarial prediction of future losses and expenses,

which takes into account predicted claims costs, the uncertainty of predicted claims, the insurer's

predicted income from investments of premiums received, projected administrative expenses, tax

considerations and a profit margin. *Id.* & n.26.  There is no indication in the Complaints that

competition as to the premium charged for insurance coverage has been restrained by any

concerted action to use the Ingenix database to determine ONET reimbursements.  Nor have

---

[17] The Court makes this assumption regarding the requisite concerted action element of an antitrust claim to illustrate the fallacy of Plaintiffs' price-fixing theory.  However, a serious review of the factual allegations and the insurance plans referenced in the Complaints casts doubt on the plausibility of an antitrust conspiracy among CIGNA and the other insurers to fix the ONET benefit.  Recall, as set forth earlier in this Opinion, that *Twombly* requires an adequately pled antitrust claim to be based on facts indicating concerted action.  The insurance plans pertaining to the Subscriber Plaintiffs, however, clearly set forth that the ONET benefit payable thereunder is a function of more than merely prevailing fee data.  Instead, the "allowed amount" or "maximum reimbursable charge" - which is a key component of the ultimate benefit payment - will be determined according to the insurer-selected percentile of the prevailing fee curve or range, as reflected in the Ingenix database.  Then, the insurer covers only a percentage of this maximum reimbursable charge (the insurer's co-payment obligation).  Chazen's plan, for example, sets forth that the co-insurance level for an in-network service is 100%, whereas the ONET benefit is "70% of the Maximum Reimbursable Charge."  (Lefkowitz Cert. Ex. C at 13.) There is no indication in the Complaints that CIGNA and the other insurers agreed to select the same percentile on the Ingenix data curve to represent the maximum reimbursable charge for an ONET service or that they agreed to cover ONET claims at the same percentage (co-payment) of that maximum reimbursable charge.  Nor are there any facts alleged which would support the necessary, but by itself insufficient, demonstration of parallel conduct among the alleged co-conspirators as to what level of ONET coverage will be afforded under a health plan.

Plaintiffs articulated that the alleged conspiracy to cap ONET reimbursements at a below-market amount represents a concerted action to standardize one aspect or component of the premium, such that it might be analogized to an agreement to fix a credit, a discount or other sale terms whose manipulation would patently affect the price of the product bought by insureds and could thus plausibly state an agreement to price fix.  *Cf. Catalano Inc. v. Target Sales Inc.*, 446 U.S. 643, 646-47 (1980) (discussing agreements to fix components of price as falling into category of practices that had *per se* anticompetitive effect even if not directly related to ultimate price of commodity).

At best, one might characterize Defendants' behavior, assuming it to be true, as depressing a cost to the seller in the provision of its product.  In other words, the alleged agreement to standardize and diminish ONET coverage – whereby all insurers agree to peg reimbursements to one flawed database – might very well constitute an agreement as to the parameters of the quality of the product sold, thus giving the purchasers cause to complain they have been overcharged. Providing a product that is allegedly worth less to the insureds than the premium they paid does not equate with fixing, pegging or otherwise standardizing the price, or a component thereof, charged to insureds for the insurance coverage.

In short, the misconduct underpinning the Sherman Act section 1 claim does not set forth a price-fixing conspiracy or any other recognized *per se* antitrust violation.  Plaintiffs essentially fill a top hat with facts about how Defendants and various other health insurance companies acted together to uniformly lower the quality of their product and thus hold down cost and - presto! - pull out the conclusion that price of the product has been fixed.  Such prestidigitation cannot

create a plausible antitrust claim. Despite Plaintiffs' attempt to characterize the amount payable as an insurance benefit for ONET services as the "price" of the ONET service coverage, benefits paid by the insurance company to the insured pursuant to a health benefits plan do not express the price of any discrete good or service. They represent one aspect of the product sold. Plaintiffs are at bottom complaining about having been sold a product with a less desirable benefit component. They cite no authority for the proposition that the concerted efforts by horizontal competitors to keep a product component's value down constitutes a practice whose anticompetitive impact is presumed. Examining the Complaints according to the analysis demanded by *Twombly*, this Court finds that the pleadings fail to state a plausible agreement to fix prices.

### C.     Rule of Reason Claim

Plaintiffs also attempt to state a section 1 claim under a rule of reason theory. To plead an actionable restraint of trade under the rule of reason test, a plaintiff must allege

> (1) that the defendants contracted, combined, or conspired among each
> other; (2) that the combination or conspiracy produced adverse,
> anti-competitive effects within relevant product and geographic markets;
> (3) that the objects of and the conduct pursuant to that contract or
> conspiracy were illegal; and (4) that the plaintiffs were injured as a
> proximate result of that conspiracy.

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). Defendants' argument that Plaintiffs have failed to allege antitrust injury and thus lack standing comes to the forefront of the Court's analysis. In this case, Plaintiffs take a somewhat unorthodox approach to claiming a cognizable antitrust injury in that their claim rests on the premise that they were harmed as a proximate result of a restraint on trade in a market in which they do not participate.

63

The Third Circuit has held that it is essential that the plaintiff define the relevant market to plead a cognizable section 1 claim. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F3d 430, 436 (3d Cir. 1997).   The Complaints define the relevant product market as the "market for data used to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services." (CAC, ¶ 322; Nelson Compl., ¶ 63.)  The Court will hereinafter refer to this market as the "Data Market."  As the Court has reviewed, Plaintiffs allege that Defendants unlawfully restrained trade by engaging in concerted action to create and use the Ingenix database of flawed UCR information to the exclusion of any competition to Ingenix.  The theory is that their underpayment of ONET benefits, based on skewed UCR data, hinged on creating an environment in which Ingenix was the sole purveyor of prevailing fee schedules in the Data Market.  The Court understands the Complaints to take the position that this lack of competition in the Data Market ensured that the flawed data, supplied by the co-conspirator insurance companies themselves, was insulated from market challenges and thus became the allegedly rigged standard.

Subscriber Plaintiffs, however, concede that they do not participate in the Data Market. There is no dispute that they are neither competitors engaged in the business of supplying prevailing fee schedules nor direct purchasers of the product sold by Ingenix.  Normally, without further analysis, Subscriber Plaintiffs' status with regard to the anticompetitive conduct challenged would dictate dismissal of their claim as barred for lack of antitrust standing. It is well-established that only direct purchasers have standing to pursue federal antitrust claims for

damages.[18]  *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207-08 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 493-94 (1968); *Link v. Mercedes-Benz of N.Am., Inc.*, 788 F.2d 918-930 (3d Cir. 1986).  This principle, first articulated by the Supreme Court in *Hanover Shoe* and then reaffirmed in *Illinois Brick*, is commonly referred to as the "direct purchaser" or  "*Illinois Brick*" rule.  *Utilicorp United*, 497 U.S. at 207; *Link*, 788 F.2d at 930-31.

Plaintiffs, however, argue that the direct purchaser rule of *Illinois Brick* does not apply. They plead a theory of antitrust injury the Court will refer to as the "linked markets" theory.  The Complaints allege that Subscriber Plaintiffs purchase healthcare services in the market for "insured medical services acquired on an ONET basis" (hereinafter, the "ONET Services Market").  (CAC, ¶ 322; Nelson Compl., ¶ 63.)  According to the pleadings, the Data Market and the ONET Services Market are inextricably intertwined because the Data Market, from which UCR data is derived, constitutes the primary input for the reimbursement of services purchased on the ONET Services Market.  Plaintiffs aver that the depressed UCR schedules created by Defendants' manipulation and control of the Data Market both increase the Subscriber Plaintiffs' healthcare costs as well as place ONET providers at a competitive disadvantage compared with in-network providers.  In other words, for every dollar that ONET reimbursements are reduced as a result of artificially low UCRs, Subscriber Plaintiffs' financial burden for obtaining ONET healthcare increases accordingly, and this effect of making ONET services more expensive to

---

[18] Treble damages for antitrust violations are available through § 4 of the Clayton Act, which provides that such remedy may be sought by "[a]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15.

subscribers than in-network makes the in-network providers a more attractive, lower-cost option.

Thus, the complaints allege, Subscriber Plaintiffs *directly* bear the injury (in the ONET Services

Market) caused by Defendants' concerted action to restrain trade in the Data Services Market,

giving them standing to pursue an antitrust claim.  (CAC, ¶¶ 322-25; Nelson Compl., ¶¶ 63-67.)

Subscriber Plaintiffs' linked markets theory relies primarily on the Supreme Court's

opinion in *Blue Shield of Virginia v. McCready*.[19]  In *McCready*, a group health plan subscriber

brought a Sherman Act § 1 claim against her health insurer and an organization of psychiatrists

for conspiring to restrain trade in the psychotherapy market.  *Blue Shield of Va. v. McCready,* 457

U.S. 465, 467 (1982). Though the allegedly anticompetitive scheme analyzed in *McCready* was

designed to halt encroachment by psychologists into a market which psychiatrists sought to

preserve for themselves, the scheme was allegedly accomplished by inflicting economic injury on

insurance plan subscribers.  *Id.* at 468-69.  Those subscribers who did not obtain services from

psychiatrists, but rather sought treatment from psychologists, were denied reimbursement unless

the claims were billed through a physician.  *Id.* at 468.  McCready, the insurance subscriber

---

[19]  They also cite to a Third Circuit opinion in a case involving an alleged conspiracy by wholesalers to restrain trade and monopolize the American market for oriental rugs.  *Carpet Group Int'l v. Oriental Rug Importing Ass'n*, 227 F.3d 62, 63 (3d Cir. 2000).  In that market, manufacturers sold their goods to wholesalers in the United States, who in turn sold the imported goods to U.S. retailers.  *Id.* at 64.  The plaintiffs were brokers who sought to establish a new chain of distribution in which they would facilitate direct purchases by retailers from manufacturers.  *Id.* at 64-65.  Defendants argued that the brokers did not have antitrust standing because they were neither defendants' competitors nor consumers in the relevant market.  *Id.* at 76.  The *Carpet Group* court rejected this argument as an overly rigid interpretation of the jurisprudence concerning what constitutes an "antitrust injury,"observing that, in some circumstances, antitrust injury could occur where the plaintiff's harm is "inextricably intertwined" with the defendant's wrongdoing.  *Id.* at 77.

66

plaintiff, had been treated by a clinical psychologist, and her claims to the insurance company for

reimbursement of the costs of that treatment were denied.  *Id.*

The question addressed by the Supreme Court in its opinion was whether plan subscriber

McCready had alleged an antitrust injury giving her standing to sue under § 4 of the Clayton Act.

*Id.* at 472.  The Court held that she did.  *Id.* at 485.  It rejected the application of the *Illinois Brick*

rule to bar the subscriber plaintiff from recovering, reasoning that the rule's concern with the risk

of duplicative recovery along a chain of distribution was not present in that case.  *Id.* at 474.  In its

analysis the Court pointed out the following facts, which are clearly analogous to those presented

in the case at bar:

> McCready has paid her psychologist's bills; her injury consists of Blue
> Shield's failure to pay her. Her psychologist can link no claim of injury to
> himself arising from his treatment of McCready; he has been fully paid for
> his service and has not been injured by Blue Shield's refusal to reimburse
> her for the cost of his services. And whatever the adverse effect of Blue
> Shield's actions on McCready's employer, who purchased the plan, it is
> not the employer as purchaser, but its employees as subscribers, who are
> out of pocket as a consequence of the plan's failure to pay benefits.

*Id.* at 475.

The *McCready* court took an expansive view of the antitrust laws, observing that § 4 of the

Clayton Act "does not confine its protection to consumers, or to purchasers, or to competitors, or

to sellers . . . The Act is comprehensive in its terms and coverage, protecting all who are made

victims of the forbidden practices by whomever they may be perpetrated."  *Id.* (quoting

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).  Thus, it also

rejected defendants' argument that the subscriber plaintiff lacked standing to pursue her antitrust

claim because she was not economic actor in the market that had been restrained, which

defendants identified as the market in group health care plans.  *Id.* at 479-80.  (The group health

plan under which McCready was insured had been purchased by her employer.  *Id.*)  The Supreme

Court's analysis on this point undermines a similar argument raised by Defendants in this case,

that is, that the Subscriber Plaintiffs cannot recover because they do not participate in the Data

Market.  The Court reasoned as follows:

> McCready does not allege a restraint in the market for group health plans.
> Her claim of injury is premised on a concerted refusal to reimburse under a
> plan that was, in fact, purchased and retained by her employer for her
> benefit, and that as a matter of contract construction and state law
> permitted reimbursement for the services of psychologists without any
> significant variation in the structure of the contractual relationship
> between her employer and Blue Shield . . . As a consumer of
> psychotherapy services entitled to financial benefits under the Blue Shield
> plan, we think it clear that McCready was "within that area of the economy
> ... endangered by [that] breakdown of competitive conditions" resulting
> from Blue Shield's selective refusal to reimburse.

*Id.* at 480-81 (quoting *In re Multidistrict Vehicle Air Pollution* M.D.L. No. 31, 481 F.2d 122, 129

(9th Cir. 1973)) (footnote omitted).

In this case, the Complaints allege that the restraint of competition in the Data Market was

essential to the artificial depression of ONET reimbursements, which in turn created

anticompetitive conditions in the inextricably linked market for ONET services, thus causing

injury to Subscriber Plaintiffs.  The Nelson Complaint alleges:

> Due to the agreement between Defendants and the Conspirators to
> manipulate a limited number of data points, which are used to set the False
> UCRs that Ingenix disseminates and CIGNA, UnitedHealth and the
> Conspirators deploy, competition in the market for the provision of data
> services used to calculate UCRs was harmed and constrained.  In turn,
> competition in the inextricably linked market for the provision of ONS
> [out-of-network services] was also harmed and constrained, and
> subscribers wishing to reduce their out-of-pocket costs by artificially

> reducing reimbursements for out-of-network providers thereby resulted in services being shifted to in-network Providers. By refusing to disclose any information about their UCRs, Defendants and the Conspirators make it impossible for health insurance consumers to make informed competitive choices about ONS based on actual reimbursement rates.

(Nelson Compl., ¶ 131.)[20]  Similarly, the CAC avers:

> Due to the agreement by CIGNA and its Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (UCRs) which Ingenix disseminates and CIGNA and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed by this systematic manipulation of data. In turn, competition in the inextricably linked market for the provision of ONET is harmed because of the agreement by CIGNA and its Co-Conspirators to use the flawed UCRs in order to reimburse for ONET Services.

> As a result . . . Defendants deprived the Subscriber Plaintiffs . . . of a competitive market where they could obtain full reimbursement for ONET Services.

(CAC, ¶¶ 345-46).  According to the CAC, the Co-Conspirators' manipulation of the Data Market illegally restrained competition by, among other things "putting extreme additional competitive pressure on Nonpar healthcare providers to become part of particular networks by collusively refusing to even honor competitive market rates for those medical services in the UCR determinations.  (*Id.,* ¶ 563c.)

Insofar as the Complaints in this case could be read to allege that Defendants manipulated insurance benefits to the detriment of subscribers as part of a scheme which had the purpose or effect of inhibiting competition among healthcare providers, Plaintiffs' antitrust claim would

---

[20] The Court recognizes that the quoted portion of the Nelson Complaint is awkwardly worded and contains errors of syntax.  However, it is a verbatim representation of the paragraph that captures the essence of the Nelson Plaintiffs' linked markets theory of antitrust injury.

appear on its surface to be similar to *McCready*.  A closer look at the facts alleged, however,

distinguishes this case from *McCready*.  Whereas the conspiracy at issue in *McCready* was

designed to exclude clinical psychologists from a segment of the psychotherapy market, here

Plaintiffs' antitrust theory posits that CIGNA has inhibited competition among healthcare

providers by incentivizing plan subscribers to utilize providers who participate in CIGNA's

preferred provider network rather than providers who do not.  The problem with Plaintiffs'

antitrust claim is that there is nothing anticompetitive about the complained-of scheme of shifting

business to in-network providers.

The CIGNA insurance contracts in question contain numerous provisions designed to give

subscribers financial incentives to use providers who had, by prior arrangement, agreed to accept

reduced negotiated rates for their services (i.e., "in-network providers") instead of providers

whose charges are not capped at all (i.e., "ONET providers").[21]  These incentives include capping

the charges made by in-network providers through negotiated rates agreed to between the

providers and the insurance company.  In contrast, ONET providers are not similarly limited as to

what they may charge.  They also include a different allocation of liability for in-network services

versus ONET services.  For in-network, the subscriber's liability is generally capped at a set dollar

figure, typically referred to as a co-payment.  For ONET, however, the insured's share of liability

will generally be greater, as the plans provide coverage (1) based on an allowed amount, which

may be less than a provider's actual (non-capped) charge and (2) at only a percentage of the

---

[21] The Court properly considers Subscriber Plaintiffs' insurance plan documents in this
Rule 12(b)(6) motion as documents relied upon by the Complaints. *In re Burlington Coat
Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

allowed amount.  The insured is liable for anything in excess of that percentage of the allowed amount.  Chazen's plan, for example, covers in-network services at a co-insurance level of 100%, clearly setting forth that apart from a co-payment amount required for some but not all services, the insured will not bear responsibility for any charge.  (Lefkowitz Cert. Ex. C at 13-25.)  The ONET benefit level is, in contrast, only "70% of the Maximum Reimbursable Charge."  (*Id.* at 13.)  The Nelsons' plan makes similar coverage level distinctions between in-network and ONET services.  For example, under the Nelson plan the co-insurance level for in-network is 90%, and in many instances the plan provides that CIGNA covers 100% of the service charge after a set co-pay.  (6/28/10 Deni Cert. at Ex. 1 & 2.) ONET co-insurance, however, is "80% of Reasonable & Customary."  (*Id.*)  Negotiated rates and greater allocation of liability on the insurer for provider charges clearly provide more complete coverage for services obtained from in-network providers. The entire structure of the insurance contracts favors the use of in-network providers and deters insureds from seeking treatment outside of the preferred provider network.

Neither Subscriber Plaintiffs nor the now-dismissed Provider Plaintiffs have even suggested that such overt efforts to direct subscribers toward the use of certain providers with whom CIGNA has negotiated rates is conduct which restrains trade.  Indeed, to argue that incentives to use "preferred providers" are anticompetitive would be misguided, since the obvious objective of such plan provisions is to reduce costs for both the healthcare benefits plan and for the subscriber.  If anything, these efforts to keep costs down foster competition among healthcare providers by encouraging ONET providers to charge fees which compete with the lower negotiated rates charged by in-network providers.  Similarly, while Plaintiffs maintain that

Defendants' conduct in curtailing ONET reimbursements – albeit through allegedly fraudulent means – had the effect or purpose of inducing subscribers to obtain services from less expensive in-network providers, their Complaints fail to articulate any plausible factual basis for how this conduct has had an inhibiting effect on competition which has caused injury to the CIGNA subscribers.  To the extent Plaintiffs complain that the anticompetitive effect of the diminished ONET reimbursements was to shift CIGNA subscribers' business from ONET providers to lower-cost in-network providers, the logical consequence, if any, would be to promote competition, with greater pressure placed on ONET providers - albeit through fraudulent means - to lower rates.

Insofar as the antitrust claim rests on the theory that Plaintiffs' injury results from the alleged collusion among insurers to exclude all competitors to Ingenix from the Data Market, that is, that "monopolization" by Ingenix was critical to the scheme to depress UCRs, the claim lacks a plausible factual predicate.  An analysis of the Complaints' factual allegations indicates that this averred restraint of trade in the Data Market really plays no role in Plaintiffs' claim.  Plaintiffs' real dispute over the alleged collusion among insurers, including Defendants, lies with their use of *flawed* data, not with the absence of competition in the Data Market as the Complaints superficially assert.  Assume, for purposes of illustration, that Ingenix provided UCR schedules that actually reflected the correct distribution of fees charged by providers in a statistically created data curve (i.e., "Bell curve").  If Ingenix supplied "true UCRs" as opposed to the "false UCRs" that Plaintiffs have accused Ingenix and the co-conspirator insurance companies of generating, Plaintiffs would presumably have no objection to the use of the data to determine reimbursements to ONET providers.  The crux of Plaintiffs' claims is that, through Ingenix, Defendants produced

72

artificially low UCRs thus reducing ONET reimbursements.  Plaintiffs' true claim is the arguable

deception and covert manner in which Defendants and the co-conspirator insurance companies

have allegedly manipulated the UCR data to further drive subscribers toward in-network,

"preferred" providers.  This alleged misconduct may state a claim for relief under other legal

theories, analyzed in prior sections of this opinion, but it does not confer antitrust standing upon

Plaintiffs to sue for any alleged restraint of trade in the Data Market.

A frequently quoted observation made by the Third Circuit bears repeating here: "The

Sherman Act was designed to prohibit significant restraints of trade rather than to 'proscribe all

unseemly business practices . . . .'" *Tunis Bros.*, 952 F.2d at 728 (quoting *Sitkin Smelting and Ref.*

*Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58

L.Ed.2d 176 (1978)).  To reiterate, the Supreme Court has emphasized that the antitrust laws are

intended to protect competition, not competitors.  *Assoc. Gen. Contractors of California, Inc.,* 459

U.S. at 908; *Brown Shoe Co.*, 370 U.S. at 320.  The essence of an antitrust claim is to provide

redress for injury which flows from an unreasonable restraint on *competition*. *Tunis Bros.*, 952

F.2d at 728.  Here, however, Plaintiffs' rule of reason claim fails for failure to articulate the

connection between their allegedly artificially low ONET benefit and a restraint on trade, much

less an unreasonable one.  As discussed, Plaintiffs have not complained that a two-tiered benefits

structure which favors in-network providers is anticompetitive.  Unlike *McCready*, where the

anticompetitive scheme of excluding psychologists from a segment of the psychotherapy market

was effected by denying benefits to plan subscribers, Plaintiffs' injury – a reduced ONET benefit

– is neither the means nor the result of a scheme to make providers in the "ONET services

market" less competitive with in-network providers.[22]  Nor, for the reasons discussed above, does the Complaint plead facts which might plausibly establish that Plaintiffs' alleged injury of receiving an artificially reduced ONET benefit flows from the existence of a sole UCR database. Rather, the facts connect the injury with the alleged fraud concerning UCR data.

In other words, the injury of which Plaintiffs complain – receiving a lower ONET benefit than they would have had accurate prevailing fee schedules been employed by CIGNA – is not one which flows from Defendants' alleged efforts to reduce competition.  Subscriber Plaintiffs have failed to plead any plausible antitrust injury.  Therefore, their Sherman Act section 1 claim will be dismissed.

---

[22] The Court further notes an additional problem with Plaintiffs' rule of reason claim.  As Defendants have argued, there is no indication that there is a separate market for "ONET services." Indeed, recognizing that market definition often depends upon a fact-sensitive inquiry, the Third Circuit has held that a plaintiff is not thereby relieved of his burden to plead a relevant product market in the complaint.  *Queen City Pizza, Inc.*, 124 F.3d at 436.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  In other words, a product market consists of "those commodities reasonably interchangeable by consumers for the same purposes."  *Tunis Bros.*, 952 F.2d at 722 (quoting *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Factors bearing on reasonable interchangeability and cross-elasticity include price, use and qualities.  *Id.*  In this case, the Complaints fail to identify what interchangeable products or services the so-called "ONET Services Market" comprises.  There is no allegation, nor can any reasonable inference be drawn, that a provider who is ONET for one insurance company is also ONET for all other insurance companies.  Under Third Circuit precedent, the Court need not, and will not credit Plaintiffs' conclusory assertions that such a market exists.  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza, Inc.*, 124 F.3d at 436.  If Plaintiffs have attempted to plead an "ONET Services Market" where competition has been restrained by the manipulation of UCR (and relatedly ONET benefits), that effort fails as legally insufficient under *Twombly* and *Queen City Pizza*.

## VI.   VARIOUS STATE LAW CLAIMS

### A.   Chazen's Claim for Violation of New Jersey Regulation Concerning Small Employer Health Plans

Chazen asserts a separate claim in the CAC on behalf of New Jersey members of health plans with 50 or fewer members to recover unpaid benefits.  He claims that he, and other small employer plan members, are entitled to unpaid benefits on the basis that CIGNA allegedly violated a New Jersey regulation which requires that "small employer carriers pay covered charges for medical services, using either the allowed charges or actual charges." *N.J.A.C.* § 11:21-7.13. (The Court will refer to this regulation as the "Small Employer Health Plan Regulation" or "SEHP Regulation.") CIGNA raises a number of arguments for dismissal of this claim, including ERISA preemption.  *See* 29 U.S.C. § 1144(a) (ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.").  Chazen counters that the regulation is valid according to ERISA's savings clause, which in relevant part excepts from preemption all state laws relating to the regulation insurance.  *See* 29 U.S.C. § 1144(b)(2)(A).

The Court, however, need not address the parties' preemption argument.  Regardless of whether the regulation falls within ERISA's savings clause or not, it is clear that neither the statutory nor regulatory scheme governing Small Employer Health Plans authorize plan members to bring a private cause of action seeking redress for the violation claimed by Chazen.  The only statutory provision Chazen raises in support of his right to sue is, to put it bluntly, completely inapplicable.  The provision cited vests the Board of Directors of the New Jersey SEHP Program with the power to "sue and be sued, including taking any legal actions as may be necessary for recovery of any assessments due to the program or to avoid paying improper claims." *N.J.S.A.*

17B:27A-32(b).  Without any legal authority whatsoever, Plaintiffs assert that the New Jersey legislature must have intended "eligible employees" be empowered to enforce their rights, in particular through civil legal remedy because "access to the courts is the most effective means to redress deprivations" relating to heath insurance benefits.  (Pl. Br. at 49.)  Plaintiffs' conjecture does not create a cause of action.

Accordingly, Chazen's claim to recover plan benefits as redress for CIGNA's alleged violation of the SEHP Regulation will be dismissed for failure to state a claim upon which relief may be granted.

### B.      ERISA Preemption of Certain State Law Claims in the Nelson Complaint

ERISA expressly preempts all state laws insofar as they "relate to" employee benefit plans. 29 U.S.C. § 1144(a).  The scope of the preemption provision is broad.  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987).  A "state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'"  *Id.*  The Supreme Court has held that the preemption provision applies to bar all claims which assert the improper processing of claims under ERISA-regulated plans.  *Id.* at 57

The Nelson Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing and violation of California's Unfair and Deceptive Trade Practices Act seek redress for CIGNA's alleged underpayment of ONET benefits under their health plans. These claims clearly "relate to" the Nelson Plaintiffs' ERISA-regulated health plans, as they are premised on the allegation that CIGNA's reimbursement determinations for the ONET services sought by the Nelson Plaintiffs were contrary to CIGNA's obligations under the plans.  In spite of

their arguments that it is premature to dismiss claims based on ERISA preemption where the

status of the named defendant as a proper ERISA defendant has been challenged, the Nelson

Plaintiffs raise no issue that would call the applicability of ERISA into question.  Their complaint

clearly alleges throughout that their CIGNA plan is governed by ERISA.  The identity of the

proper defendant does not bear on the nature of the health plan at issue or the fact that the plan,

and any claim for benefits owed thereunder, fall within the purview of ERISA.

Accordingly, the Court will dismiss the Nelson Complaint's claims for breach of contract,

breach of the implied covenant of good faith and fair dealing and violation of California's Unfair

and Deceptive Trade Practices Act as preempted by 29 U.S.C. § 1144(a).

### C.    Nelson Plaintiffs' Cartwright Act Claim

The Cartwright Act "is California's version of the federal Sherman Act and sets forth

California's antitrust laws."  *Lorenzo v. Qualcomm Inc.*, 603 F.Supp.2d 1291, 1302 (S.D. Cal.

2009).  Like its federal counterpart, the Cartwright Act requires that a plaintiff establish the

existence of a conspiracy to restrain trade.  *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709,

720 (Cal. Ct. App. 1982) (citing Cal. Bus. & Prof. Code, § 16720). Although the Cartwright Act

differs from the Sherman Act in that it does not categorically bar indirect purchasers from seeking

monetary relief, it is nevertheless patterned on the Sherman Act.  *Id.*   Thus, the Ninth Circuit has

observed that Cartwright Act claims raise the same issues as  Sherman Act claims and that

California courts follow the federal cases in deciding claims under the Cartwright Act.

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 n.4 (9th Cir. 1988); *see also Lorenzo*, 603

F.Supp.2d at 1302 (holding same).  The Nelson Complaint offers the same factual predicate for its

Cartwright Act claim as it does for its Sherman Act § 1 claim.  It alleges that CIGNA,

UnitedHealth, Ingenix and others conspired to fix UCRs, with the aim of capping ONET

reimbursement rates and underpaying ONET claims made by insureds.   For the reasons expressed

in this Court's analysis of the federal antitrust claim, the Nelson Plaintiffs have failed to plead a

plausible conspiracy to restrain trade, rendering the Cartwright Act claim deficient under Rule

8(a).  Accordingly, the claim will be dismissed.

      **D.**     **Nelson Plaintiffs' Common Law Conspiracy Claim**

The Nelson Complaint also seeks relief under the common law theory of conspiracy.  In

the absence of a choice of law issue, which the Court notes the parties have not raised, the Court

will apply the substantive law of the forum state to the determine the adequacy of the conspiracy

claim.  *Chin v. Chrysler*, 538 F3d 272, 278 (3d Cir. 2008). "In New Jersey, a civil conspiracy is 'a

combination of two or more persons acting in concert to commit an unlawful act, or to commit a

lawful act by unlawful means, the principal element of which is an agreement between the parties

to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Banco*

*Popular N. Am. v. Gandi*, 184 N.J. 161, 179 (2005) (quoting *Morgan v. Union County Bd. of*

*Chosen Freeholders*, 268 N.J.Super. 337, 364 (App.Div.1993), *certif. denied*, 135 N.J. 468

(1994).  The Court will permit the Nelson Plaintiffs to proceed with their state law civil

conspiracy claim.  Although their RICO claim failed for lack of statutory standing, the Nelson

Plaintiffs have pled similar factual allegations to those in the CAC regarding a combination

between CIGNA and Ingenix acting together for the purpose of defrauding CIGNA insureds with

regard to their ONET benefits.  Those factual allegations, discussed in more depth above in

Section IV, suffice to plead a plausible common law conspiracy claim.   Defendants' motion will

therefore be denied insofar as it concerns the Nelson Plaintiffs' civil conspiracy claim.[23]

### E.        Partial Dismissal of Nelson Plaintiffs' Claims as Time-Barred

The Court notes for purposes of completeness that Defendants have argued that, apart

from their substantive defects, all of the Nelson Plaintiffs' claims are time-barred to an extent.   In

particular, Defendants point out that the Nelson Complaint asserts claims dating back to January

1, 1999, the beginning of the purported class period, even though the Nelson Complaint was not

filed until March 3, 2010.   The applicable limitations periods, Defendants state in their papers,

range generally from two to four years depending on the claim.   They ask that the Court dismiss

all claims arising outside of the limitations period.

The Court, however, declines at this procedural juncture to dispose of the claims as time-

barred.   The Third Circuit generally disfavors granting a Rule 12(b)(6) dismissal based on a

statute of limitations defense because of the factual questions often raised by the defense.   *So.*

*Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 425 (3d Cir.

1999).   It has held that "[w]hen the applicability of the statute of limitations is in dispute, there

are usually factual questions as to when a plaintiff discovered or should have discovered the

elements of its cause of action, and thus 'defendants bear a heavy burden in seeking to establish as

a matter of law that the challenged claims are barred.'"   *Id.* (quoting *Van Buskirk v. Carey*

*Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir.1985); *see also Bethel v. Jendoco Const. Corp.*,

---

[23] Defendants have not argued that the common law conspiracy claim should be dismissed on ERISA preemption grounds.   As the parties have not raised this argument, the Court does not consider it in this Opinion.

570 F.2d 1168, 1174 (3d Cir. 1978) (holding that time bar must be apparent on fact of the

complaint to constitute grounds for dismissal under Rule 12(b)(6)). The Nelson Plaintiffs raise

tolling and fraudulent concealment arguments in opposition to the partial dismissal of their

claims.  The Court cannot conclude, based on the face of the Nelson Complaint, that some portion

of their otherwise viable claims (per the foregoing discussion) must be dismissed as time-barred.

The Court will deny dismissal based on statute of limitations, without prejudice to a renewed

presentation of this argument on a motion for summary judgment.

### F.    North Peninsula's Claim Under California's Unfair Competition Law

North Peninsula's Complaint also pleads for relief under California's unfair competition

law, California Business & Professions Code § 17200, *et seq.*, (hereinafter the "UCL") on behalf

of two subclasses: (1) Non-physician Nonpars located in California who were assigned benefits

from a CIGNA healthcare plan (the "California Subclass") and (2) Non-physician Nonpars located

in California who were assigned benefits from a CIGNA healthcare plan not subject to ERISA

(the "California Non-ERISA Subclass").  Both subclasses base their UCL claim on CIGNA's

having paid less than the providers' billed charges for ONET Services rendered to CIGNA

insureds.  The harm to providers in the California Subclass and California Non-ERISA Subclass

lies, in other words, in the underpayment of ONET benefits which their patients were allegedly

owed under the patients' CIGNA healthcare plans.

A California unfair competition claim can only be brought by a plaintiff that "has suffered

injury in fact and has lost money or property as a result of the unfair competition."  Cal. Bus. &

Prof. Code § 17204.  The North Peninsula Complaint makes clear that North Peninsula and the

class of Nonpars it claims to represent have the right, however, to collect their billed charges from patients, notwithstanding CIGNA's denial of the patient's ONET claim.  It states: "Whether or not the health plan honors the full assignment and pays the out-of-network benefit amount to the non-physician provider, out-of-network providers are entitled to bill the patient for the amount of the charge which exceeds the amount the health plan covers.  Patients remain liable to the provider for these unpaid balances."  (North Peninsula Compl. ¶ 3.)  In light of this entitlement, North Peninsula has not plausibly pled that it has lost money or property as a result of CIGNA's alleged misconduct, which revolves around the underpayment of ONET benefits.  Though North Peninsula contends, in its brief in opposition to the motion to dismiss, that it has sustained its own, unique injury as a result of the "improper payment of benefits," North Peninsula does not cite any factual allegation expressing what that injury might be.  (*See* North Peninsula Op. Br. at 9.)  Any purported right of North Peninsula and the two California sub-classes to sue CIGNA for the unpaid portions of billed charges would exist solely by virtue of the assignment of rights from patient-insureds to providers.  The Supreme Court of California has held that "an injured [person]'s assignment of rights cannot confer standing on an uninjured assignee" to sue under the UCL.  *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal.4th 993, 1002 (Cal. 2009).

        Accordingly, the UCL claim asserted in the North Peninsula Complaint fails to state a claim upon which relief may be granted and will accordingly be dismissed.

## CONCLUSION

The Court has reached a number of conclusions with respect to the three complaints whose sufficiency has been challenged in the instant motions to dismiss.  The North Peninsula Complaint will be dismissed in its entirety.  The CAC, which asserts federal claims by Subscriber Plaintiffs, Provider Plaintiffs and Association Plaintiffs, will survive CIGNA's motion to dismiss, albeit in a substantially pared down form.  All claims in the CAC asserted by Provider Plaintiffs and Association Plaintiffs will be dismissed under Rule 12(b)(6) for lack of standing.  Subscriber Plaintiffs Franco and Chazen will be permitted to pursue their ERISA § 502(a)(1)(B) claims to recover unpaid benefits as well as their claims for relief under RICO predicated on mail and wire fraud.  The remainder of their claims in the CAC will be dismissed.  As to the Nelson Complaint, only the ERISA § 502(a)(1)(B) claim and the common law conspiracy claim withstand the motions to dismiss brought by CIGNA, UnitedHealth and Ingenix.  The remainder of the claims pled in the Nelson Complaint will be dismissed for failure to state a claim upon which relief may be granted.

An appropriate form of Order will be filed together with this Opinion.


  s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge


DATED: September 23, 2011

82